# Exhibit A

EFiled: Nov 23 2022 01:22PM EST
Transaction ID 68430616
Case No. K22C-11-031 RLG

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GAVIN J. BIRNEY; DELAWARE   :
STATE SPORTSMEN'S   :
ASSOCIATION, INC. and   :
BRIDGEVILLE RIFLE & PISTOL   :
CLUB, LTD.,   :
   :
       Plaintiffs,   :
   :   C.A. No.
   v.   :
   :
DELAWARE DEPARTMENT OF   :
SAFETY AND HOMELAND   :
SECURITY; NATHANIEL   :
MCQUEEN JR. in his official   :
capacity as Cabinet Secretary,   :
Delaware Department of Safety and   :
Homeland Security; and COL.   :
MELISSA ZEBLEY in her official   :
capacity as superintendent of the   :
Delaware State Police,   :
   :
       Defendants.   :

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs Gavin J. Birney; Delaware State Sportsmen's Association ("DSSA"); and Bridgeville Rifle and Pistol Club, Ltd. ("BRPC") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this complaint against Defendants, Delaware Department of Safety and Homeland Security; Secretary Nathanial McQueen Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley as the top law enforcement officer at the Delaware State Police, all of whom are Delaware state officials

responsible for enforcing and implementing Delaware's laws and regulations infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family, and for other lawful purposes, and allege as follows:

## **INTRODUCTION**

1. The United States Supreme Court and a unanimous Delaware Supreme Court have recognized that the fundamental right to self-defense includes the right to keep and bear firearms both inside and outside the home. In defiance of this established and unassailable authority, the Delaware General Assembly recently enacted into law House Bill 451 ("HB 451"[1]) which flouts the fundamental civil rights of Delawareans, particularly those 18 years-old through 20 years-old, by making them criminals–felons–for exercising one of their most exalted rights enshrined in both the Delaware Constitution and the United States Constitution.[2]

2. The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const., amend. II. Under the Second Amendment, Plaintiffs Birney, DSSA (and its members), and BRPC (and its members) are all similarly situated individuals who are legally eligible to

---

[1] "HB 451" refers to 11 *Del. C.* §§ 1445, 1448 as well as provisions in HB 451. HB 451 is attached hereto as Exhibit "A."

[2] "The constitutional right to keep and bear arms is enshrined in the Bill of Rights as among the most important "civil rights" of citizens." *McDonald v. City of Chicago*, 561 U.S. 742, 774-75 (2010).

possess and acquire firearms and have a fundamental constitutionally-guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

3. Article I, Section 20 of the Delaware Constitution affords even broader protections than the United States Constitution does, providing that: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." DEL. CONST., art. I, § 20; *see Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014) ("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation.").

4. Pursuant to 1 *Del. C.* § 701, "[a] person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." This statute was in effect when Article I, Section 20 became part of the Delaware Constitution in 1987.

5. Therefore, Plaintiffs bring this complaint to challenge HB 451 as violative of the Second Amendment of the United States Constitution and Article I, Section 20 of the Delaware Constitution.

3

## **Delaware Criminalizes Lawful Behavior by Law-Abiding Citizens**

6. When HB 451 was signed into law on June 30, 2022, the State of Delaware criminalized the purchase and ownership of common firearms used by law abiding citizens, 18 years-old through 20 years-old, for lawful purposes—labeling them as "deadly weapons"—and making it a felony for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C*. § 1448 (a)(5) (2022).

7. The State's limited exceptions to these broad criminal statutes do not allow typical law-abiding citizens 18 years-old through 20 years-old to keep and bear common firearms for lawful purposes. *See* 11 *Del. C.* §§ 1448 (5)(a)(1)-(3),  1448 (5)(b)(1)-(3).

8.   The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny thousands of individuals who reside in Delaware, including Plaintiffs and their members, and others like them, their fundamental, individual right to keep and bear common arms due to HB 451.

9. Plaintiffs seek declaratory and injunctive relief not only on the basis that HB 451 violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution, but also because HB 451 violates their rights under the Delaware

Constitution at Article I, Section 20; and their right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution.[3]

## Key Authorities

10. HB 451 relies upon laws and court precedent formulated before the U.S. Supreme Court's recent landmark decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. _, 142 S.Ct. 2111 (2022).

11. In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (*citing Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

12. The Supreme Court, thus, reinforced the approach to assessing a Second Amendment challenge it had established in *District of Columbia v. Heller*, 554 U.S. 570 (2008). That approach requires only: (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right. *Id*.

---

[3] DSSA and BRPC have also filed suit in Federal Court to challenge other unconstitutional statutes passed at the same time as HB 451. *See* Amended Complaint challenging HB 450 and SS1 for SB 6, attached hereto as Exhibit "B."

5

13. In so doing, the *Bruen* court repudiated the "means-end" scrutiny to restrictions upon fundamental Second Amendment rights that had developed in Circuit Courts following *Heller*. HB 451 draws its inspiration from exactly those types of flawed, now repudiated restrictions.

14. Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has begun to crumble in the decision's wake. HB 451 is no different.

15. In fact, even before *Bruen*, courts have struck down statutes, similar to HB 451, restricting fundamental Second Amendment rights based upon age restrictions.

16. In *Jones v. Bonta*, Civ. No. 20-56174, 2022 WL 1485187 (9th Cir. 2022), the Ninth Circuit Court of Appeals reversed the district court and granted a preliminary injunction in favor of plaintiffs ages 18 years-old through 20 years-old who were restricted, by California statute, from purchasing semi-automatic weapons.[4]

17. The Ninth Circuit reached this decision applying intermediate scrutiny, prior to *Bruen*, and therefore ruled in favor of plaintiffs under a more oppressive standard than the instant Plaintiffs face in the instant challenge

---

[4] This decision has since been vacated for further review by the District Court, in light of *Bruen*.

18. Importantly, now post-*Bruen*, the government undoubtedly has the burden of proof to establish that it has not infringed on the constitutional right to keep and bear arms. *Rigby v. Jennings*, No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375, at *16 n.13 (D. Del. Sep. 23, 2022)

## JURISDICTION

19. This Court has jurisdiction to issue a declaratory judgment under 10 *Del. C.* §§ 6501, *et seq.*

20. This Court has personal jurisdiction over Defendants because Cabinet Secretary McQueen and Col. Zebley are officials working for the State of Delaware, and the Delaware Department of Safety and Homeland Security is a state agency.

## PARTIES

21. Plaintiff Gavin J. Birney is a natural person, a resident of Sussex County, Delaware, an 18 year-old adult, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Birney is a member of DSSA and BRPC.

22. Plaintiff DSSA is a Delaware corporation with a principal place of business in Sussex County, Delaware. DSSA was founded in 1968 as the official State-level affiliate of the National Rifle Association of America, and its membership currently consists of approximately 4,500 individual members, including members

between the ages of 18 years-old and 20 years-old, and constituent clubs. DSSA's prime purpose is to preserve, protect and defend the constitutional rights of its members and to support the rights of the people of the State of Delaware to keep and bear arms for lawful purposes. DSSA brings this action on behalf of itself and its members, including Birney, in order to protect and defend the constitutional rights of its members and of itself.

23. Plaintiff BRPC is a Delaware corporation with a principal place of business in Sussex County, Delaware. BRPC was formed in the early 1950s by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual members and their families, including members 18 years-old through 20 years-old, residing in Delaware, Maryland, Pennsylvania, Virginia, New Jersey, and other states. BRPC serves as a competitive shooting club that conducts education, training and competitive shooting events drawing competitors and participants throughout the United States. BRPC brings this action on behalf of itself and its members, including Birney, in order to protect the rights of its members and to protect BRPC's ability to continue to engage in competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

8

24. Defendant Delaware Department of Safety and Homeland Security is a department within the State of Delaware that oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including HB 451. Defendant Delaware Department of Safety and Homeland Security's enforcement of HB 451's ban on "deadly weapons" against Delaware residents, 18 years-old through 20 years-old, places Plaintiff, Birney, under imminent threat of arrest and/or prosecution should he violate HB 451, which leaves him unable to keep common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

25. Defendant Nathanial McQueen Jr. is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security for the State of Delaware. Suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security. In such capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including HB 451. Defendant McQueen's ongoing enforcement of HB 451's ban on "deadly weapons" against Delaware residents ages 18 years-old through 20 years-old places Plaintiffs under imminent threat of arrest and/or prosecution should they violate HB 451, which leaves them unable to keep common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

9

26. Defendant Col. Melissa Zebley is the Superintendent of the Delaware State Police. Suit is brought against Defendant Zebley in her official capacity as Superintendent of the Delaware State Police. In such capacity Defendant Zebley executes and administers the State's laws, including HB 451. Defendant Zebley's ongoing enforcement of HB 451's ban on "deadly weapons" against Delaware residents ages of 18 years-old through 20 years-old places Plaintiffs under imminent threat of arrest and/or prosecution should they violate HB 451, which leaves them unable to keep common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

## FACTUAL ALLEGATIONS

### I.  DELAWARE'S UNCONSTITUTIONAL HB 451

27. The State of Delaware bans Delawareans, 18 years-old through 20 years-old, from purchasing and owning common firearms labeled "deadly weapons" pursuant to HB 451.

28. This broad ban on purchasing and owning any firearm  labeled as a "deadly weapon" applies to every Delawarean 18 years-old through 20 years-old who does not fall into one of a few narrow categories: primarily on-duty military personnel, law enforcement officers, and certain persons licensed to carry a concealed deadly weapon. 11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).

29.   If an ordinary, law-abiding citizen 18 years-old through 20 years-old keeps or bears a "deadly weapon" as defined by HB 451 they commit either an unclassified misdemeanor, a Class E felony offense or a Class G felony offense and are subject to severe criminal sanctions, including imprisonment for up to five years for the first offense. 11 *Del. C.* §§ 4205, 1445 (c). Further, under both state and federal law, conviction under these provisions would result in a lifetime ban on possession of firearms. 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[5]

## II.   FIREARMS IN COMMON USE

30.  Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), HB 451 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home. *Id.* at 628-629.

31.  HB 451 bans Delawareans 18 years-old through 20 years-old from purchasing or owning firearms labeled "deadly weapons."

32.  Specifically, HB 451 provides that "[e]xcept as otherwise provided, "[a]ny person under the age of 21" is "prohibited from purchasing, owning, possessing, or

---

[5] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10 § 4509(b)(6)(jury).

controlling a deadly weapon or ammunition for a firearm within the State." 11 *Del. C.* § 1448(a)(5).

33.  While not specifically incorporated into HB 451, "deadly weapon," is defined in the Delaware Criminal Code as:

> "…a "firearm", as defined in paragraph (12) of this section, a bomb, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick or any "dangerous instrument", as defined in paragraph (4) of this section, which is used, or attempted to be used, to cause death or serious physical injury. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length."

11 *Del. C.* § 222(a)(6)

34.  In turn, a "firearm" is defined as including "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded. It does not include a BB gun." 11 *Del. C.* § 222(a)(13).

35.  HB 451 further identifies a limited subset of firearms that do not qualify as "deadly weapons" exempting the following from its ban:

a.  A shotgun as defined in § 1444(c) of this title or ammunition for a shotgun;

b.  A muzzle-loading rifle as defined in § 704(f) of Title 7;

c.  Deadly weapons other than firearms if the person is 18 years of age or older.

   11 *Del. C.* § 1448 (a)(5)(a)(1)-(3).

36. HB 451 also identifies a limited subset of individuals to which HB 451 does not apply, as follows:

a. An active member of the Armed Forces of the United States or the National Guard;

b. A qualified law-enforcement officer as defined in § 1441A of this title;

c. A person who has license to carry a concealed deadly weapon pursuant to § 1441 of this title. 11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).

37. HB 451 further provides "[p]aragraph (a)(5) of this section [§ 1448] does not apply to the possession or control of a firearm by a person 18 years of age or older." 11 *Del. C.* § 1448 (a)(5)(e).

38. Therefore, HB 451 bans any law-abiding Delawarean, 18 years-old through 20 years-old, who does not possess a concealed carry license, from purchasing or owning a firearm deemed a "deadly weapon."[6]

39. Handguns and/or pistols banned from purchase and/or ownership by HB 451 are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)); *see also*, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1269 (D.C. Cir.

---

[6] It is noted that HB 451 is not a model of clarity, requiring reference to and application of often inapposite statutes to derive the final set of individuals who are subject to this new outright ban from purchasing or owning commonly owned and used firearms. *See* Explanation of the HB 451 Ban, attached hereto as Exhibit "C."

2011)(Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semi-automatic—….have not traditionally been banned and are in common use by law-abiding citizens.").

40. Because HB 451 presumably also bans purchase and/or ownership of certain rifles and/or long guns, it is noted that "[n]ationally, modern rifles are ubiquitous ... In 2018 it was reported that 909,330 Ford F-150s were sold. Twice as many modern rifles were sold the same year." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal, 2021). A 2022 study by the National Shooting Sports Foundation, the firearm industry trade association, estimated 24,446,000 Modern Sporting Rifles to be in circulation in the United States since 1990. That is an increase of over 4.5 million rifles since the last estimate was released in 2020 and far exceeds the 16,100,000 F-150 trucks estimated to be on the road. https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/

41. Handguns and long guns banned from purchase and/or ownership by HB 451 aid home defense.

42. Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on

the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property.

43.  HB 451 harms law-abiding citizens, not criminals.

44.  HB 451's prohibition against Delawareans 18 years-old through 20 years-old  purchasing and/or owning firearms labeled as "deadly weapons" effectively bans the acquisition of firearms that are commonly used for  lawful purposes, including self-defense in the home.

### III.   THE UNCONSTITUTIONAL LICENSING PROCESS

45.  The State of Delaware, through HB 451, further imposes vague and unconstitutional requirements upon Delawareans 18 years-old through 20 years-old that further serves to impose unconstitutional licensing requirements upon ordinary, law-abiding citizens, including Plaintiffs.

46.  The State of Delaware purports to create an "exception" to HB 451's ban to the extent that HB 451 does not apply to "[a] person who has a license to carry a concealed deadly weapon pursuant to § 1441 of this title." 11 *Del. C.* § 1448 (a)(5)(b)(3).

47.  However, this "exception" requires prospective permit holders to comply with an extremely vague, arbitrary and burdensome registration and licensing process.

48.  The permit that provides a purported "exception" to HB 451 is open to "[a] person of full age[7] and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the protection of the person's property," and requires prospective permit holders to strictly comply with the following conditions:

> "(1) The person shall make application therefor in writing and file the same with the Prothonotary of the proper county, at least 15 days before the then next term of the Superior Court, clearly stating that the person is of full age and that the person is desirous of being licensed to carry a concealed deadly weapon for personal protection or protection of the person's property, or both, and also stating the person's residence and occupation. The person shall submit together with such application all information necessary to conduct a criminal history background check. The Superior Court may conduct a criminal history background check pursuant to the procedures set forth in Chapter 85 of Title 11 for the purposes of licensing any person pursuant to this section.
>
> (2) At the same time the person shall file, with the Prothonotary, a certificate of 5 respectable citizens of the county in which the applicant resides at the time of filing the application. The certificate shall clearly state that the applicant is a person of full age, sobriety and good moral character, that the applicant bears a good reputation for peace and good order in the community in which the applicant resides, and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the

---

[7] Pursuant to 1 *Del. C.* § 701, "[a] person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." This statutory right should apply with greater force to constitutional rights in Article I, Section 20 of the Delaware Constitution, which post-dated the statutory recognition of adult-rights for 18 year-olds.

applicant's property, or both. The certificate shall be signed with the proper signatures and in the proper handwriting of each such respectable citizen.

(3) Every such applicant shall file in the office of the Prothonotary of the proper county the application verified by oath or affirmation in writing taken before an officer authorized by the laws of this State to administer the same, and shall under such verification state that the applicant's certificate and recommendation were read to or by the signers thereof and that the signatures thereto are in the proper and genuine handwriting of each. Prior to the issuance of an initial license the person shall also file with the Prothonotary a notarized certificate signed by an instructor or authorized representative of a sponsoring agency, school, organization or institution certifying that the applicant: (i) has completed a firearms training course which contains at least the below-described minimum elements; and (ii) is sponsored by a federal, state, county or municipal law enforcement agency, a college, a nationally recognized organization that customarily offers firearms training, or a firearms training school with instructors certified by a nationally recognized organization that customarily offers firearms training. The firearms training course shall include the following elements:

    a. Instruction regarding knowledge and safe handling of firearms;

    b. Instruction regarding safe storage of firearms and child safety;

    c. Instruction regarding knowledge and safe handling of ammunition;

    d. Instruction regarding safe storage of ammunition and child safety;

    e. Instruction regarding safe firearms shooting fundamentals;

    f. Live fire shooting exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition;

g. Identification of ways to develop and maintain firearm shooting skills;

h. Instruction regarding federal and state laws pertaining to the lawful purchase, ownership, transportation, use and possession of firearms;

i. Instruction regarding the laws of this State pertaining to the use of deadly force for self-defense; and

j. Instruction regarding techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution.

(4) At the time the application is filed, the applicant shall pay a fee of $65 to the Prothonotary issuing the same…

(b) The Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county. In making such publication it shall be sufficient for the Prothonotary to do the same as a list in alphabetical form stating therein simply the name and residence of each applicant respectively.

(c) The Prothonotary of the county in which the application for license is made shall lay before the Superior Court, at its then next term, all applications for licenses, together with the certificate and recommendation accompanying the same, filed in the Prothonotary's office, on the first day of such application.

(d) The Court may or may not, in its discretion, approve any application, and in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose…" 11 *Del. C.* § 1441.

49. HB 451 thus overextends an already vague, arbitrary and burdensome licensing process, originally designed for public carry, to the right to mere purchase and/or ownership of firearms.

50. HB 451's unconstitutional licensing process reduces fundamental rights to mere privileges to be granted or denied at the whim of public officials and private individuals, accountable to no one, to whom the State of Delaware has impermissibly delegated the authority to review and publish applicants.

51. HB 451's unconstitutional licensing process conditions the grant of what is a fundamental right of all citizens upon vague, arbitrary, and discretionary requirements such as proof of "good moral character." *Bruen*, 142 S. Ct. 2111 at 2135 n.1 (noting with disapproval states with licensing schemes that give officials discretion to deny licenses based on a perceived lack of suitability).

52. HB 451's unconstitutional licensing process is arbitrary, discretionary, lengthy, expensive, invasive and completely unnecessary. Every firearm purchaser must already pass a background check under federal law which the federal government has streamlined via computer to take place in mere minutes. *See*, *Bruen*, 142 S. Ct. 2111 at 2138 n.9, (declining to rule out constitutional challenges to licensing regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.)

53.  Ordinary, law-abiding Delawareans ages 18 years-old through 20 years-old are completely barred from purchase and/or ownership of common firearms—mislabeled as "deadly weapons" prior to applying to and participating in  HB 451's unconstitutional registration and licensing process.

54.  The licensing process imposed by HB 451 heavily discriminates against and acts as a complete barrier to the acquisition of commonly used firearms by the poor or disadvantaged citizens of State of Delaware, who live in urban areas, where access to a public shooting range is effectively non-existent and where the licensing process is costly. The underlying intent and practical effect of these requirements is the disenfranchisement of Second Amendment rights for the poor and disadvantaged. These and the other requirements imposed by the registration and licensing process of the Regulatory Scheme form undue and effective practical barriers to the exercise of fundamental constitutional rights preserved by the Second Amendment.[8]

---

[8] An overtly racist history of gun licensing and registration laws has been evident since around the time of America's founding. The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823). An exception was provided, however, for "negroes, mullattos, or Indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.* Delaware, in its early history, like many states, used laws to restrict the use of firearms as a means of racial discrimination. *Laws of the State of Delaware*, Chapter 94, Vol. 12, March

### IV.    THE NATION'S LONG HISTORY OF ENSURING THE RIGHTS OF 18 THROUGH 20 YEAR-OLD CITIZENS TO BEAR ARMS

55.   The tradition of young adults owning, keeping and bearing arms is deep-rooted in our law and custom. As far back as medieval times, able-bodied men aged fifteen and older were compelled to own and possess personal arms and had a duty, when asked, to use those personal arms to maintain the king's peace and protect their communities and property. *See* David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 788 (2014).

56.   "[T]he militia from its obscure origin in Saxon times has been composed of all subjects and citizens capable of bearing arms, regardless of age or parental authority." S.T. Ansell, *Legal and Historical Aspects of the Militia*, 26 Yale L.J. 471, 473 (1917).

57.   And the militia was not the only institution imposing an obligation to acquire and possess arms: "[u]nder English law originating long before the Norman Conquest of 1066, all able-bodied men were obliged to join in the

---

6, 1861, at Section 7 (prohibiting free blacks from possessing guns); Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? at 233 (2021); Stephen B. Tahmassebi, *Gun Control and Racism*, 2 Civil Rights Law Journal 67 (1991) (describing history of gun control coinciding with oppression of blacks); *First Conviction under Weapon Law; Judge Foster gives Marino Rossi One Year for Arming himself*…" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting Italian immigrants to restrict their Second Amendment rights.)

hutesium et clamor (hue and cry) to pursue fleeing criminals." Kopel, *supra* n.8, at 771–72.

58. More generally, sheriffs, coroners, and magistrates could "summon all able-bodied males to assist in keeping the peace," *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L. J. 495, 535 (2019) and the traditional minimum age for these law-enforcement duties was typically 15 or 16 years old. Kopel, *supra* n.6, at 788, 790.

59. For example, at common law, the sheriff could command citizens—already armed—to help suppress riots, arrest criminals, and otherwise enforce civil processes. *Id*. at 792.

60. This deep-rooted tradition was brought across the Atlantic by the American colonists. The U.S. Supreme Court in *Heller* confirmed that the "militia" in colonial America consisted of "a subset of 'the people'—those who were male, able bodied, and within a certain age range." 554 U.S. at 580, 128 S.Ct. 2783

61. Before ratification, when militias were solely defined by state law, most colonies and states set the age for militia enlistment at 16.

62. Every colony passed, at some point, laws identifying 18 year-olds as persons required to own and possess arms.

63. Delaware did not enact a militia statute until 1740. It required "all the inhabitants and freemen" aged fifteen to sixty-three to "provide and keep . . . a

well-fixed firelock or musket," plus ammunition supplies and cleaning tools. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, at 556.

64.   Delaware's pre-Revolutionary militia acts recognized owning, keeping and bearing arms as a right and a duty, requiring each male to "provide himself" with a firearm and "to keep such Arms and Ammunition by him." *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 171.[9]

65.   After the Revolution began, Delaware enacted several militia statutes in 1778. The foundational act "establishing a Militia within this State" included "each and every able-bodied, effective, Male white Person between the Ages of Eighteen and Fifty." *Id*.

66.   Like most states, Delaware enacted a new militia law after the federal Uniform Militia Act passed in 1792. Delaware's 1793 act included "each and every free able bodied white male citizen of this state, who is or shall be of the age of eighteen years, and under the age of forty-five years." *Id*. at 558.

---

[9] As an example, for security against pirates, "all the Inhabitants and Freemen" of the seaport of Lewes were obliged to meet armed on the sound of the alarm. *Id*. at 152.

67.  That federal legislation, The Militia Act of 1792 (Uniform Militia Act) was signed into law by President Washington on May 8, 1792. 1 Stat. 271 (1792) (Uniform Militia Act) (UMA). The Act provided:

> "That each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia, by the Captain or Commanding Officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this Act. And it shall at all time hereafter be the duty of every such Captain or Commanding Officer of a company, to enroll every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of 18 years, or being at the age of 18 years, and under the age of 45 years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrollment, by the proper noncommissioned Officer of the company, by whom such notice may be proved. That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powderhorn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned Officers shall severally be armed with a sword or hanger, and espontoon; and that from and after five years from the passing of this Act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound; and every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the

24

same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes." *Id.* [10]

68. Congress made no changes to the 1792 Militia Act until the Civil War, when an 1862 revision removed the word "white" from the definition of the militia. Militia Act of 1862, 12 Stat. 597 (July 17, 1862)

69. The 1792 Act was not repealed and replaced until 1903, whereupon the Dick Act took its place, defining the modern militia as consisting of all-able-bodied male citizens between 18 and 45 years of age, and also aliens who have declared intent to naturalize. Dick Act, ch. 196, 32 Stat. 775 (1903).

70. Further, in 1972, Delaware passed legislation confirming that 18 year-olds are adults under the law of Delaware, stating, "[a] person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." 1 *Del. C.* § 701,

71. In *Heller*, the Supreme Court made clear that "the people" protected by the Second Amendment was not restricted to only those in "the militia," however the

---

[10] George Washington believed that 18 was the ideal age for militia enrollment. Nearly a decade before he signed the Militia Act of 1792, he wrote to Alexander Hamilton that, "the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

Court also explicitly confirmed that "the militia" consisted of a subset of "the people" with Second Amendment rights. *Id*. at 651.

72. Further, the Delaware Supreme Court, in *Bridgeville Rifle & Pistol Club, Ltd*. *v. Small*, 176 A.3d 632, 642 (Del. 2017), specifically endorsed the above *Heller* interpretation.

73. By both endorsing *Heller* and holding that Article I, Section 20 of the Delaware Constitution is intentionally broader than the Second Amendment, Delaware's High Court in *Bridgeville*  acknowledges that "the militia," which in Delaware and federally included 18 through 20 year-olds, are included in the "the people" protected by Article I, Section 20.

74. Therefore, it is beyond dispute that both the Second Amendment and Article I, Section 20 of the Delaware Constitution  codify the pre-existing rights of young adults to keep and bear arms. From the first Delaware and federal militia laws to the present, the militia, and thus those with the right to bear arms by right and under law, has always included eighteen-year-olds.

### V.   DEFENDANTS' LAWS DO NOT SERVE THEIR STATED PURPOSE TO PROVIDE FOR THE SAFETY OF 18 YEAR-OLDS THROUGH 20 YEAR-OLDS WHOSE SECOND AMENDMENT AND DELAWARE CONSTITUTIONAL RIGHTS THEY HAVE RESTRICTED

75.  While the precedent of *Heller* and now *Bruen* have made perfectly clear that "means-end scrutiny" has no place in assessing the constitutionality of

legislation restricting Second Amendment rights, it is still notable that HB 451 undoubtedly does not serve, but rather detracts, from its stated purpose.

76.  In its preamble, HB 451 states that it endeavors to place restriction on "young people" purchasing firearms "for their safety and the safety of our communities."

77.  However, violent crime rates among young adults  18 years-old through 20 years-old are very low. Based on the most recent data, covering 2016-2018, at most, just 6/100th of 1% will commit a homicide during the age span from 18 to 20, and 1.04% will commit a robbery, 1.02% will commit an aggravated assault, and 2.12 % will commit any of these three offenses. *Resident population by age in 2016*:        U.S.        Census        Bureau        website        at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk#; *Arrests by age and by offense type*: *U.S. Federal Bureau of Investigation, Uniform Crime Reports, annual issues, covering 2016-2018*, FBI website at https://ucr.fbi.gov/crime-in-the-u.s.

78. Conversely, young adults have the highest rates of violent crime "victimization" and thus are especially likely to need effective means of self-protection. *Criminal Victimization, 2017.* U.S. Bureau of Justice Statistics (2018). https://www.bjs.gov/content/pub/pdf/cv17.pdf.

79. Further, self-defense with a gun is highly effective. Crime victims who use this self-protection strategy are less likely to be injured or lose property than victims who use other strategies, including nonresistance. Tark, Jongyeon, and Gary Kleck, *"Resisting crime: the effects of victim action on the outcomes of crimes." Criminology* 42(4):861-909 (2004).

80. Past experience with age-based restrictions on purchase and possession of firearms indicates that they have no detectable crime-reducing effect. Gary Kleck and E. Britt Patterson, "*The impact of gun control and gun ownership levels on violence rates*." Journal of Quantitative Criminology 9(3):249-287 (1993); Gary Kleck, Tomislav Kovandzic and Jon Bellows, "*Does gun control reduce violent crime*?" Criminal Justice Review 41:488-513 (2016); Gary Kleck, *"Regulating guns among young adults."* American Journal of Criminal Justice 44:689-704 (2019).

81. More specifically applicable to HB 451's ban on gun purchases by young adults, Kleck found that the ban on handgun purchases by person ages 18 years-old to 20 years-old implemented in the Federal Gun Control Act of 1968, from which HB 451 took inspiration, had no impact on violent crime among persons in this age group, as indicated by age specific arrest data. This study also found no effect of state bans on gun carrying/possession by persons aged 18 years-old to 20 years-

old. Kleck, "*Regulating guns among young adults*." American Journal of Criminal Justice 44:689-704.

82. HB 451 oddly, also appears to allow possession and use but not purchase or ownership of a deadly weapon. Apparently Delaware believes 18 through 20 year-old Delawareans are mature enough to use firearms, but not to purchase or own them.

## VI.   DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AMENDMENT AND THE BROADER RIGHTS AFFORDED BY THE DELAWARE CONSTITUTION

83. The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the  people to keep and bear Arms shall not be infringed."

84. "[I]t 'has always been widely understood that the Second Amendment codified a pre-existing right.' The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (*citing Heller*, 554 U.S. at 599.)

85. The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within  its jurisdiction the equal protection of the laws."

86. The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

87. The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at  634 (2008).

88. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures  or (yes) even future judges think that scope too broad." *Id*. at 634-635.

89. In *Heller*, the Supreme Court refuted the argument that "the people" protected by the  Second Amendment was restricted to only those in "the militia," however the Court also explicitly confirmed that "the militia" consisted of a subset of "the people" with Second Amendment rights—those who were male, able-bodied and of a certain age range. *Id*. at 651.

90. In the wake of the Supreme Court's decisions in *Heller* and *McDonald*, Courts of Appeals developed a two-step test to assess Second Amendment claims. But in *Bruen* the Supreme Court rejected that two-step test as inconsistent with *Heller* and *McDonald* and as containing one step too many. The  Court determined that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by

history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

91.  In so doing, the Supreme Court held that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical  tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

92.  *Bruen*, thus, reinforced the *Heller* approach to assessing a Second Amendment challenge by (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right. *Id*. at 2127-28.

93.  *Bruen* further reinforced reasoning by analogy, maintaining that "[m]uch like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present- day firearm regulations, this historical inquiry that courts must conduct

will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. at 2132.

94.  What is more, the plain text of the Delaware Constitution affords even broader rights to bear arms than the Second Amendment, providing that "[a] person  has the right to keep and bear arms for the defense of self, family, home, and State,  and for hunting and recreational use." DEL. CONST., Art. I, § 20; *see also Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014)("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation."); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. 2018).[11]

95.  In assessing the right to bear arms enumerated under the Delaware Constitution, the Supreme Court of the State of Delaware has emphasized "the significance of knowing the original text, context and evolution of any phrase that appears in the present Delaware Constitution." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017) (citations omitted).

96. The *Bridgeville* decision undertook an extensive review of Delaware's legislative history regarding the right to bear arms, noting that:

---

[11] This *Garvin* decision was not appealed by the State. Undersigned lead counsel successfully argued the *Doe*, *Bridgeville* and *Garvin* decisions, which are the only decisions that directly address the scope of Article I, Section 20 of the Delaware Constitution outside the home.

Article 25 of Delaware's first constitution (enacted on September 20, 1776) provided that, unless otherwise altered by the State's legislature, the common law of England "shall remain in force. By definition, this included Article VII of the 1689 English Bill of Rights — described by the United States Supreme Court as "the predecessor to our Second Amendment" — which provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id*. at 645-646.

97.  Both *Doe* and *Bridgeville* establish that the Second Amendment provides a floor of minimum rights below which Delaware may not legally restrict, but above which Delaware may expand the fundamental rights of its citizens; and that the 1987 codification of Article I, Section 20, was of a pre-existing right to bear arms with a rich role in Delaware's history.

98. The firearms at issue in this case, labeled as "deadly weapons" and/or "dangerous weapons" and banned as to Delawareans ages 18 years-old through 20 years-old under HB 451 are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. And they are, moreover, exactly what they would bring to service, e.g., militia duty and repelling violent mobs, should that be necessary.

99.  Plaintiffs and their members, age 18 years-old through 20 years-old, have a constitutional right to make use of common firearms, banned by HB 451, for effective self-defense and not to be disarmed by HB 451 and its enforcement by Defendants.

100.   The State  must permit ordinary, law-abiding citizens, aged 18 years-old through 20 years-old, to keep and bear common firearms, deemed "deadly weapons" under HB 451, for lawful purposes.

101.   The right of Delawareans ages 18 years-old through 20 years-old, to keep and bear common firearms, deemed "deadly weapons" and/or "dangerous weapons" under HB 451, guaranteed under the Bill of Rights, cannot be subjected to laws and regulations such as HB 451's licensing and registration process, that act as an undue and unconstitutional burden preventing law-abiding citizens from keeping and bearing common firearms.

102.   The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller* 554 U.S. at 636.

103.   Yet, this is precisely how HB 451 operates, completely shutting out ordinary, law-abiding citizens, ages 18 years-old through 20 years-old, from exercising their rights in the State—and making a "policy choice" that the Federal and State Constitutions  have "taken off the table."

### VII.   THE EFFECT ON PLAINTIFFS

104.   Plaintiff Gavin J. Birney is a resident of Milton, Delaware, and a member of DSSA and BRPC, who owns firearms deemed "deadly weapons" and/or dangerous weapons" under HB 451. Birney is an honor roll student and is the

president of his school's chapter of the National Honor Society. Birney has taken marksmanship classes at his high school and has attended firearm training courses from Triangle Self-Defense and the United States Concealed Carry Association.

105. Birney intends and desires to exercise his right to keep and bear arms by continuing to possess and purchase firearms deemed "deadly weapons" and/or "dangerous weapons" by HB 451. Birney would continue to purchase and possess these firearms were it not for Defendants' enforcement of Delaware's outright ban on these common arms for Delawareans ages 18 years-old through 20 years-old. Particularly, Birney would acquire and possess handguns for purposes of self-defense and for purposes of participating in International Defensive Pistol Association competitions with his father. Further, Birney currently possesses firearms deemed "deadly weapons" and/or "dangerous weapons" by HB 451 that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of HB 451.  Birney also does not currently have a license to carry concealed weapons pursuant to 11 *Del. C.* § 1441, which would purportedly be "exempt" from the ban of HB 451.

106. Members of Plaintiff DSSA,  18 years-old through 20 years-old, intend and desire to acquire, possess, and transport pistols, rifles, and shotguns banned by HB 451 as "deadly weapons" and/or "dangerous weapons" and are subject to and adversely affected by each and every restriction on "deadly weapons" and/or

"dangerous weapons" (including the definitions thereof) articulated in this complaint.

107.  But for HB 451, some DSSA members  18 years-old through 20 years-old would possess handguns designated as "deadly weapons" and/or "dangerous weapons" under HB 451. Such handguns are commonly used for self-defense and target-shooting.

108.  Further, some DSSA members are in the business of selling firearms in the State of Delaware. DSSA members' businesses are subject to and adversely affected by the restrictions on "deadly weapons" and/or "dangerous weapons" as defined, and articulated in this complaint.

109.  Plaintiff BRPC is a competitive shooting club that has members 18 years-old through 20 years-old, that also conducts education, training, and competitive shooting events. BRPC and its members are subject to and adversely affected by the restrictions on "deadly weapons" and/or "dangerous weapons" as defined, and articulated in this complaint.

110.  BRPC conducts competitive shooting events that involve the use of handguns. Further, BRPC membership permits the immediate family living in the same household as a named member to participate in the same club activities and competitive shooting programs as the named member. As a direct result of the bans of HB 451, BRPC and its members 18 years-old through 20 years-old are

prohibited from exercising their right to keep and bear arms by acquiring, "deadly weapons" and/or "dangerous weapons" for use in club activities. The restrictions on "deadly weapons" and/or "dangerous weapons" as defined, and articulated in this complaint, adversely affect the continued operation of BRPC and the rights of its individual members.

## COUNT I

### Violation of Plaintiffs' Rights in Article I, Section 20 of the Delaware Constitution

111. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

112. There is an actual and present controversy between the parties.

113. Article I, Section 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

114. Article I, Section 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.).

115. The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

116. Article I, Section 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, both in the home and in public.

117. The right to keep and bear arms under Article I, Section 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive or possess common firearms for all lawful purposes, including self-defense.

118. Both *Doe* and *Bridgeville* establish that the Second Amendment provides a floor of minimum rights below which Delaware may not legally restrict, but above which Delaware may expand the fundamental rights of its citizens; and that the 1987 codification of Article I, Section 20 was of a pre-existing right to bear arms with a rich role in Delaware's history.

119. Under HB 451, the State bans Delawareans  18 years-old through 20 years-old from purchasing and owning "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

120. HB 451 is not consistent with the intent of Article I, Section 20 at the time it was passed in 1987. Fifteen years earlier, in 1972, Delaware passed legislation establishing that the age of majority was 18 years-old. *See*, 1 *Del. C.* § 701.

121. Therefore, the State cannot carry its burden of proof that the rights enshrined in Article I, Section 20 were intended to be enjoyed by only a subset of the Delaware citizens recognized fifteen years earlier to be entitled to enjoy the rights of an adult.

122. HB 451's licensing process further violates Article I, Section 20 of the Delaware Constitution because:

(a) it denies a constitutional right until a license to exercise that right is issued;

(b) the licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague and arbitrary;

(c) the licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights, and make them harder to exercise.

123. Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, Birney, DSSA and its similarly situated members and BRPC and its similarly situated members, through Defendants' enforcement and implementation of HB 451.

124. Defendants have burdened the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, Birney, DSSA and its similarly situated members and BRPC and its similarly situated members, more than reasonably necessary to achieve important government objectives.

125. For all the reasons asserted herein, Defendants have acted in violation of Article I, Section 20 of the Delaware Constitution and continue to act in violation thereof, .which is causing Plaintiffs irreparable harm for which they seek declaratory relief.

## COUNT II

### 42 U.S.C. § 1983 Claim for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution

126. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

127. There is an actual and present controversy between the parties.

128. The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states, including those 18 years-old through 20 years-old, their fundamental right to keep and bear arms, both in the home and in public.

129. The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

40

130. The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive or possess common firearms for all lawful purposes, including self-defense.

131. Under HB 451, the State bans Delawareans 18 years-old through 20 years-old from purchasing and owning, "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

132. HB 451's licensing process further violates the Second Amendment of the United States Constitution because:

(a) it denies a constitutional right until a license to exercise that right is issued;

(b) the licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague and arbitrary;

(c) the licensing process, both on the face of the statute and as applied, was designed to deny constitutional rights and make it more burdensome to exercise them..

133. 42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

134. Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, Birney, DSSA and its members and

BRPC and its members, through Defendants' enforcement and implementation of HB 451.

135. For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## <u>COUNT III</u>

**Deprivation of Plaintiffs' Rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution**

136. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

137. There is an actual and present controversy between the parties.

138. The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

139. All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

140. HB 451 also identifies a limited subset of individuals to which HB 451 does not apply, as follows:

(a) An active member of the Armed Forces of the United States or the National Guard;

(b) A qualified law-enforcement officer as defined in § 1441A of this title;

(c) A person who has license to carry a concealed deadly weapon pursuant to §
1441 of this title. 11 Del. C. § 1448 (a)(5)(b)(1)-(3).

141. HB 451's license to carry a concealed deadly weapon application process
further  premises the grant of what is a fundamental right of all citizens upon
vague, arbitrary, and discriminatory requirements such as proof of "good moral
character."

142. The law thus discriminates in favor of selected Delawareans 18 years-old
through 20 years-old and against other law-abiding Delawareans 18 years-old
through 20 years-old, such as Plaintiffs Birney, DSSA  and its similarly situated
members and BRPC and its similarly situated members.

143. HB 451's exceptions arbitrarily and unreasonably afford a privilege—
ownership of "deadly weapons" to one group of individuals that is denied to others
and is unconnected to any legitimate state  interest.

144. Therefore, Defendants, individually and collectively, and under the color
of state law at all relevant times, have deprived the fundamental right to Equal
Protection of persons in the State of Delaware, including Plaintiffs, through
Defendants' enforcement and implementation of HB 451's enumerated exceptions,
which is causing Plaintiffs irreparable harm for which they seek declaratory and
permanent injunctive relief.

**PRAYER FOR RELIEF**

Plaintiffs respectfully pray for the following relief:

(a)    A declaratory judgment that Plaintiffs Birney, DSSA and its similarly situated members, and BRPC and its similarly situated members, have a fundamental right to keep and bear arms including by offering for sale, acquiring, purchasing,  owning and lawfully using common firearms banned under HB 451 for lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the Delaware Constitution;

(b)    A declaratory judgment that HB 451 and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Birney, DSSA and its similarly situated members, and BRPC and its similarly situated members, from exercising their fundamental right to keep and bear arms, including offering for sale, acquiring, purchasing,  owning and lawfully using common firearms banned under HB 451, for all lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution and Article I, Section 20 of the Delaware Constitution;

(c)    A declaratory judgment that HB 451 and all related regulations, policies, and/or customs designed to enforce or implement the same violates Plaintiffs Birney, DSSA and its similarly situated members, and BRPC and its

similarly situated members, rights to Equal Protection under the Fourteenth Amendment of the U.S. Constitution. Declaratory judgment is proper in this matter, pursuant to 10 *Del. C.* § 6501 as there is a real controversy between the parties, an interest is adversely affected , and the issue is ripe for resolution;

(d)     Attorney's fees pursuant to 42 U.S.C. § 1988.

(e)     Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully Submitted,

LEWIS BRISBOIS
  BISGAARD & SMITH LLP

By: */s/Francis G.X. Pileggi*
        Francis G.X. Pileggi (DE Bar No. 2624)
        Sean M. Brennecke (DE Bar No. 4686)
        500 Delaware Ave., Suite 700
        Wilmington, Delaware 19801
        302-985-6000
        Francis.Pileggi@LewisBrisbois.com
        Sean.Brennecke@LewisBrisbois.com

              and

        Alexander MacMullan, Esquire
        (*Pro Hac Vice Motion Forthcoming*)
        552 E. Swedesford Road, Suite 270
        Wayne, Pennsylvania 19087
        Alexander.MacMullan@LewisBrisbois.com

        *Attorneys for Plaintiffs*

Dated: November 23, 2022

EFiled: Nov 23 2022 01:22PM EST
Transaction ID 68430616
Case No. K22C-11-031 RLG

**INDEX OF EXHIBITS TO VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF EXHIBIT**

House Bill No. 451 ...........................................................................................................A

*Delaware State Sportsmen's Association, Inc., et.al v. Delaware Department of Safety And Homeland Security , et al.,* Del. Ch., C.A. No. 22-cv-00951 RGA Amended Complaint for Declaratory and Injunctive Relief.................................................................................................B

House Bill No. 451 Explanation ...........................................................................................C

# EXHIBIT A



SPONSOR:  Rep. Schwartzkopf & Sen. Sokola & Rep. Longhurst &
Rep. Mitchell & Rep. Bolden & Rep. Baumbach &
Rep. Heffernan & Sen. Townsend & Sen. Lockman
Reps. Bentz, Chukwuocha, Cooke, Freel, Griffith,
K. Johnson, Kowalko, Matthews, Minor-Brown,
Morrison, Osienski, K. Williams; Sens. Gay, S. McBride,
Paradee, Sturgeon

HOUSE OF REPRESENTATIVES
151st GENERAL ASSEMBLY

HOUSE BILL NO. 451
AS AMENDED BY
HOUSE AMENDMENT NO. 3
AND
HOUSE AMENDMENT NO. 6
AND
HOUSE AMENDMENT NO. 8
AND
SENATE AMENDMENT NO. 2

AN ACT TO AMEND TITLE 11 OF THE DELAWARE CODE RELATING TO FIREARMS.

1        WHEREAS, in 1968, federal law established that a buyer must be at least 21 years old for all handgun purchases;

2    and

3        WHEREAS, the federal government recognized over 50 years ago that it was reasonable to place a restriction on

4    young people purchasing firearms for their safety and the safety of our communities; and

5        WHEREAS, there is conclusive scientific research that shows the human brain is still developing in young adults

6    aged 18 to 21 which impacts their decision making, self-control, aggressive impulses, and risk-taking behaviors; and

7        WHEREAS, the Statistical Analysis Center's Delaware Shootings reports for the previous 3 years shows that the

8    most common age for shooters was between 18 to 21 which represents 33% of all shooters in 2020, 29% in 2019, and 32%

9    in 2018; and

10       WHEREAS, the age to purchase any alcohol and tobacco products in Delaware is 21 years old.

11       NOW, THEREFORE:

12       BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

13       Section 1.  Amend Chapter 5, Title 11 of the Delaware Code by making deletions as shown by strike through and

14    insertions as shown by underline as follows:

15       § 1445 Unlawfully dealing with a dangerous weapon; unclassified misdemeanor; Class E or G felony.

HD : NSW : MAW : 2141510719
LC : HVW : CM : 5081510263          Draft: 06/15/2022  10:28 AM

16    (a) A person is guilty of unlawfully dealing with a dangerous weapon when:

17    (1) The person, who is not a qualified law-enforcement officer, possesses, ~~sells or~~ sells, or in any manner has

18    control of any of the following:

19    a.  A weapon which by compressed air or by spring discharges or projects a pellet, slug or bullet, except a

20    BB gun, paintball gun, or air gun which does not discharge or project a pellet or slug larger than a ~~BB shot; or~~ .177

21    caliber shot.

22    b.  A pellet, slug or bullet, intending that it be used in any weapon prohibited by paragraph (a)(1)a. of this

23    ~~section; or~~ section

24    (2)  The person sells, gives or otherwise transfers to a child under 16 years of age a BB or air gun or spear gun

25    or BB shot, unless the person is that child's parent or guardian, or unless the person first receives the permission of said

26    parent or ~~guardian; or~~ guardian.

27    (3)  Being a parent, the person permits the person's child under 16 years of age to have possession of a ~~firearm~~

28    ~~or a~~ BB or air gun or spear gun unless under the direct supervision of ~~an adult;~~ a person 21 years of age or older. ~~or~~

29    (4)  The person sells, gives or otherwise transfers to a ~~child under 18~~ person under 21 years of age a firearm or

30    ammunition for a firearm, unless ~~the person is that child's parent or guardian, or unless the person first receives the~~

31    ~~permission of said parent or guardian; or~~ permitted by § 1448 of this title.

32    (5) The person sells, gives or otherwise transfers a firearm to any person knowing that said person intends to

33    commit any felony, class A misdemeanor or drug related criminal offense while in possession of said firearm.

34    (6) Being a parent, the person permits the person's child under 18 years of age to have possession of a firearm

35    unless under the direct supervision of a person 21 years of age or older.

36    (b) As used in this section, "qualified law-enforcement officer" means as defined in § 1441A of this title.

37    (c) Unlawfully dealing with a firearm or dangerous weapon is an unclassified misdemeanor, unless the person is

38    convicted under paragraph (a)(4) of this section, in which case it is a class G felony, or unless the person is convicted under

39    paragraph (a)(5) of this section, in which case it is a class E felony.

40    (d) The Superior Court has exclusive jurisdiction over a violation of paragraphs (a)(3) and (a)(6) of this section.

41    § 1448. Possession and purchase of deadly weapons by persons prohibited; penalties.

42    (a) Except as otherwise provided in this section, the following persons are prohibited from purchasing, owning,

43    possessing, or controlling a deadly weapon or ammunition for a firearm within the State:

44    (5) Any ~~juvenile,~~ person under the age of 21. ~~if the deadly weapon is a handgun, unless the juvenile possesses~~

45    ~~the handgun for the purpose of engaging in lawful hunting, instruction, sporting or recreational activity while under the~~

HD : NSW : MAW : 2141510719
LC : HVW : CM : 5081510263

46  ~~direct or indirect supervision of an adult. For the purpose of this subsection, a "handgun" shall be defined as any pistol,~~

47  ~~revolver or other firearm designed to be readily capable of being fired when held in 1 hand.~~

48  a. Paragraph (a)(5) of this section shall not apply to the purchase, owning, possession, or control of the

49  following deadly weapons:

50  1. A shotgun as defined in § 1444(c) of this title or ammunition for a shotgun.

51  2. A muzzle-loading rifle as defined in § 704(f) of Title 7.

52  3. Deadly weapons other than firearms if the person is 18 years of age or older.

53  b. Paragraph (a)(5) of this section shall not apply to any of the following persons 18 years of age or older:

54  1. An active member of the Armed Forces of the United States or the National Guard.

55  2. A qualified law-enforcement officer as defined in § 1441A of this title.

56  3. A person who has license to carry a concealed deadly weapon pursuant to § 1441 of this title.

57  c. Paragraph (a)(5) of this section shall not apply to any person under the age of 21 who does any of the

58  following:

59  1. Possesses or controls a firearm for the purpose of engaging in lawful hunting, instruction, sporting,

60  or recreational activity while under the direct supervision of a person 21 years of age or older.

61  2. Possesses or controls a firearm for the purpose of engaging in lawful hunting and is in compliance

62  with § 704(g) of Title 7.

63  3. Possesses or controls a firearm for the purpose of transporting the firearm to the location of a  lawful

64  hunting, instruction, sporting, or recreational activity, for which the person is authorized to possess or control

65  the firearm under paragraph (a)(5)c.1. of this section.

66  d. It is not a violation of paragraph (a)(5) of this section if a person under the age of 21 possesses or uses a

67  firearm during the use of force upon or towards another person if such use of force is justifiable pursuant to § 464,

68  § 465, § 466, or § 469 of Title 11.

69  e. Paragraph (a)(5) of this section does not apply to the possession or control of a firearm by a person 18

70  years of age or older.

71  (f)(1) Upon conviction, any person who is a prohibited person as described in paragraph (a)(5) of this section and

72  who is 15 years of age or  ~~older~~ older, but not yet 18 years of age, is declared a child in need of mandated institutional

73  treatment and shall, for a first offense, receive a minimum sentence of 6 months of Level V incarceration or institutional

74  confinement, and shall receive a minimum sentence of 1 year of Level V incarceration or institutional confinement for a

75  second and each subsequent offense, which shall not be subject to suspension. Any sentence imposed pursuant to this

76  subsection shall not be subject to §§ 4205(b) and 4215 of this title.

77  (2) The penalties prescribed by this subsection and subsection (g) of this section shall be imposed regardless of

78  whether or not the juvenile is determined to be amenable to the rehabilitative process of the Family Court pursuant to §

79  1010(c) of Title 10 or any successor statute.

80  (g) In addition to the penalties set forth in subsection (f) of this ~~section herein,~~ section, a person who is a prohibited

81  person as described in paragraph (a)(5) of this section and who is 14 years of age or ~~older~~ older, but not yet 18 years of age,

82  shall, upon conviction of a first offense, be required to view a film ~~and/or~~ or slide presentation depicting the damage and

83  destruction inflicted upon the human body by a projectile fired from a gun, and shall be required to meet with, separately or

84  as part of a group, a victim of a violent crime, or with the family of a deceased victim of a violent crime. The Division of

85  Youth Rehabilitative Service, with the cooperation of the Division of Forensic Science and the ~~Violent Crimes Compensation~~

86  ~~Board,~~ Victims' Compensation Assistance Program, shall be responsible for the implementation of this subsection.

87  Section 2. If a provision of this Act, or the application of this Act to a person or circumstance, is held invalid, the

88  provisions of this Act are severable if the invalidity does not affect the other provisions of this Act, or applications of this

89  Act, that can be given effect without the invalid provision or invalid application of this Act.

90  Section 3. Sections 1445(a)(6) and 1448(a)(5)e. of Title 11, as contained in this Act, expire 3 years after the date of

91  enactment of this Act.

HD : NSW : MAW : 2141510719
LC : HVW : CM : 5081510263

Draft: 06/15/2022  10:28 AM

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE STATE SPORTSMEN'S | : | |
| ASSOCIATION, INC; BRIDGEVILLE | : | |
| RIFLE & PISTOL CLUB, LTD.; | : | |
| DELAWARE RIFLE AND PISTOL CLUB; | : | C.A. No.: 22-cv-00951-RGA |
| DELAWARE ASSOCIATION OF | : | |
| FEDERAL FIREARMS LICENSEES; | : | |
| MADONNA M. NEDZA; CECIL CURTIS | : | |
| CLEMENTS; JAMES E. HOSFELT, JR; | : | |
| BRUCE C. SMITH; VICKIE LYNN | : | |
| PRICKETT; and FRANK M. NEDZA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DELAWARE DEPARTMENT OF | : | |
| SAFETY AND HOMELAND SECURITY; | : | |
| NATHANIAL MCQUEEN JR. in his | : | |
| official capacity as Cabinet Secretary, | : | |
| Delaware Department of Safety and | : | |
| Homeland Security; and COL. MELISSA | : | |
| ZEBLEY in her official capacity as | : | |
| superintendent of the Delaware State Police, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## AMENDED COMPLAINT FOR DECLARATORY
## <u>AND INJUNCTIVE RELIEF</u>

Plaintiffs Delaware State Sportsmen's Association ("DSSA"); Bridgeville

Rifle and Pistol Club, Ltd. ("BRPC"); Delaware Rifle and Pistol Club ("DRPC");

Delaware Association of Federal Firearms Licensees ("DAFFL"); Madonna M.

Nedza; Cecil Curtis Clements; James E. Hosfelt, Jr.; Bruce C. Smith; Vickie Lynn Prickett; and Frank M. Nedza (collectively, "Plaintiffs"), by and through undersigned counsel, bring this complaint against Defendants, Delaware Department of Safety and Homeland Security; Secretary Nathanial McQueen Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley as the top law enforcement officer at the Delaware State Police, all of whom are Delaware state officials responsible for enforcing and implementing Delaware's laws and regulations infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family, and for other lawful purposes, and allege as follows:

## **INTRODUCTION**

1.     The United States Supreme Court and a unanimous Delaware Supreme Court have recognized that the fundamental right to self-defense includes the right to keep and bear firearms both inside and outside the home. In defiance of this established and unassailable authority, the State of Delaware recently enacted into law House Bill 450 ("HB 450"[1]) and Senate Substitute 1 for Senate Bill 6 ("SS 1

---

[1] "HB 450" refers to 11 *Del. C.* §§ 1464-1467 as well as provisions in HB 450. HB 450 is attached hereto as Exhibit "A."

for SB 6"[2])(collectively "The Regulatory Scheme"[3]) which flout the fundamental civil rights of Delawareans and others visiting the First State, by making them criminals–felons–for exercising one of their most exalted rights enshrined in both the Delaware Constitution and the United States Constitution.

2.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const., amend. II. Under the Second Amendment, Plaintiffs DSSA (and its members), BRPC (and its members), DRPC (and its members), DAFFL (and its members and their customers), and the individual Plaintiffs are all similarly situated individuals who are legally eligible to possess and acquire firearms and have a fundamental constitutionally-guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

3.      Article I, § 20 of the Delaware Constitution affords even broader protections than the United States Constitution does, providing that: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." DEL. CONST., art. I, § 20; *see Doe v. Wilmington*

---

[2] "SS 1 for SB 6" refers to 11 *Del. C.* §§ 1441, 1468-1469A as well as provisions in Senate Substitute 1 for Senate Bill 6. SS 1 for SB 6 is attached hereto as Exhibit "B."

[3] The "Regulatory Scheme" collectively refers to 11 *Del. C.* §§ 1464-1467 as well as provisions in House Bill 450 ("HB 450") and to 11 *Del. C.* §§ 1441, 1468-1469A as well as provisions in Senate Substitute 1 for Senate Bill 6 ("SS 1 for SB 6", and sometimes referred to as simply SB 6).

*Housing Authority*, 88 A.3d 654, 665 (Del. 2014) ("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation.").

### Delaware Criminalizes Lawful Behavior by Law-Abiding Citizens

4.     But when HB 450 was signed into law on June 30, 2022, the State of Delaware criminalized possession, transportation and sale of common firearms used by law abiding citizens for lawful purposes—mislabeling them as "assault weapons"—and making it a felony for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C.* §§ 1457, 1464-1467 (2022).

5.     Further, when SS 1 for SB 6 was signed into law, also on June 30, 2022, the State of Delaware also criminalized possession, transportation and sale of common "ammunition feeding devices" or "magazines" capable of holding more than seventeen rounds—mislabeling them as "large-capacity magazines"—and making it illegal, and ultimately a felony, for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C.* §§ 1468-1469 (2022).

6.     The State's limited exceptions to these broad criminal statutes do not allow typical law-abiding citizens to keep and bear common firearms for lawful purposes. *See* 11 *Del. C.* §§ 1465(2), 1469(c).[4]

7.     The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny hundreds of thousands of individuals who reside in Delaware, including Plaintiffs, their members and customers, and others like them, their fundamental, individual right to keep and bear common arms through the Regulatory Scheme.

8.     Plaintiffs seek declaratory and injunctive relief not only on the basis that the Regulatory Scheme violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution, but also on the fact that the Regulatory Scheme violates their rights under Delaware Constitution at Article I, § 20; their rights to Due Process under the Fourteenth Amendment to the U.S. Constitution and Article I, § 7 of the Delaware Constitution; their right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution; violates the Commerce Clause of Article I, § 8, Clause 3 of the U.S. Constitution; and is preempted by 18 U.S.C. § 926A and § 926A(3).

---

[4] The Delaware Legislature and the Governor took advantage of the tragic shooting occurring at Uvalde, Texas, on May 24, 2022, to introduce HB 450 and SS 1 for SB 6 with other statutes criminalizing the exercise of Second Amendment rights, and rushed them through the legislative process and passed them into law in only approximately two-weeks' time.

## **The Regulatory Scheme Relies On Pre-*Bruen* Precedent**

9.      Both HB 450 and SS 1 for SB 6 rely upon laws and court precedent formulated before the U.S. Supreme Court's recent landmark decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. _, 142 S.Ct. 2111 (2022).

10.      In *Bruen* the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical  tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (*citing Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

11.      The Supreme Court, thus, reinforced the approach to assessing a Second Amendment challenge it had established in *District of Columbia v. Heller*, 554 U.S. 570 (2008). That approach requires only (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right.  *Id*.

12.      In so doing, the *Bruen* court repudiated the "means-end" scrutiny to restrictions upon fundamental Second Amendment rights that had developed in Circuit courts following *Heller*. HB 450 and SS 1 for SB 6 draw their inspiration from exactly those types of flawed, now repudiated restrictions.

6

13.     Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has begun to crumble in the decision's wake. HB 450 and SS1 to SB 6 are no different.

14.     HB 450 denies the fundamental right to bear arms based in large measure on a court decision relied on for support of HB 450--that has been vacated by *Bruen*.

15.     The legislative history of HB 450, as signed into law, includes a prior iteration of HB 450 known previously as Senate Bill 68 ("SB 68").[5] SB 68's synopsis states that it relies on a Maryland statute that bans commonly-used firearms as so-called "assault rifles." SB 68, and thus HB 450, further relies upon a now-repudiated decision of the U.S. Court of Appeals for the Fourth Circuit, *Kolbe v. Hogan,* 849 F. 3d 114 (4th Cir. 2017)(en banc), that wrongly upheld that similarly flawed Maryland ban. However, the United States Supreme Court expressly abrogated another Fourth Circuit decision that relied exclusively on *Kolbe* in light of *Bruen*. *Bianchi v. Frosh*, U.S. Supr. Ct. No. 21-902, Order (June 30, 2022)[6] (vacating *Bianch v. Frosh,* 858 F. App'x 645 (4th Cir. 2021))[7].

---

[5] HB 450 is attached hereto as Exhibit "A" and the prior SB 68 is attached hereto as Exhibit "C."

[6] Attached as Exhibit "D" hereto is a copy of the vacated decision in *Bianch v. Frosh*, 858 F. App'x 645 (4th Cir. 2021), which relied on the now-discredited decision in *Kolbe*, that HB 450 relies on.

16.     Further, also in light of its decision in *Bruen*, the United States Supreme Court  vacated and remanded a Ninth Circuit Court of Appeals decision upholding a ban of "large-capacity magazines" similar to those banned in SS 1 for SB  6. *See Duncan v. Becerra*, U.S. Supr. Ct. No. 21-1194, Order (June 30, 2022).

17.     Two judges on the United States District Court for the District of Colorado also very recently  granted temporary restraining orders preventing similarly flawed bans of common arms, including common ammunition magazines similar to those banned by SS 1 for SB 6, from being enacted following *Bruen*. *See Rocky Mountain Gun Owners v. The Town of Superior*, Civ. Action No. 22-cv-01685-RM (D. Colo. July 22, 2022); *Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*, Civ. Action No. 1:22-cv-02113-CNS-MEH (D. Colo. Aug. 30, 2022).[8]

18.     Here in the Third Circuit, on August 30th of this year, also relying on *Bruen*, the Court of Appeals reversed a District Court dismissal of a claim brought

---

[7] The legislative findings and several prefatory "Whereas Clauses" of HB 450, *see* Exhibit "A" attached hereto, are based on false premises. For example, contrary to the "Whereas Clause" on lines 28 to 30 on page one of HB 450, the AR-15 was not originally designed for military use. Moreover, the U.S. Supreme Court rejected an "interest-balancing inquiry" that weighs the burden on a right with important governmental interests. *Bruen*, 142 S. Ct. 2111, at 2118; *see also Id*. at 2158 (Alito, J., concurring)("And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense.")

[8] A copy of these two decisions are attached as Exhibit "E."

pursuant to the Second Amendment and the Fifth Amendment's Takings Clause. In *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097 (3d Cir. Aug. 30, 2022), the Court of Appeals held that the seizing of the firearms of the parents of a convicted criminal constituted a violation of the Fifth Amendment's Takings Clause, where the warrant's justification, under which they were seized, had run out, the firearms were not contraband and/or proceeds of a crime, and the Plaintiff-parents did not forfeit the guns. *Id.*[9] Citing to *Bruen*, the Court also held that the Plaintiff-parents' Second Amendment rights had been violated where "this Nation's historical tradition" did not permit seizing and holding onto the firearms. *Id*. at *10; *see also*, *Id*. at *12 ("…the Second Amendment prevents the government from hindering citizens' ability to "keep" their guns.")[10]

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201 and 2202; 42 U.S.C. §§ 1983 and 1988; U.S. Constitution Amendment II and Amendment XIV;

---

[9] A copy of this decision is attached hereto as Exhibit "F."

[10] Similarly, the Third Circuit Court of Appeals has ordered parties in a New Jersey magazine ban case to submit supplemental briefing to address the proper disposition of the matter in light of *Bruen*. *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, Case No. 19-3142 (3rd Cir. July 7, 2022).

U.S. Constitution art. 1, § 8, Clause 3 as well as art. 2 paragraph 2, and DEL. CONST., art. I, § 7 as well as art. I, § 20.

21.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

22.     Plaintiff DSSA is a Delaware corporation with a principal place of business in Sussex County, Delaware. DSSA was founded in 1968 as the official State-level affiliate of the National Rifle Association of America, and its membership currently consists of approximately 4,500 individual members and constituent clubs. DSSA's prime purpose is to preserve, protect and defend the constitutional rights of its members and the people of the State of Delaware to keep and bear arms for lawful purposes. DSSA brings this action on behalf of itself and its members, including Plaintiffs M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza in order to protect and defend the constitutional rights of its members and of itself.

23.     Plaintiff BRPC is a Delaware corporation with a principal place of business in Sussex County, Delaware. BRPC was formed in the early 1950s by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual

10

members and their families, residing in Delaware, Maryland, Pennsylvania, Virginia, New Jersey, and other states. BRPC serves as a competitive shooting club that conducts education, training and competitive shooting events drawing competitors and participants throughout the United States. BRPC brings this action on behalf of itself and its members, including Plaintiffs M. Nedza, Smith and Prickett, in order to protect the rights of its members and to protect BRPC's ability to continue to engage in competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

24.     Plaintiff DRPC is a Delaware non-profit corporation, formed in 1946 and offering the following forms of membership: Active Membership, Spousal Membership, Honorary Membership, Military Service Inactive Membership, Inactive Membership, and Junior Membership. DRPC membership currently stands at approximately 498 individual members and their families residing in Delaware, Maryland, New Jersey and New York.  DRPC's mission is (1) to protect and promote the right to keep and bear arms; (2) encourage organized rifle and pistol shooting by United States citizens and legal residents; (3) increase knowledge of the lawful and safe handling and proper care of firearms; and (4) to promote the proper use of firearms in marksmanship programs, hunting and self-defense. DRPC brings this action on behalf of itself and its members, including Plaintiff Prickett, in order to protect the rights of its members and to protect DRPC's ability to continue to engage

in the competitive and non-competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

25.  Plaintiff DAFFL is a voluntary unincorporated association consisting of Federal Firearms Licensees, licensed to do business in the State of Delaware. DAFFL exists for the purpose of protecting and defending the Constitutional right to keep and bear arms for lawful purposes by law-abiding citizens, to protect and enhance the lawful commerce in arms in the State of Delaware, to support and assist members in establishing and executing best business practices, and to educate customers and the public at large in the safe and lawful handling, use and storage of firearms. DAFFL brings this action on behalf of itself and its members, including Plaintiff Smith, in order to protect and defend its members' constitutional right to keep and bear arms for lawful purposes by law-abiding citizens.

26.  Plaintiff Madonna M. Nedza is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. M. Nedza is a member of DSSA and BRPC.

27.  Plaintiff Cecil Curtis Clements is a natural person, a resident of New Castle County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Clements is a member of DSSA and is an NRA certified firearms instructor.

28.     Plaintiff James Hosfelt Jr. is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Hosfelt is a member of DSSA.

29.     Plaintiff Bruce C. Smith is a natural person, a resident of Sussex County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.  Smith is a member of DSSA, BRPC and DAFFL.

30.     Plaintiff Vickie Lynn Prickett is a natural person, a resident of New Castle County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Prickett is a member of DSSA, BRPC, and DRPC and is an NRA certified firearms instructor.

31.     Plaintiff Frank M. Nedza is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. F. Nedza is a member of DSSA and is an NRA certified firearms instructor.

32.     Defendant Delaware Department of Safety and Homeland Security is a department within the State of Delaware that oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws,

including the Regulatory Scheme. Defendant Delaware Department of Safety and Homeland Security's enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms. All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

33. Defendant Nathanial McQueen Jr. is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security for the State of Delaware. Suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security. In such capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Regulatory Scheme. Defendant McQueen's ongoing enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms. All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

34.     Defendant Col. Melissa Zebley is the Superintendent of the Delaware State Police. Suit is brought against Defendant Zebley in her official capacity as Superintendent of the Delaware State Police. In such capacity Defendant Zebley executes and administers the State's laws, including the Regulatory Scheme. Defendant Zebley's ongoing enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms. All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

## FACTUAL ALLEGATIONS

## I.     DELAWARE'S UNCONSTITUTIONAL HB 450

35.     The State of Delaware mislabels scores of common rifles, common shotguns, common pistols, and "copycat' weapons with a misnomer of "assault weapons"—and bans all of them outright pursuant to the enactment of HB 450.  11 *Del. C.* §§ 1457, 1464-1467.

36.     This broad ban on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "assault weapon" applies to everyone who does not fall into one of a few narrow categories, primarily on-duty

military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government.  *See* 11 *Del. C.* § 1466 (a)(1)-(2).

37.     Ordinary citizens may possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022,  and then only,  "[a]t that person's residence, place of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair." *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

38.     Ordinary citizens meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) are further encouraged, no later than 1 year from June 30, 2022, to apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession.  11 *Del. C.* § 1467(a).

39.     Moreover, HB 450 mandates that a law-abiding citizen meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon"

incapable of being used for defense of self or family outside the home, contrary to the rights enumerated in the United States and Delaware Constitutions. See 11 *Del. C.* § 1465 (12); 11 *Del. C.* § 1466 (c)(4).

40.     If an ordinary, law-abiding citizen keeps or bears an arm that he did not lawfully possess prior to June 30, 2022, or keeps or bears an arm anywhere but the locations enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d), and HB 450 has dubbed that arm an "assault weapon," then Defendants or their agents may seize and dispose of that arm, regardless of whether it is in common use. See 11 *Del. C.* § 1466 (e). Moreover, any ordinary, law-abiding citizen who possesses an "assault weapon," or transports one into the State, commits a Class D felony offense and is subject to severe criminal sanctions, including imprisonment for up to eight years for the first offense.  11 *Del. C.* §§ 4205, 1466 (d).  Further, under both state and federal law, conviction under these provisions would result in a lifetime ban on possession even of firearms that have not been prohibited under the Regulatory Scheme as "assault weapons." 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[11]

---

[11] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10 § 4509(b)(6)(jury).

## II.    FIREARMS IN COMMON USE

41.    Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), HB 450 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home. *Id*. at 628-629.

42.    HB 450 bans as "assault weapons" the below named firearms, any "copy" of those firearms, and firearms with certain features that have no necessary relation to the named firearms that are banned.

43.    The semiautomatic pistols banned as "assault pistols" are any of the following or their copies, regardless of the producer or manufacturer:

      a.      AA Arms AP-9 pistol;
      b.      Beretta 93R pistol;
      c.      Bushmaster pistol;
      d.      Claridge HI-TEC pistol;
      e.      D Max Industries pistol;
      f.      EKO Cobra pistol;
      g.      Encom MK-IV, MP-9, or MP-45 pistol;
      h.      Heckler and Koch MP5K, MP7, SP-89, or VP70 pistol.
      i.      Holmes MP-83 pistol;
      j.      Ingram MAC 10/11 pistol and variations, including the Partisan Avenger and the SWD Cobray;
      k.      Intratec TEC-9/DC-9 pistol in any centerfire variation;
      l.      P.A.W.S. type pistol;
      m.      Skorpion pistol;
      n.      Spectre double action pistol (Sile, F.I.E., Mitchell);
      o.      Stechkin automatic pistol;
      p.      Steyer tactical pistol;
      q.      UZI pistol;
      r.      Weaver Arms Nighthawk pistol;
      s.      Wilkinson "Linda" pistol.

11 *Del. C.* § 1465(3).

44.    The semiautomatic long guns banned as "assault long guns" are any of

the following or their copies, regardless of the producer or manufacturer:

<ol type="a">
<li>American Arms Spectre da Semiautomatic carbine;</li>
<li>Avtomat Kalashnikov semiautomatic rifle in any format, including the AK-47 in all forms;</li>
<li>Algimec AGM-1 type semi-auto;</li>
<li>AR 100 type semi-auto;</li>
<li>AR 180 type semi-auto;</li>
<li>Argentine L.S.R. semi-auto;</li>
<li>Australian Automatic Arms SAR type semi-auto;</li>
<li>Auto-Ordnance Thompson M1 and 1927 semi-automatics;</li>
<li>Barrett light .50 cal. semi-auto;</li>
<li>Beretta AR70 type semi-auto;</li>
<li>Bushmaster semi-auto rifle;</li>
<li>Calico models M-100 and M-900;</li>
<li>CIS SR 88 type semi-auto;</li>
<li>Claridge HI TEC C-9 carbines;</li>
<li>Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;</li>
<li>Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, andK-2;</li>
<li>Dragunov Chinese made semi-auto;</li>
<li>Famas semi-auto (.223 caliber);</li>
<li>Feather AT-9 semi-auto;</li>
<li>FN LAR and FN FAL assault rifle;</li>
<li>FNC semi-auto type carbine;</li>
<li>F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;</li>
<li>Steyr-AUG-SA semi-auto;</li>
<li>Galil models AR and ARM semi-auto;</li>
<li>Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;</li>
<li>Holmes model 88 shotgun;</li>
<li>Manchester Arms "Commando" MK-45, MK-9;</li>
<li>Mandell TAC-1 semi-auto carbine;</li>
<li>Mossberg model 500 Bullpup assault shotgun;</li>
<li>Sterling Mark 6;</li>
<li>P.A.W.S. carbine;</li>
</ol>

19

ff.    Ruger mini-14 folding stock model (.223 caliber);

gg.    SIG 550/551 assault rifle (.223 caliber);

hh.    SKS with detachable magazine;

ii.    AP-74 Commando type semi-auto;

jj.    Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, and M1A, excluding the M1 Garand;

kk.    Street sweeper assault type shotgun;

ll.    Striker 12 assault shotgun in all formats;

mm.    Unique F11 semi-auto type;

nn.    Daewoo USAS 12 semi-auto shotgun;

oo.    UZI 9mm carbine or rifle;

pp.    Valmet M-76 and M-78 semi-auto;

qq.    Weaver Arms "Nighthawk" semi-auto carbine;

rr.    Wilkinson Arms 9mm semi-auto "Terry."

11 *Del. C.* § 1465(2).

45.    HB 450 also bans any "copycat weapon," which is defined as any of the following:

a.    A semiautomatic, centerfire rifle that can accept a detachable magazine and has at least 1 of the following:

1.    A folding or telescoping stock;

2.    Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

3.    A forward pistol grip;

4.    A flash suppressor;

5.    A grenade launcher or flare launcher.

b.     A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

c.     A semiautomatic pistol that can accept a detachable magazine and has at least 1 of the following:

     1.     An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

     2.     A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

     3.     A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

     4.     A second hand grip.

d.     A semiautomatic shotgun that has both of the following:

     1.     A folding or telescoping stock;

     2.     Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.

e.     A semiautomatic shotgun that has the ability to accept a detachable magazine.

f.     A shotgun with a revolving cylinder.

g.     A semiautomatic pistol with a fixed magazine that can accept more than 17 rounds.

h.     A semiautomatic, centerfire rifle that has a fixed magazine that can accept more than 17 rounds.

*11 Del. C.* § 1465(5).

46.     Handguns are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)); *see also*, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1269 (D.C. Cir. 2011)(Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semi-automatic—… have not traditionally been banned and are in common use by law-abiding citizens.").

47.     At the start of the last decade, over eighty percent of the handguns sold in the United States were semiautomatic. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 8, 11 (2012).

48.     "Nationally, modern rifles are ubiquitous . . . In 2018, 909,330 Ford F-150s were sold. Twice as many modern rifles were sold the same year." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal, 2021). A 2022 study by the NSSF®, the firearm industry trade association, estimated there are 24,446,000 Modern Sporting Rifles in circulation in the United States since 1990. That is an increase of over 4.5 million rifles since the last estimate was released in 2020 and far exceeds the 16,100,000 F-150 trucks estimated to be on the road. https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.

49.     Semiautomatic rifles are also in common use and accounted for 40 percent of rifles sold in 2010; with two million AR-15s, America's most popular rifle, manufactured between 1986 and 2010. *Heller II* at 1287; *see also Friedman v. City of Highland Park, Ill*., 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from denial of cert) ("Roughly five million Americans own AR-styled semiautomatic rifles….The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting.")

50.     Semiautomatic long guns "traditionally have been widely accepted as lawful possessions..." *See Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle). And they too are in common use presently. Counting just "modern sporting rifles" (a category that includes semiautomatic AR-style and AK-style rifles), the number in circulation today approaches twenty-five million. According to industry sources, more than one out of every five firearms sold in certain recent years were semiautomatic modern sporting rifles.

51.     The banned semiautomatic firearms deemed as "assault weapons" under HB 450, like all other semiautomatic firearms, fire only one round for each pull of the trigger.  They are not machine guns.[12] *See Staples*, 511 U.S. at 602 n.1.

---

[12] The State of Delaware was corrected by the Delaware Superior Court for mistakenly conflating this distinction in a firearms case the State lost and did not

What is more, the designation "assault weapons" is a complete misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). *See generally* Charles C. W. Cooke, *When The News Becomes Propaganda, America's 1ˢᵗ Freedom*, at 56 (August 2022) ("rifles of all types are used in fewer murders than are hands and feet, and…the rifles that have been arbitrarily deemed "assault weapons" are used in only a fraction of those crimes.")

52.    Rifles built on an AR-style platform are a paradigmatic example of the type of arm HB 450 bans. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans.

53.    Central among the common uses of "assault weapons" banned in Delaware is defense of self in the home. For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and highly common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered, but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after

---

appeal. *Del. State Sportsmen's Ass'n v. Garvin,* 2020 Del. Super. LEXIS 2927, *1, *13 (Del. Super. 2020).

passing through walls and other objects, and pose substantially greater risk to unintended targets in the home. An AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm to rely on in a self-defense encounter.

54.    Further, the .223 caliber round does not more easily penetrate walls or car doors, must less soft body armor at great distances. Cartridges used in deer hunting rifles have far greater penetration.

55.    Like the AR-15 generally, the specific features of banned so-called "copycat weapons" aid home defense. A flash suppressor, for example, not only reduces the chance that a home-invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 397 (1994). Similarly, folding stocks, whether on rifles or shotguns, support maneuverability in tight home spaces, *Kopel* at 398-99, as well as safe storage of defense instruments.

56.    Encounters with criminal intruders in the home are not uncommon.  For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there

are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property.

57.    Other common, lawful uses of the "assault weapons" are for hunting and for sporting purposes. At least a third of all gun-owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning a modern sporting rifle.

58.    Here again, the banned features of "copycat weapons" serve lawful purposes. Folding stocks, for example, allow for safe transportation and easier carrying over long distances while hunting. Flash suppressors promote accuracy in target-shooting and hunting (especially at dawn.)

59.    By contrast, one use that is not common for "assault rifles" is crime. These arms "are used in a small fraction of gun crimes." *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% of [crime guns] are 'assault rifles.'")

60.    HB 450 harms law-abiding citizens, not criminals.

61.    HB 450's prohibition on the enumerated long guns, their "copies," and the "copycat weapons," as "assault weapons" effectively bans the acquisition of semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## III.  DELAWARE'S UNCONSTITUTIONAL SS 1 FOR SB 6

62.  The State of Delaware also mislabels scores of common ammunition magazines with a misnomer of "large-capacity magazines"—and bans all of them outright.  11 *Del. C.* §§ 1468-1469A. Like the term "assault weapon," "there simply is no such thing as a 'large capacity magazine.' It is a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded into any firearm at one time." *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, No. 19-3142, at *9 (3d Cir. Aug. 25, 2022) (Matey, J. dissenting from Order remanding case back to the district court) (Dkt. 147-1).

63.  This broad ban on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "large-capacity magazine" applies to everyone who does not fall into one of a few narrow categories, primarily on-duty military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government.  11 *Del. C.* § 1469.

64.  This broad ban contains no provision for owners of "large-capacity magazines" purchased prior to enactment of the ban to retain the "large-capacity magazine" and instead mandates that Defendant Nathanial McQueen Jr., "establish and administer a compensation program for residents of this State to allow a

resident in possession of a large-capacity magazine on August 29, 2022 to relinquish the large-capacity magazine to the Department of Safety and Homeland Security ("Department") or a participating local law-enforcement agency in exchange for a monetary payment established under this subsection." 11 *Del. C.* § 1469(d).

65.     SS 1 for SB 6 also creates a purported exception to the outright ban for "[a]n individual who holds a valid concealed carry permit issued by the Superior Court under § 1441." 11 *Del. C.* § 1469(c)(5). However, the standard for such exception is entirely arbitrary and vague, requiring that successful applicant be "of good moral character" and stating that the Court "may or may not, in its discretion, approve any application…" 11 *Del. C.* § 1441(a), (d).

66.    This purported exception further creates an unconstitutional registration and licensing process for applicants, providing, in part, that "[t]he Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county..." 11 *Del. C.* § 1441(b).

67.    What's more, many of the common arms deemed "assault weapons" by HB 450, such as the AR-15, are equipped with standard-capacity ammunition magazines that are deemed "large-capacity magazines" by SS 1 for SB 6.

However, because SS 1 for SB 6 contains no provision for owners of "large-capacity magazines" purchased prior to the enactment of the ban to retain the "large-capacity" in the same manner provided by HB 450 in a "grandfather clause," SS 1 for SB 6 effectively contradicts and/or overrules HB 450's prior ownership provision for any common arm deemed an "assault weapon" under HB 450 that is equipped with a standard-capacity magazine "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468(2)(a).

68.   If an ordinary, law-abiding citizen keeps or bears an ammunition magazine and SS 1 for SB 6 has dubbed that ammunition magazine a "large-capacity magazine" then Defendants or their agents may seize and dispose of that ammunition magazine, regardless of whether it is in common use. See 11 *Del. C.* § 1469(b). Moreover, any ordinary, law-abiding citizen who possesses a "large-capacity magazine," or transports one into the State, is subject to a civil penalty for a first violation, commits a Class B misdemeanor offense for a second violation, and a Class E felony offense for any further violations. *Id*.

69.   Any ordinary, law-abiding citizen who is convicted of a Class E felony is subject to severe criminal sanctions, including imprisonment for up to five years for the first offense. 11 *Del. C.* §§ 4205(b)(5), 1469(b). Further, under both state and federal law, conviction under these provisions would result in a

lifetime ban on possession even of firearms and ammunition magazines that have not been prohibited under the Regulatory Scheme as "assault weapons" and "large-capacity magazines." 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[13]

## IV.  AMMUNITION MAGAZINES IN COMMON USE

70.   Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), SB 6 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home.  Id.  at 628-629.

71.   SS 1 for SB 6 bans as "large-capacity magazines" "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468(2)(a).

72.   Firearms with ammunition magazines capable of holding more than seventeen rounds, which includes many commonly used arms deemed "assault weapons" under HB 450, are indisputably in common use today by law-abiding citizens for lawful purposes, including self-defense.

---

[13] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10 § 4509(b)(6)(jury).

73. There are currently tens of millions of rifle magazines that are lawfully-possessed in the United States with capacities of more than seventeen rounds.

74. The most popular rifle in American history, and to this day, is the AR-15 platform, a semiautomatic rifle with standard magazines of 20 or 30 rounds.

75. The AR-15 was brought to the market in 1963, with a then-standard magazine of 20; the 30-round standard magazine was developed a few years later. Patrick Sweeney, *Gun Digest Book of the AR-15*, 104 (2005).

76. Two million AR-15s alone were manufactured between 1986 and 2010. *Heller II* at 1287; *see also Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from denial of cert) ("Roughly five million Americans own AR-styled semiautomatic rifles…The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting.")

77. Springfield Armory also introduced the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine. The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round

detachable magazines. *2014 Standard Catalog of Firearms*, 1102 (2014). Both the M1A and the Mini-14 are very popular to this day.[14]

78. Further, SS 1 for SB 6 bans ammunition magazines capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition. However, ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber. For example, a certain magazine often affiliated with the AR-15 will hold 30 rounds of 5.56 mm ammunition but only 10 rounds of the larger .458 SOCOM ammunition. Many popular magazines have similarly variable capacities. The existence of this variability means that common arms that come equipped with standard-capacity magazines of 17 rounds of ammunition or below are still banned under SB 6. Matthew Larosiere, *CATO Institute Legal Bulletin: Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions* https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions (July 17, 2018).

---

[14] Ammunition magazines capable of holding more than seventeen rounds are not only in common use today, they have been for centuries. At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 20 or 22-shot magazine capacity. Merriweather Lewis carried one on the Lewis & Clark expedition. Jim Garry, *Weapons of the Lewis & Clark Expedition* 91-103 (2012)

79.     Firearms with ammunition magazines capable of holding more than seventeen rounds, such as the AR-15, the M1A, and the Ruger Mini-14 are well-suited and preferred for self-defense.

80.     These ammunition magazines decrease the risk of running out of ammunition before one can successfully repel a criminal attack.

81.     The availability of more ammunition in an arm for self-defense is particularly preferable given that: (1) violent crimes often involve multiple attackers, increasing the likelihood that a greater number of defensive discharges will be required to eliminate the threat, and (2) the stress of a criminal attack greatly reduces the likelihood that shots fired will hit the aggressor, and (3) a single shot that does strike will rarely incapacitate the aggressor before he or she can complete his or her attack.

82.     SS 1 for SB 6 harms law-abiding citizens, not criminals.

83.     SS 1 for SB 6's prohibition on "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition" effectively bans the acquisition of  firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## V. THE UNCONSTITUTIONAL REGISTRY AND LICENSING PROCESS CREATED BY THE REGULATORY SCHEME

84.     The State of Delaware, through the Regulatory Scheme, further creates unconstitutional firearms registries and imposes unconstitutional licensing requirements upon ordinary, law-abiding citizens, including Plaintiffs.

85.     The State of Delaware purports to create an "exception" HB 450's ban whereupon ordinary law-abiding citizens may possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022, and then only, "[a]t that person's residence, place of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair." *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

86.     However, ordinary law-abiding citizens meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) are further encouraged, no later than 1 year from June 30, 2022, to apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession. 11 *Del. C.* § 1467(a).

87.     This "certificate of possession" is an unconstitutional firearms registration and licensing process.

88.     The State of Delaware also purports to create an "exception" to SS 1 for SB 6's ban whereupon SS 1 for SB 6 does not apply to "[a]n individual who holds a valid concealed carry permit issued with the approval of the Superior Court under § 1441 of this title." 11 *Del. C.* § 1469(c)(5).

89.     However, this "exception" requires prospective permit holders to comply with an extremely vague, arbitrary and burdensome registration and licensing process.

90.     The permit that provides a purported "exception" to SS 1 for SB 6 is open to "[a] person of full age and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the protection of the person's property," and requires prospective permit holders to strictly comply with the following conditions:

> "(1) The person shall make application therefor in writing and file the same with the Prothonotary of the proper county, at least 15 days before the then next term of the Superior Court, clearly stating that the person is of full age and that the person is desirous of being licensed to carry a concealed deadly weapon for personal protection or protection of the person's property, or both, and also stating the person's residence and occupation. The person shall submit together with such application all information necessary to conduct a criminal history background check. The Superior Court may conduct a criminal history background check pursuant to the procedures set forth in Chapter 85 of Title 11 for the purposes of licensing any person pursuant to this section.

(2) At the same time the person shall file, with the Prothonotary, a certificate of 5 respectable citizens of the county in which the applicant resides at the time of filing the application. The certificate shall clearly state that the applicant is a person of full age, sobriety and good moral character, that the applicant bears a good reputation for peace and good order in the community in which the applicant resides, and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property, or both. The certificate shall be signed with the proper signatures and in the proper handwriting of each such respectable citizen.

(3) Every such applicant shall file in the office of the Prothonotary of the proper county the application verified by oath or affirmation in writing taken before an officer authorized by the laws of this State to administer the same, and shall under such verification state that the applicant's certificate and recommendation were read to or by the signers thereof and that the signatures thereto are in the proper and genuine handwriting of each. Prior to the issuance of an initial license the person shall also file with the Prothonotary a notarized certificate signed by an instructor or authorized representative of a sponsoring agency, school, organization or institution certifying that the applicant: (i) has completed a firearms training course which contains at least the below-described minimum elements; and (ii) is sponsored by a federal, state, county or municipal law enforcement agency, a college, a nationally recognized organization that customarily offers firearms training, or a firearms training school with instructors certified by a nationally recognized organization that customarily offers firearms training. The firearms training course shall include the following elements:

    a.    Instruction regarding knowledge and safe handling of firearms;

    b.    Instruction regarding safe storage of firearms and child safety;

    c.      Instruction regarding knowledge and safe handling of ammunition;

    d.      Instruction regarding safe storage of ammunition and child safety;

    e.      Instruction regarding safe firearms shooting fundamentals;

    f.      Live fire shooting exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition;

    g.      Identification of ways to develop and maintain firearm shooting skills;

    h.      Instruction regarding federal and state laws pertaining to the lawful    purchase, ownership, transportation, use and possession of firearms;

    i.      Instruction regarding the laws of this State pertaining to the use of deadly force for self-defense; and

    j.      Instruction regarding techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution.

(4) At the time the application is filed, the applicant shall pay a fee of $65 to the Prothonotary issuing the same…

    a. The Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county. In making such publication it shall be sufficient for the

Prothonotary to do the same as a list in alphabetical form stating therein simply the name and residence of each applicant respectively.

b. The Prothonotary of the county in which the application for license is made shall lay before the Superior Court, at its then next term, all applications for licenses, together with the certificate and recommendation accompanying the same, filed in the Prothonotary's office, on the first day of such application.

c. The Court may or may not, in its discretion, approve any application, and in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose…" 11 *Del. C.* § 1441.

91.     Further, the Department of Safety and Homeland Security has published "Regulations Governing the Delaware Large Capacity Magazine Compensation Program" that provide a proposal for the collection and disposition of "recovered large capacity magazines." This proposal states that:

"3.1   Upon surrender, all LCM [large capacity magazines] shall be tagged or marked by the collecting agency as to:

3.1.1  Where collected;
3.1.2  Whom collected by;
3.1.3  Who collected from;
3.1.4  The date of collection;
3.1.5  The make, model and serial number if applicable."

*See, Department of Safety and Homeland Security Proposed 103 Regulations Governing the Delaware Large Capacity Magazine Compensation Program*

92.     This Compensation Program is an unconstitutional firearms registration and licensing process.

93.    The Regulatory Scheme's unconstitutional registration and licensing process reduces fundamental rights to mere privileges to be granted or denied at the whim of public officials and private individuals, accountable to no one, to whom the State of Delaware has impermissibly delegated the authority to review and publish applicants.

94.    The Regulatory Scheme's unconstitutional registration and licensing process is lengthy, expensive, invasive and completely unnecessary. Every firearm purchaser must already pass a background check under federal law which the federal government has streamlined via computer to take place in mere minutes.[15]

95.    Ordinary, law-abiding citizens are completely barred from possession, transportation and sale of common firearms-mislabeled as "assault weapons" and "large-capacity magazines" prior to applying to and participating in the Regulatory Scheme's unconstitutional registration and licensing process.

96.    The registration and licensing process imposed by the Regulatory Scheme heavily discriminates against and acts as a complete barrier to the acquisition of commonly used firearms by the poor or disadvantaged citizens of State of Delaware, who live in urban areas, where access to a public shooting range

---

[15] It is further believed, and therefore averred, that the State of Delaware intends to implement a program for return of "large-capacity magazines" whereupon compensation for those returned ammunition magazines is only granted to those who provide their names to the State. In so requiring, the State of Delaware creates not only an unconstitutional registry of "large-capacity magazine" owners but also of "assault weapon" owners.

is effectively non-existent and where the registration and licensing process is costly. The underlying intent and practical effect of these requirements is the disenfranchisement of Second Amendment rights for the poor and disadvantaged. These and the other requirements imposed by the registration and licensing process of the Regulatory Scheme form undue and effective practical barriers to the exercise of fundamental constitutional rights preserved by the Second Amendment.[16]

## VI.  THE EFFECT ON PLAINTIFFS

97.  Members of Plaintiff DSSA intend and desire to acquire, possess, and transport pistols, rifles, and shotguns banned by the Regulatory Scheme as "assault

---

[16] There is an overtly racist history of gun licensing and registration laws in the colonies and at the time of America's founding. The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823). An exception was provided, however, for "negroes, mullattos, or Indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.* Delaware, in its early history, like many states, used laws to restrict the use of firearms as a means of racial discrimination. *Laws of the State of Delaware*, Chapter 94, Vol. 12, March 6, 1861, at Section 7 (prohibiting free blacks from possessing guns); Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? at 233 (2021); Stephen B. Tahmassebi, *Gun Control and Racism*, 2 Civil Rights Law Journal 67 (1991) (describing history of gun control coinciding with oppression of blacks); *First Conviction under Weapon Law; Judge Foster gives Marino Rossi One Year for Arming himself…*" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting minorities to restrict their Second Amendment rights.)

weapons" and ammunition magazines capable of holding more than seventeen rounds banned by the Regulatory Scheme as "large-capacity magazines" and are subject to and adversely affected by each and every restriction on"assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

98. But for the Regulatory Scheme, some DSSA members would possess semiautomatic rifles designated as "assault weapons" under the Regulatory Scheme and ammunition magazines capable of holding more than seventeen rounds designated as "large-capacity magazines" under the Regulatory Scheme. Such rifles and ammunition magazines are commonly used for self-defense, hunting and target-shooting.

99. Further, some DSSA members are in the business of selling firearms in the State of Delaware. DSSA members' businesses are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

100. Plaintiff BRPC is a competitive shooting club that also conducts education, training, and competitive shooting events. BRPC and its members are subject to and adversely affected by the restrictions on "assault weapons" (including

the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

101.   BRPC conducts competitive shooting events that involve the use of rifles, including semiautomatic rifles. Further, BRPC membership permits the immediate family living in the same household as a named member to participate in the same club activities and competitive shooting programs as the named member. As a direct result of the "assault weapons" and "large-capacity magazines" bans BRPC and its members are prohibited from exercising their right to keep and bear arms by acquiring, possessing, and transporting "assault weapons" and "large-capacity magazines" for use in club activities. The restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint adversely affect the continued operation of BRPC and the rights of its individual members.

102.   Plaintiff DRPC is a shooting club that also conducts education, training, and regular and special shooting events that include competitive shooting events. DRPC and its members are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

103.   All members of Plaintiff DAFFL are Federal Firearms Licensees, licensed to do business in the State of Delaware. All of DAFFL's members are in

the business of selling firearms, including firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme in the State of Delaware. DAFFL's members' businesses are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and the restrictions on "large-capacity magazines" articulated in this complaint.

104. For example, DAFFL's members' businesses involve the sale of rifles, including semiautomatic rifles. As a direct result of the "assault weapons" ban, DAFFL's members are prohibited from selling many of the most popular semiautomatic rifles, such as the AR-15-type rifles which are often equipped with ammunition magazines capable of holding more than seventeen rounds, to customers in Delaware. But for Delaware's ban on "assault weapons" and "large-capacity magazines" DAFFL's members would sell AR-15-type rifles and other banned firearms in Delaware. Delaware's ban therefore has substantially harmed DAFFL's members' business.

105. Plaintiff Madonna M. Nedza is a resident of Harrington, Delaware, and a member of DSSA and BRPC, who owns an AR-15 rifle that she uses regularly in shooting competitions and for self-defense that would be impacted by the Regulatory Scheme. M. Nedza intends and desires to exercise her right to keep and bear arms by continuing to possess and purchase firearms deemed "assault weapons" and

ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme. M. Nedza would continue to purchase and possess these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. Particularly, M. Nedza would acquire and possess an AR platform rifle with a collapsible buttstock for purposes of self-defense as it is light and easy to use, which is an important characteristic to her as she ages. Further, M. Nedza currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme. M. Nedza also does not currently have a license to carry concealed weapons pursuant to 11 Del. C. § 1441, so as to purportedly be "exempt" from the "large-capacity magazine" ban of SS 1 for SB 6.

106.   Plaintiff Cecil Curtis Clements is a married engineer and legal guardian to his grandchild, who resides in Wilmington, Delaware, and is a member of DSSA. He is also an NRA certified firearms instructor, a range safety officer and instructor, and a competitive shooter who owns several firearms that would be impacted by the Regulatory Scheme. Clements intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and

ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of his roles as a firearms instructor, range safety officer and instructor and competitive shooter. Clements would continue to purchase and possess these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, Clements continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, Clements currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

107.   Plaintiff James E. Hosfelt Jr. is the retired Chief of Police for the City of Dover, and a member of DSSA who owns several firearms that would be impacted by the Regulatory Scheme, including AR-15 style rifles and pistols. Hosfelt intends and desires to exercise his right to keep and bear arms by continuing to possess and purchase firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes,

especially for self-defense. Hosfelt would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. Particularly Hosfelt would acquire and possess additional AR-15 style rifles and pistols. Further, Hosfelt currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

108.   Plaintiff Bruce C. Smith is a resident of Bridgeville, Delaware, and is a member of DSSA, BRPC and DAFFL, who owns several firearms that would be impacted by the Regulatory Scheme. Smith is also a Federal Firearms Licensee who owns a business, BKK Firearms, which involves the sale of firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme. Personally, Smith intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense. Further, Smith currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that

represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

109. As a Federal Firearms Licensee, and owner of BKK Firearms, Smith is also in the business of selling firearms, including firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, in the State of Delaware. Therefore, Smith's business is subject to and adversely affected by the restrictions on "assault weapons"(including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint. But for Delaware's ban on "assault weapons" and "large-capacity magazines" Smith would sell banned firearms in Delaware. Delaware's ban therefore has substantially harmed Smith's business.

110. Plaintiff Vickie Lynn Prickett is a resident of Middletown, Delaware, and is a member of DSSA, BRPC and DRPC, and is also an NRA certified firearms instructor who owns several firearms that would be impacted by the Regulatory Scheme. Prickett intends and desires to exercise her right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of her roles as a firearms instructor. Prickett is also a female of small stature and the Regulatory Scheme has an adverse impact upon her and women like her by banning certain

"assault weapons" that are lighter and easier to use for home and self-defense purposes. Prickett would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, Prickett continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, Prickett currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

111. Plaintiff Frank M. Nedza is a veteran of the United States Armed Forces and a member of DSSA, who resides in Harrington, Delaware. He is also an NRA certified firearms instructor, a range safety officer and instructor, and a competitive shooter who owns several firearms that would be impacted by the Regulatory Scheme. F. Nedza intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of

his roles as a firearms instructor, range safety officer and instructor and competitive shooter. F. Nedza would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, F. Nedza continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, F. Nedza currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme. F. Nedza also does not currently have a license to carry concealed weapons pursuant to 11 *Del. C.* § 1441, so as to purportedly be "exempt" from the "large-capacity magazine" ban of SS 1 for SB 6.

112. But for Delaware's unconstitutional Regulatory Scheme and Defendants' enforcement thereof, and the severe lifelong and criminal penalties associated with violations of the Regulatory Scheme, Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DAFFL and its similarly situated members, DRPC and its similarly situated members, and M.

Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza would exercise their right to keep and bear the banned firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" for lawful purposes, including self-defense, without the fear or risk of arrest, prosecution and loss of their right to keep and bear arms for engaging in constitutionally protected, lawful conduct.

## VII. DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AMENDMENT AND THE BROADER RIGHTS AFFORDED BY THE DELAWARE CONSTITUTION

113.  The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

114.  "[I]t 'has always been widely understood that the Second Amendment codified a pre-existing right.' The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (*citing Heller*, 554 U.S. at 599.)

115.  The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

116.   The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

117.   "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634 (2008).

118.   "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-635.

119.   In the wake of the Supreme Court's decisions in *Heller* and *McDonald*, Courts of Appeals developed a two-step test to assess Second Amendment claims. But in the recently decided *Bruen* case the Supreme Court rejected that two-step test as inconsistent with *Heller* and *McDonald* and as containing one step too many.  The Court determined that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

120.   In so doing, the Supreme Court held that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical  tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (*citing Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

121.   *Bruen*, thus, reinforced the Heller approach to assessing a Second Amendment challenge by (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right.  *Id*. at 2127-28.

122.   *Bruen* further reinforced reasoning by analogy, maintaining that "[m]uch like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding.  When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. at 2132.

123.   Drawing from this historical tradition, *Bruen* and *Heller* instruct that the Second Amendment protects the carrying of weapons "in common use at the time." *Id*. at 2128 (*quoting Heller* at 627).

124.   Indeed, for this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582 (citations omitted).

125.   What's more, the plain text of the Delaware Constitution affords even broader rights to bear arms than the Second Amendment, providing that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20 (emphasis added); *see also Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014)("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation."); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. 2018).

126.   In assessing the right to bear arms enumerated under the Delaware Constitution, the Supreme Court of the State of Delaware has emphasized "the significance of knowing the original text, context and evolution of any phrase that

appears in the present Delaware Constitution." *Bridgeville Rifle & Pistol Club, Ltd.*

*v. Small*, 176 A.3d 632, 642 (Del. 2017) (citations omitted).

127. The *Bridgeville* court further emphasized that "Section 20 protects a bundle of rights--including hunting, recreation, and the defense of self, family, and State." *Id.* at 652.

128. The firearms at issue in this case, mislabeled as "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. And they are, moreover, exactly what they would bring to service, e.g., militia duty and repelling violent mobs, should that be necessary.

129. Plaintiffs and their members have a constitutional right to make use of common firearms, given the misnomer "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, for effective self-defense and not to be disarmed by the Regulatory Scheme and its enforcement by Defendants.

130. The State must permit ordinary, law-abiding citizens to keep and bear common firearms, deemed "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, for lawful purposes.

131. The right to keep and bear common firearms, improperly deemed "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, guaranteed under the Bill of Rights, cannot be subjected to laws and regulations

such as the Regulatory Scheme's licensing and registration process, that act as an undue and unconstitutional burden preventing law-abiding citizens from keeping and bearing common firearms.

132. The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller* 554 U.S. at 636.

133. Yet, this is precisely how the Regulatory Scheme in Delaware operates, completely shutting out ordinary, law-abiding citizens from exercising their rights in the State -- and making a "policy choice" that the Federal and State Constitutions have "taken off the table."

## COUNT I

### 42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution
### (HB 450)

134. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

135. There is an actual and present controversy between the parties.

136. The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

137.    The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

138.    The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms for all lawful purposes, including self-defense.

139.    Under HB 450, the State of Delaware bans "assault weapons" that are common firearms, listed in sections *11 Del. C.* § 1465(2)-(3) of the Delaware Criminal Code.

140.    Further, under HB 450, in section 11 *Del. C.* § 1465(5) of the Delaware Criminal Code, the State of Delaware bans arms commonly used for lawful purposes by labeling them "assault weapons, grounding this ban on features that do not make a firearm more powerful or dangerous. Moreover, HB 450 mandates that a law-abiding citizen possessing an "assault weapon" legally under the exceptions to HB 450 enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon" incapable of being used for defense of self or family outside the home. *See* 11 *Del. C.* § 1465 (12); 11 *Del. C.* §1466 (c)(4).

141.   HB 450's registration and licensing process further violates the Second Amendment because:

(a)   a constitutional right may not be denied until a license to exercise that right is issued;

(b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

(c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

142.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

143.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its members, BRPC and its members, DRPC and its members, DAFFL and its members, and M. Nedza, Clements, Hosfelt, Smith, Prickett, and F. Nedza through Defendants' enforcement and implementation of HB 450.

144.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs to seek.

## COUNT II

**Action for Deprivation of Plaintiffs' Rights under Delaware Constitution
Article I, § 20
(HB 450)**

145. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

146. There is an actual and present controversy between the parties.

147. Article I, § 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

148. Article I, § 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.)

149. The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

150. Article I, § 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, both in the home and in public.

151. The right to keep and bear arms under Article I, § 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms for all lawful purposes, including self-defense.

152. Under HB 450, the State bans so-called "assault weapons" that are common firearms, listed in sections 11 *Del. C.* § 1465(2)-(3) of the Delaware Criminal Code.

153. Further, in 11 *Del. C.* § 1465(5) of the Delaware Criminal Code, the State bans arms commonly used for lawful purposes, as "assault weapons," grounding this ban on features that do not make a firearm more powerful or dangerous.

154. Further, HB 450 mandates that a law-abiding citizen possessing an "assault weapon" legally under the exceptions enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon" incapable of being used for defense of self or

family outside the home, contrary to the rights enumerated in the Delaware Constitution. *See* 11 *Del. C.* § 1465 (12); 11 *Del. C.* §1466 (c)(4).

155. HB 450's registration and licensing process further violates Article I, § 20 of the Delaware Constitution because:

(a) a constitutional right may not be denied until a license to exercise that right is issued;

(b) the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

(c) the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

156. Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza through Defendants' enforcement and implementation of HB 450.

157. Defendants have burdened the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly

situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza more than reasonably necessary to achieve important government objectives.

158.   For all the reasons asserted herein, Defendants have acted in violation of Article I, § 20 of the Delaware Constitution and continue to act in violation thereof, compelling the relief Plaintiffs seek.

## COUNT III

**Action for Violation of Plaintiffs' Rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution**
**(HB 450)**

159.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

160.   There is an actual and present controversy between the parties.

161.   The Fourteenth Amendment of the United States Constitution prohibits denying a citizen the due process of law.

162.   The Due Process Clause contains both a substantive and a procedural component. Substantive due process forbids the government from infringing on certain 'fundamental' liberty interests at all, no matter what process is provided unless the infringement is narrowly tailored to serve a compelling state interest. Procedural due process imposes constraints on governmental decisions which

deprive individuals of liberty or property interests within the meaning of the Due Process Clause.

### Impermissible Burden-Shifting

163.  "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

164.  The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." *Id.* at 361 (citing C. McCormick, Evidence § 321, at 681-682 (1954)); *see also* 9 J. Wigmore, Evidence § 2497 (3d ed. 1940).

165.  Further, the Delaware Constitution requires at least as much as the Due Process Clause, providing in part that an accused in a criminal prosecution, "shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." DEL. CONST., art. I, § 7.

166.  "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be

interpreted so as to provide greater rights." *Goddard v. State*, 382 A.2d 238, 240 (Del. 1977).

167.   Under the provisions of the Delaware Criminal Code, no person may be convicted of an offense unless the State proves each element of the offense beyond a reasonable doubt; the defendant is entitled to a jury instruction delineating the aforestated burden of the State, and the defendant may produce whatever credible evidence he has to negate the existence of any element of the crime charged. 11 *Del. C.* §§ 301, 302; *see also Goddard* at 241.

168.   HB 450, in a restrictive way, may permit ordinary citizens to possess and transport an "assault weapon"—but only if they lawfully possessed it prior to June 30, 2022,  and then only "[a]t that person's residence, place  of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair  " See 11 *Del. C.* § 1466 (c)(3)(a)-(d).

169.   Under HB 450: "[a] person who is exempt from § 1466(a) of this title under § 1466(c)(3) of this title may, no later than 1 year from [June 30, 2022], apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession." 11 *Del. C.* § 1467(a).[17]

170.   Further, "it is an affirmative defense that the defendant was lawfully in possession or had completed a purchase of the "assault weapon" prior to [June 30, 2022]. A certificate of possession is conclusive evidence that a person lawfully possessed or had completed a purchase of an assault weapon before [June 30, 2002] and is entitled to continue to possess and transport the assault weapon on or after [June 30, 2022] under § 1466(c)(3) of this title." 11 *Del. C.* § 1467(a).

171.   HB 450 shifts the burden of proof away from the State of Delaware and onto ordinary citizens lawfully possessing "assault weapons"—contrary to the Due Process Clause's protection of the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged, and contrary to the protections afforded by the Delaware Constitution, Article I, § 7 and 11 *Del. C.* §§ 301, 302.

---

[17] This "registry" enabled by HB 450 is in violation of 18 U.S.C. § 926(a)(3): "No such rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

172.   Defendants lack any legitimate or compelling interest for depriving Plaintiffs of their right to Due Process.

## Vagueness

173.   HB 450 is arbitrary and capricious and thus is invalidated by the Fourteenth Amendment's procedural due process protections.

174.   HB 450's listed "assault pistols" do not enumerate what generic features tie them together so as to justify their prohibition. *See* 11 *Del. C.* § 1465(3).

175.   HB 450 also does not enumerate any nexus between the generic definition of "assault long guns" and the listed firearms. *See* 11 *Del. C.* § 1465(2).

176.   Further, the only pistol identified as a "copycat weapon" is a semiautomatic pistol with a fixed magazine that holds more than 10 rounds, and what, exactly, is considered a "copy" is in no way defined or enumerated in HB 450. *See* 11 *Del. C.* § 1465(5).

177.   The randomly-chosen named firearms, mislabeled "assault weapons," have no common denominator that ties them together.

178.   The definitions are thus vague and arbitrary, in violation of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 251 (6th Cir. 1994) (Invalidating an ordinance defining "assault weapon" as a list of 46 named firearms together with "other

models by the same manufacturer with the same action design that have slight modifications or enhancements" as unconstitutionally vague).

179. Particularly, the definition of the term "copy" is unconstitutionally vague. *See Id*. at 253 ("A copy-cat weapon is only outlawed if it is developed from a listed weapon by a listed manufacturer…. [O]rdinary consumers cannot be expected to know the developmental history of a particular weapon…"); *see also Robertson v. Denver*, 874 P. 2d 325, 335 (Col. 1994) ("ascertaining the design history … of a pistol is not something that can be expected of a person of common intelligence.)

180. Here the vagueness is worse than that in *Springfield*, as the term "copy" found in HB 450 need not be by the same manufacturer.

181. This vagueness extends to the features listed in the definition that qualify an arm as a "copy." For example, an arm is considered a "copy" when it has a grip that allows an individual to grip the weapon in a manner "resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing." 11 *Del. C.* § 1465(a)(2). What constitutes "below any portion of the action" is vague and undefined.

182. HB 450 violates the Due Process Clause because it is vague, as the randomly chosen firearms mislabeled "assault weapons" have no common denominator that ties them together and the average ordinary, law-abiding gun

owner has no way of knowing the relevant history of firearms so as to be able to determine what constitutes a "copy."

## COUNT IV

**Action for Violation of Plaintiffs' Rights Pursuant to the Takings Clause under the Fifth Amendment and the Fourteenth Amendment of the U.S. Constitution**
**(HB 450)**

183.　Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

184.　There is an actual and present controversy between the parties.

185.　The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

186.　The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Lawfully possessed firearms—which the citizens have the right to "keep" under the Second Amendment and Article I, § 20 of the Delaware Constitution—cannot be taken without just compensation. *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097, at *2 (3d Cir. Aug. 30, 2022).

187. The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 537 (2005).

188. The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 636 (O'Connor, J., concurring)

189. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

190. HB 450 goes "too far" and must be recognized as a taking.

191. HB 450 prohibits the sale, manufacture, and possession of "assault weapons" in common use by law-abiding citizens and, in so doing, destroys the value of the lawful property of such citizens, including Plaintiffs, and destroys the

businesses of Federal Firearms Licensees, arbitrarily and capriciously and without just compensation.

192.   HB 450 takes the private property of Plaintiffs, for public use, without just compensation.

193.   In so doing, HB 450 constitutes a taking based on "the magnitude of [HB 450's] economic impact and the degree to which [HB 450] interferes with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

194.   HB 450 has a massive economic impact upon Plaintiffs, has significantly interfered with the distinct investment-backed expectations of individual law-abiding citizens who own "assault weapons" and businesses who sell "assault weapons," and, as described throughout this complaint, has been done in violation of the United States Constitution and the Delaware Constitution.

195.   Thus, HB 450 violates the Takings Clause of the Fifth and Fourteenth Amendments, for which Plaintiffs seek relief.

196.   Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Due Process of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of HB 450.

_____

## COUNT V

**Action Pursuant to Deprivation of Plaintiffs' Rights under the Equal
Protection Clause of the Fourteenth Amendment of the U.S. Constitution
(HB 450)**

197.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

198.   There is an actual and present controversy between the parties.

199.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

200.   All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

201.   HB 450 permits "possession by a qualified retired law-enforcement officer who is not otherwise prohibited from receiving an assault weapon if … the assault weapon is sold or transferred to the qualified retired law-enforcement officer by the law-enforcement agency on retirement" or "was purchased or obtained by the qualified retired law-enforcement officer for official use with the law-enforcement agency before retirement." 11 *Del. C.* § 1466(b)(7)(a)-(b).

202.   This is not limited to "assault weapons" obtained by the effective date of the enactment of HB 450.

203.   When they retire, those officers have no further law enforcement duties and become private citizens, yet other private, law-abiding citizens at large, including retired law enforcement officers who did not obtain a weapon through their agency prior to retirement,  would be committing a felony by obtaining the banned firearms.

204.   The law thus discriminates in favor of selected retired officers and against other law-abiding citizens of the State of Delaware, such as Plaintiffs  DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza.

205.   HB 450's officer exception arbitrarily and unreasonably affords a privilege—ownership of "assault weapons"—to one group of individuals that is denied to others and is wholly unconnected to any legitimate state interest.

206.   Further, as referenced in Count III, the arms enumerated as "assault weapons" under HB 450 are arbitrary.

207.   HB 450, thus, violates the Equal Protection Clause because the arms enumerated as "Assault Long Guns," "Assault Pistols," and more  generally, "assault weapons," are arbitrary and without any grounding, common denominator or nexus.

208.    HB 450 is also impermissibly vague, as the randomly chosen firearms mislabeled "assault weapons" have no common denominator that ties them together and the average ordinary, law-abiding gun owner has no way of knowing the relevant history of firearms so as to be able to determine what constitutes a "copy."

209.    Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Equal Protection of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of HB 450's officer exception.

## COUNT VI

### Action Pursuant to the Commerce Clause, U.S. Constitution Article I, Section 8, Clause 3 (HB 450)

210.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

211.    There is an actual and present controversy between the parties.

212.    The Commerce Clause vests Congress with "Power ... [t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, but also prohibits states from discriminating against interstate commerce.

213.    "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies

the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98 (1994)

214.   "The critical inquiry" under this "dormant" aspect of the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989).

215.   HB 450 prohibits ordinary, law-abiding citizens from transporting an "assault weapon" into Delaware and from manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing an "assault weapon" in Delaware. *See* 11 *Del. C.* § 1466(a)(1)-(2).

216.   Federally-licensed firearm importers have firearms, including "assault weapons" transported from foreign nations into U.S. ports where they clear customs and are then transported to the premises of importers, manufacturers, and dealers throughout the United States.

217.   The Port of Wilmington is a favorable destination for such purposes, but the Regulatory Scheme prohibits it. Firearms are also shipped by traveling on the Delaware River, through the boundaries of the State of Delaware, to the Port of Philadelphia. HB 450 criminalizes the transport of "assault weapons" to and through the Port of Wilmington and while traveling on the Delaware River, enroute to the Port of Philadelphia and other destinations.

218.   Although the ban does not apply to "[p]ossession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage, purchases, sales, and transport to or by a licensed firearms dealer or manufacturer" who "[a]cts to sell or transfer an assault weapon to a licensed firearm dealer in another state or to an individual purchaser in another state through a licensed firearms dealer" under 11 *Del. C.* § 1466(b)(3)(b), this exception does not allow a sale or transfer to a licensed manufacturer, nor does it allow a sale or transfer from or to a licensed firearm importer, and thus, bans the transport into and through Delaware of "assault weapons" by a federally-licensed importer, contrary to the power of Congress to regulate commerce with foreign nations.

219.   Further, "[i]f a restriction on commerce is discriminatory, it is virtually per se invalid" under the Commerce Clause. *Oregon Waste Systems, Inc*., at 99.

220.   The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. *Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994).

221.   HB 450 permits Delaware residents to possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022, and then only "[a]t that person's residence, place of business, or other property owned by that

74

person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair. *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

222. However, HB 450 is discriminatory because it does not permit non-Delaware residents to possess and transport "assault weapons" in identical circumstances while passing through Delaware.

223. HB 450 violates the dormant Commerce Clause because it is discriminatory, and it interferes with the natural functioning of the interstate market through prohibition and burdensome regulation. *See McBurney v. Young*, 569 U.S. 221, 235 (2013).

## COUNT VII

### Preemption Under 18 U.S.C. § 926A
### (HB 450)

224. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

225.   There is an actual and present controversy between the parties.

226.   18 U.S.C. § 926A, expressly permits a person to carry a firearm "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," provided the person properly stores the firearm.

227.   The Senate Judiciary Committee explained about § 926A: "This is intended to prevent local laws, which may ban or restrict firearm ownership, possession or transportation, from being used to harass interstate commerce and travelers."  Report 98-583, 9th Cong. 2d Sess., 27-28 (1984).

228.   Section 926A specifically entitles a person "'not otherwise prohibited … from transporting, shipping, or receiving a firearm' to 'transport a firearm … from any place where he may lawfully possess and carry' it to 'any other place' where he may do so." *Muscarello v. United States*, 524 U.S. 125, 134 (1998).

229.   HB 450 prohibits ordinary, law-abiding citizens from transporting an "assault weapon" into the State of Delaware and further prohibits the manufacture, sale, transfer, purchase, receipt, or possession of an "assault weapon."

230.   HB 450 conflicts with and stands as an obstacle to the accomplishment of 18 U.S.C. § 926A's purposes, which include the free transport of firearms across state lines, and for which Plaintiffs seek a remedy.

## COUNT VIII

**42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution
(SS 1 for SB 6)**

231.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

232.   There is an actual and present controversy between the parties.

233.   The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

234.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

235.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

236.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms, including common ammunition magazines, for all lawful purposes, including self-defense.

77

237.  Under SS 1 for SB 6, the State of Delaware bans "large-capacity magazines" that are common firearms, defined in 11 *Del. C.* § 1468 and SB 6 as "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 Del. C. § 1468

238.  Further, under SS 1 for SB 6, in section 11 *Del. C.* §§ 1468-1469 of the Delaware Criminal Code, the State of Delaware bans arms, including ammunition magazines, commonly used for lawful purposes by labeling them "large-capacity magazines," grounding this ban on features that do not make a firearm more powerful or dangerous.

239.  SS 1 for SB 6's registration and licensing process further violates the Second Amendment because:

   (a)   a constitutional right may not be denied until a license to exercise that right is issued;

   (b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

   (c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

240.  42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

241.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its members, BRPC and its members, DRPC and its members, DAFFL and its members, and M. Nedza, Clements, Hosfelt, Smith, Prickett, and F. Nedza through Defendants' enforcement and implementation of SS 1 for SB 6.

242.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs to seek.

## COUNT IX

**Action for Deprivation of Plaintiffs' Rights under Delaware Constitution
Article I, § 20
(SS 1 for SB 6)**

243.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

244.   There is an actual and present controversy between the parties.

245.   Article I,  § 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

246.   Article I, § 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than

the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.)

247.   The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

248.   Article I, § 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, including common ammunition magazines, both in the home and in public.

249.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

250.   The right to keep and bear arms under Article I, § 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms, including common ammunition magazines, for all lawful purposes, including self-defense.

251. Under SS 1 for SB 6, the State bans "large-capacity magazines" that are common firearms.

252. Further, in 11 *Del. C.* § 1468-1469 of the Delaware Criminal Code, the State bans arms commonly used for lawful purposes, as "large-capacity magazines," grounding this ban on features that do not make a firearm and/or ammunition magazine more powerful or dangerous.

253. SS 1 for SB 6's registration and licensing process further violates Article I, § 20 of the Delaware Constitution because:

    (a)    a constitutional right may not be denied until a license to exercise that right is issued;

    (b)    the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

    (c)    the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

254. Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza,

Clements, Hosfelt, Smith, Prickett and F. Nedza through Defendants' enforcement and implementation of SS 1 for SB 6.

255. Defendants have burdened the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza more than reasonably necessary to achieve important government objectives.

256. For all the reasons asserted herein, Defendants have acted in violation of Article I, § 20 of the Delaware Constitution and continue to act in violation thereof, compelling the relief Plaintiffs seek.

## COUNT X

**Action for Violation of Plaintiffs' Rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution (SS 1 for SB 6)**

257. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

258. There is an actual and present controversy between the parties.

259. The Fourteenth Amendment of the United States Constitution prohibits denying a citizen the due process of law.

260. The Due Process Clause contains both a substantive and a procedural component. Substantive due process forbids the government from infringing on certain 'fundamental' liberty interests at all, no matter what process is provided unless the infringement is narrowly tailored to serve a compelling state interest. Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause.

### Impermissible Burden-Shifting

261. "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

262. The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." *Id*. at 361 (citing C. McCormick, Evidence § 321, at 681-682 (1954)); *see also* 9 J. Wigmore, Evidence § 2497 (3d ed. 1940).

263. Further, the Delaware Constitution requires at least as much as the Due Process Clause, providing in part that an accused in a criminal prosecution, "shall

not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." DEL. CONST., art. I, § 7.

264.   "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be interpreted so as to provide greater rights." *Goddard v. State*, 382 A.2d 238, 240 (Del. 1977).

265.   Under the provisions of the Delaware Criminal Code, no person may be convicted of an offense unless the State proves each element of the offense beyond a reasonable doubt; the defendant is entitled to a jury instruction delineating the aforestated burden of the State, and the defendant may produce whatever credible evidence he has to negate the existence of any element of the crime charged. 11 *Del. C.* §§ 301, 302; *see also Goddard* at 241.

266.   SS 1 for SB 6, in a restrictive way, permits ordinary citizens to possess and transport a "large-capacity magazine"—but only if they hold a valid concealed carry permit issued by the Superior Court under § 1441 of this title." 11 *Del. C.* § 1469(c)(5).

267.   Under 11 *Del. C.* § 1441 as applied to SB 6 and, thus, "large-capacity magazines," "[a] person of full age and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the

protection of the person's property may be licensed to do so" when certain, arbitrary, impermissibly vague conditions are strictly met. 11 *Del. C.* § 1441.

268.  Chief among the conditions of this license are that "[t]he Court may or may not, in its discretion, approve any application…." and that "[t]he Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county." 11 *Del. C.* § 1441(b)-(c).[18]

269.  SS 1 for SB 6, thus shifts the burden of proof away from the State of Delaware and onto ordinary citizens lawfully possessing "large-capacity magazines"—contrary to the Due Process Clause's protection of the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" and contrary to the protections afforded by the Delaware Constitution, Article I, § 7 and 11 *Del. C.* §§ 301, 302.

---

[18] This public "registry" created by SB 6 is in violation of 18 U.S.C. § 926(a)(3): "No such rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

270.   Defendants lack any legitimate or compelling interest for depriving Plaintiffs of their right to Due Process.

## Vagueness

271.   SS 1 for SB 6 is arbitrary, capricious and impermissibly vague, and thus is invalidated by the Fourteenth Amendment's procedural due process protections.

272.   SS 1 for SB 6 bans ammunition magazines "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468. However, ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber. The existence of this variability renders the definition of "large-capacity magazine" vague and arbitrary, in violation of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 251 (6th Cir. 1994) (Invalidating an ordinance defining "assault weapon" as a list of 46 named firearms together with "other models by the same manufacturer with the same action design that have slight modifications or enhancements" as unconstitutionally vague).

273.   Further, the average ordinary, law-abiding gun owner has no way of knowing what ammunition magazines are "capable of accepting" or are "readily convertible" over 17 rounds of ammunition.

274.    Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Due Process of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation SS 1 for SB 6 by shifting the burden of proof for violation of SS 1 for SB 6 away from the State and upon ordinary citizens lawfully possessing "large-capacity magazines," and by creating an arbitrary, capricious and impermissibly vague law.

## COUNT XI

### Action for Violation of Plaintiffs' Rights Pursuant to the Takings Clause under the Fifth Amendment and the Fourteenth Amendment of the U.S. Constitution
### (SS 1 for SB 6)

275.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

276.    There is an actual and present controversy between the parties.

277.    The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

278.    The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Lawfully possessed magazines—which the citizens have the right to "keep" under the Second Amendment and Article I, § 20 of the Delaware Constitution—cannot be taken without just compensation. *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097, at *2 (3d Cir. Aug. 30, 2022).

279.   The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 537 (2005).

280.   The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). While these factors provide "important guideposts," "[t]heTakings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 636 (O'Connor, J., concurring)

281.   "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will  be  recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

88

282. SS 1 for SB 6 takes the private property of Plaintiffs for public use, without just compensation.

283. SS 1 for SB 6 goes "too far" and must be recognized as a taking.

284. SS 1 for SB 6 prohibits the sale, manufacture, and possession of "large-capacity magazines" in common use by law-abiding citizens and, in so doing, destroys the value of the lawful property of such citizens, including Plaintiffs, and destroys the businesses of Federal Firearms Licensees, arbitrarily and capriciously and without just compensation.

285. In so doing, SS 1 for SB 6 constitutes a taking based upon "the magnitude of [SS 1 for SB 6's] economic impact and the degree to which [SS 1 for SB 6] interferes with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

286. SS 1 for SB 6 has a massive economic impact upon Plaintiffs, has significantly interfered with the distinct investment-backed expectations of individual law-abiding citizens who own "large-capacity magazines" and businesses who sell "large-capacity magazines," and, as laid out throughout this complaint, has been done in violation of the United States Constitution and the Delaware Constitution.

287. Thus, SS 1 for SB 6 violates the Takings Clause of the Fifth and Fourteenth Amendments, for which Plaintiffs seek relief.

---

## <u>COUNT XII</u>

### Action Pursuant to Deprivation of Plaintiffs' Rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution (SS 1 for SB 6)

288.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

289.    There is an actual and present controversy between the parties.

290.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

291.    All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

292.    SS 1 for SB 6 does not apply to "a qualified retired law-enforcement officer," and thus permits possession of a "large-capacity magazine" by "a qualified retired law-enforcement officer." 11 *Del. C.* § 1469(c)(4).

293.    When they retire, such officers have no further law enforcement duties and become private citizens, yet other private, law-abiding citizens at large would be breaking the law by obtaining the banned "large-capacity magazines."

294.    The law thus discriminates in favor of selected retired officers and against other law-abiding citizens of the State of Delaware, such as Plaintiffs  DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC

and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza.

295. SS 1 for SB 6's officer exception arbitrarily and unreasonably affords a privilege--ownership of "large-capacity magazines"—to one group of individuals that is denied to others and is wholly unconnected to any legitimate state interest.

296. Further, the arms and ammunition magazines defined under SS 1 for SB 6 as "large-capacity magazines" because they are "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition" are arbitrary and impermissibly vague as ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber.

297. SS 1 for SB 6, thus, violates the Equal Protection Clause because the arms enumerated as "large-capacity magazines" are arbitrary, impermissibly vague and without any grounding, common denominator or nexus.

298. Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Equal Protection of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of SS 1 for SB 6's officer exception.

_____

## COUNT XIII

### Action Pursuant to the Commerce Clause, U.S. Constitution Article I, Section 8, Clause 3
### (SS 1 for SB 6)

299.  Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

300.  There is an actual and present controversy between the parties.

301.  The Commerce Clause vests Congress with "Power ... [t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const., art. I, § 8 cl. 3, but also  prohibits states from discriminating against interstate commerce.

302.  "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98 (1994)

303.  "The critical inquiry" under this "dormant" aspect of the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989).

304. SS 1 for SB 6 prohibits ordinary, law-abiding citizens from transporting a "large-capacity magazine" into Delaware and from manufacturing,

selling, offering to sell, transferring, purchasing, receiving, or possessing a "large-capacity magazine" in Delaware. See 11 *Del. C.* § 1469(a).

305. The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

306. Federally-licensed firearm importers have firearms, including "large-capacity magazines" transported from foreign nations into U.S. ports where they clear customs and are then transported to the premises of importers, manufacturers, and dealers throughout the United States.

307. The Port of Wilmington is a favorable destination for such purposes, but the Regulatory Scheme prohibits it. Firearms, including "large-capacity magazines" are also shipped by traveling on the Delaware River, through the boundaries of the State of Delaware, to the Port of Philadelphia. SS 1 for SB 6 criminalizes the transport of "large-capacity magazines" to and through the Port of Wilmington and while traveling on the Delaware River, en route to the Port of Philadelphia and other destinations.

308. Although the ban does not apply to "[a] licensed firearms dealer that sells a large-capacity magazine to another licensed firearms dealer" under 11 *Del. C.* § 1469(c)(6), this exception does not allow a sale or transfer to a licensed

manufacturer, nor does it allow a sale or transfer from or to a licensed firearm importer, and thus, bans the transport into and through Delaware of "large-capacity magazines" by a federally-licensed importer, contrary to the power of Congress to regulate commerce with foreign nations.

309. Further, "[i]f a restriction on commerce is discriminatory, it is virtually per se invalid" under the Commerce Clause. *Oregon Waste Systems, Inc.*, at 99.

310. The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. *Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383 (1994).

311. SS 1 for SB 6 purports to permit certain Delaware residents possessing "a valid concealed carry permit issued by the Superior Court under § 1441 of this title" to possess a "large-capacity magazine." 11 *Del. C.* § 1469(c)(5). However, SS 1 for SB 6 is discriminatory because it does not permit non-Delaware residents to possess and transport "large-capacity magazines" in identical circumstances while passing through Delaware.

312. SS 1 for SB 6 violates the dormant Commerce Clause because it is discriminatory, and it interferes with the natural functioning of the interstate

market through prohibition and burdensome regulation. *See McBurney v. Young*, 569 U.S. 221, 235 (2013).

## COUNT XIV

### Preemption Under 18 U.S.C. § 926A
### (SS 1 for SB 6)

313.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

314.   There is an actual and present controversy between the parties.

315.   18 U.S.C. § 926A, expressly permits a person to carry a firearm "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," provided the person properly stores the firearm.

316.   The Senate Judiciary Committee explained about § 926A: "This is intended to prevent local laws, which may ban or restrict firearm ownership, possession or transportation, from being used to harass interstate commerce and travelers." Report 98-583, 9th Cong. 2d Sess., 27-28 (1984).

317.   Section 926A specifically entitles a person "'not otherwise prohibited … from transporting, shipping, or receiving a firearm' to 'transport a firearm … from any place where he may lawfully possess and carry' it to 'any other place' where he may do so." *Muscarello v. United States*, 524 U.S. 125, 134 (1998).

318.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

319.   SS 1 for SB 6 prohibits ordinary, law-abiding citizens from transporting a "large-capacity magazine" into the State of Delaware and further prohibits the manufacture, sale, transfer, purchase, receipt, or possession of an "large-capacity magazine."

320.   SS 1 for SB 6 conflicts with and stands as an obstacle to the accomplishment of 18 U.S.C. § 926A's purposes, which include the free transport of firearms across state lines, and for which Plaintiffs seek a remedy.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully pray for the following relief:

(a)    A declaratory judgment that Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza have a fundamental right to keep and bear arms including by offering for sale, acquiring, transporting into and within Delaware, possessing, transferring, and lawfully using common semiautomatic firearms banned under the Regulatory Scheme for all lawful

purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the Delaware Constitution;

(b)     A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs DSSA and its similarly situated members, BRPC and its similarlysituated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza from exercising their fundamental right to keep and bear arms, including by offering for sale, acquiring, transporting into and within Delaware, possessing, transferring, and lawfully using common semiautomatic firearms banned under the Regulatory Scheme for all lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution and Article I, § 20 of the Delaware Constitution;

(c)     A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same violates Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and

F. Nedza's rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution;

(d)     A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same violates Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza's rights to Equal Protection under the Fourteenth Amendment of the U.S. Constitution;

(e)     Permanent injunctive relief to prevent Defendants from enforcing the Regulatory Scheme, thereby avoiding irreparable harm as a result of such enforcement.

(f)     Attorney's fees pursuant to 42 U.S.C. § 1988.

(g)     Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully Submitted,

LEWIS BRISBOIS
    BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire (No. 2624)
Cheneise V. Wright, Esquire (No. 6597)
Alexander MacMullan, Esquire
(Pro Hac Vice Motion Forthcoming)
500 Delaware Ave., Suite 700
Wilmington, Delaware 19801
302-985-6000
Francis.Pileggi@LewisBrisbois.com
Cheneise.Wright@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

*Attorneys for Plaintiffs*

Dated: September 9, 2022

# INDEX OF EXHIBITS

**Exhibit A**-  House Bill 450

**Exhibit B**-  Senate Substitute 1 for Senate Bill 6

**Exhibit C**-  Senate Bill 68

**Exhibit D**-  Vacated decision in *Bianchi v. Frosh*, No. 21-1255 (4th Cir., Sept 17, 2021)

**Exhibit E**-  *Rocky Mountain Gun Owners v. The Town of Superior*, Civ. Action No. 22-cv-01685-RM (D. Colo. July 22, 2022); *Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County,* Civ. Action No. 1:22-cv-02113-CNS-MEH (D. Colo. Aug 30, 2022)

**Exhibit F**- *Frein v. Pa. State Police*, No. 21-1830 (3rd Cir., August 30, 2022)

# EXHIBIT A



SPONSOR: Rep. Longhurst & Sen. Poore & Rep. Schwartzkopf &
Rep. Mitchell & Rep. Dorsey Walker & Rep. Baumbach
& Rep. Bolden & Rep. Griffith & Rep. Lynn
Reps. Bentz, Chukwuocha, Freel, Heffernan, K. Johnson,
Kowalko, Lambert, Minor-Brown, Morrison, Osienski;
Sens. Gay, Lockman, S. McBride, Paradee, Pinkney,
Sokola, Sturgeon, Townsend

HOUSE OF REPRESENTATIVES
151st GENERAL ASSEMBLY

HOUSE BILL NO. 450
AS AMENDED BY
HOUSE AMENDMENT NO. 1

AN ACT TO AMEND THE DELAWARE CODE RELATING TO DEADLY WEAPONS.

1       WHEREAS, on May 24 an 18-year-old gunman entered Robb Elementary School in Uvalde, Texas and murdered

2   19 children and 2 teachers with an AR-15-style semi-automatic rifle; and

3       WHEREAS, this tragedy came just 10 days after a shooting in Buffalo, New York where a gunman with an AR-15-

4   style semi-automatic rifle murdered 10 people in a grocery store; and

5       WHEREAS, there have been dozens more mass shootings during the last decade, including in 2019 at a Walmart in

6   El Paso, Texas, where a gunman using a WASR-10 semi-automatic rifle murdered 23 people and wounded 23 others; and

7       WHEREAS, in 2018 at Stoneman Douglas High School in Parkland, Florida, a gunman with an AR-15-style semi-

8   automatic rifle murdered 14 students and 3 adults and injured 17 more people; and

9       WHEREAS, in 2017, a gunman barricaded himself in a Las Vegas hotel room and used multiple AR-15 and AR-

10  10-type rifles to murder 60 people and injure hundreds more at an outdoor music festival; and

11      WHEREAS, in 2012, a shooter walked into Sandy Hook Elementary School in Newtown, Connecticut armed with

12  a Bushmaster semi-automatic rifle with 30-round magazines enabling him to fire 154 rounds in less than 5 minutes, murdering

13  20 first-grade children and 6 adults; and

14      WHEREAS, assault-style weapons have been used disproportionately to their ownership in mass shootings; and

15      WHEREAS, in 1994, Congress adopted the Violent Crime Control and Law Enforcement Act of 1994, which

16  prohibited the possession and sale of assault-style weapons and large capacity ammunition magazines which limited

17  magazines to 10 rounds; and

HD : KL : MAW : 2141510711
LC : HVW : : 5081510253                                                Draft: 06/13/2022  03:36 PM

18      WHEREAS, between 1994 and 2004 when the Act was in effect, there were fewer than 20 mass shootings during

19   that decade, substantially lower than the decades since, and since the law expired in 2004 there has been a proliferation of

20   assault-style weapons in the United States; and

21      WHEREAS, since 2009, there have been 274 mass shootings in the United States resulting in 1,536 people shot and

22   killed and 983 people shot and wounded, including 362 children and teens and 21 law enforcement officers; and

23      WHEREAS, between 2009 and 2020, there were at least 30 mass shootings that involved the use of an assault-style

24   weapon, resulting in 347 deaths and 719 injuries, with mass shootings that involved an assault-style weapon accounting for

25   25 percent of all mass shooting deaths and 76 percent of injuries; and

26      WHEREAS, assault-style weapons have immense killing power which amplifies the deadly will of a person seeking

27   to kill others and the use of an assault weapon has led to six times as many people shot per mass shooting; and

28      WHEREAS, the AR-15, AK-47 and other similar firearm profiles now recognized as assault-style weapons were

29   originally designed solely for military use, and these weapons, which have been modified over time to be marketed and sold

30   to civilians, were not intended for sport or self-defense; and

31      WHEREAS, the Delaware General Assembly has a compelling interest to ensure the safety of Delawareans and

32   finds that assault-style weapons are exceptionally lethal weapons of war that have no place in civilian life.

33      NOW, THEREFORE:

34      BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

35      Section 1. Amend Subchapter VII, Chapter 5, Title 11 of the Delaware Code by making deletions as shown by strike

36   through and insertions as shown by underline as follows:

37      §§ 1464 - 1469. [Reserved.]

38      § 1464. Legislative findings.

39      The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the

40   health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in § 1465

41   of this title based upon finding that each firearm has such a high rate of fire and capacity for firepower that its potential

42   function as a sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure

43   human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the possession and use of

44   assault weapons. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those

45   weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational

46   activities.

47      § 1465. Definitions related to assault weapons.

48        For purposes of this section and § 1466 and § 1467 of this title:

49        (1) "Ammunition feeding device" means any magazine, belt, drum, feed strip, or similar device that holds

50        ammunition for a firearm.

51        (2) "Assault long gun" means any of the following or a copy, regardless of the producer or manufacturer:

52        a. American Arms Spectre da Semiautomatic carbine.

53        b. Avtomat Kalashnikov semiautomatic rifle in any format, including the AK-47 in all forms.

54        c. Algimec AGM-1 type semi-auto.

55        d. AR 100 type semi-auto.

56        e. AR 180 type semi-auto.

57        f. Argentine L.S.R. semi-auto.

58        g. Australian Automatic Arms SAR type semi-auto.

59        h. Auto-Ordnance Thompson M1 and 1927 semi-automatics.

60        i. Barrett light .50 cal. semi-auto.

61        j. Beretta AR70 type semi-auto.

62        k. Bushmaster semi-auto rifle.

63        l. Calico models M-100 and M-900.

64        m. CIS SR 88 type semi-auto.

65        n. Claridge HI TEC C-9 carbines.

66        o. Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle.

67        p. Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2.

68        q. Dragunov Chinese made semi-auto.

69        r. Famas semi-auto (.223 caliber).

70        s. Feather AT-9 semi-auto.

71        t. FN LAR and FN FAL assault rifle.

72        u. FNC semi-auto type carbine.

73        v. F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun.

74        w. Steyr-AUG-SA semi-auto.

75        x. Galil models AR and ARM semi-auto.

76        y. Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3.

77        z. Holmes model 88 shotgun.

| | |
|---|---|
| 78 | aa. Manchester Arms "Commando" MK-45, MK-9. |
| 79 | bb. Mandell TAC-1 semi-auto carbine. |
| 80 | cc. Mossberg model 500 Bullpup assault shotgun. |
| 81 | dd. Sterling Mark 6. |
| 82 | ee. P.A.W.S. carbine. |
| 83 | ff. Ruger mini-14 folding stock model (.223 caliber). |
| 84 | gg. SIG 550/551 assault rifle (.223 caliber). |
| 85 | hh. SKS with detachable magazine. |
| 86 | ii. AP-74 Commando type semi-auto. |
| 87 | jj. Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, and M1A, excluding the M1 |
| 88 | Garand. |
| 89 | kk. Street sweeper assault type shotgun. |
| 90 | *ll*. Striker 12 assault shotgun in all formats. |
| 91 | mm. Unique F11 semi-auto type. |
| 92 | nn. Daewoo USAS 12 semi-auto shotgun. |
| 93 | oo. UZI 9mm carbine or rifle. |
| 94 | pp. Valmet M-76 and M-78 semi-auto. |
| 95 | qq. Weaver Arms "Nighthawk" semi-auto carbine. |
| 96 | rr. Wilkinson Arms 9mm semi-auto "Terry". |
| 97 | (2) "Assault pistol" means any of the following or a copy, regardless of the producer or manufacturer: |
| 98 | a. AA Arms AP-9 pistol. |
| 99 | b. Beretta 93R pistol. |
| 100 | c. Bushmaster pistol. |
| 101 | d. Claridge HI-TEC pistol. |
| 102 | e. D Max Industries pistol. |
| 103 | f. EKO Cobra pistol. |
| 104 | g. Encom MK-IV, MP-9, or MP-45 pistol. |
| 105 | h. Heckler and Koch MP5K, MP7, SP-89, or VP70 pistol. |
| 106 | i. Holmes MP-83 pistol. |
| 107 | j. Ingram MAC 10/11 pistol and variations, including the Partisan Avenger and the SWD Cobray. |

HD : KL : MAW : 2141510711
LC : HVW : : 5081510253

Draft: 06/13/2022 03:36 PM

| | |
|---|---|
| 108 | k. Intratec TEC-9/DC-9 pistol in any centerfire variation. |
| 109 | l. P.A.W.S. type pistol. |
| 110 | m. Skorpion pistol. |
| 111 | n. Spectre double action pistol (Sile, F.I.E., Mitchell). |
| 112 | o. Stechkin automatic pistol. |
| 113 | p. Steyer tactical pistol. |
| 114 | q. UZI pistol. |
| 115 | r. Weaver Arms Nighthawk pistol. |
| 116 | s. Wilkinson "Linda" pistol. |
| 117 | (3) "Assault weapon" means any of the following: |
| 118 | a. An assault long gun. |
| 119 | b. An assault pistol. |
| 120 | c. A copycat weapon. |
| 121 | (4) "Completed a purchase" means that the purchaser completed an application, passed a background check, |
| 122 | and has a receipt or purchase order for the assault weapon, without regard to whether the purchaser has actual physical |
| 123 | possession of the assault weapon. If receipt of the assault weapon will not occur until more than 1 year after [the effective |
| 124 | date of this Act], it is not a completed purchase. |
| 125 | (5) "Copycat weapon" means any of the following: |
| 126 | a. A semiautomatic, centerfire rifle that can accept a detachable magazine and has at least 1 of the following: |
| 127 | 1. A folding or telescoping stock. |
| 128 | 2. Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which |
| 129 | would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger |
| 130 | being directly below any portion of the action of the weapon when firing. |
| 131 | 3. A forward pistol grip. |
| 132 | 4. A flash suppressor. |
| 133 | 5. A grenade launcher or flare launcher. |
| 134 | b. A semiautomatic, centerfire rifle that has an overall length of less than 30 inches. |
| 135 | c. A semiautomatic pistol that can accept a detachable magazine and has at least 1 of the following: |
| 136 | 1. An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol |
| 137 | grip. |

Draft: 06/13/2022  03:36 PM

138     2. A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer.

139     3. A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to

140 fire the firearm without being burned, except a slide that encloses the barrel.

141     4. A second hand grip.

142     d. A semiautomatic shotgun that has both of the following:

143     1. A folding or telescoping stock.

144     2. Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which

145 would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger

146 being directly below any portion of the action of the weapon when firing.

147     e. A semiautomatic shotgun that has the ability to accept a detachable magazine.

148     f. A shotgun with a revolving cylinder.

149     g. A semiautomatic pistol with a fixed magazine that can accept more than 17 rounds.

150     h. A semiautomatic, centerfire rifle that has a fixed magazine that can accept more than 17 rounds.

151     (6) "Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm

152 without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

153     (7) "Family" means as defined in § 901 of Title 10.

154     (8) "Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect

155 muzzle flash from the shooter's field of vision.

156     (9) "Qualified retired law-enforcement officer" means as defined in § 1441B(c) of this title.

157     (10) "Shooting range" means any land or structure used and operated in accordance with all applicable laws and

158 ordinances for the shooting of targets for training, education, practice, recreation, or competition.

159     (11) "Grenade launcher" means a device designed to fire, launch, or propel a grenade.

160     (12) "Secure storage" means a firearm that is stored in a locked container or equipped with a tamper resistant

161 mechanical lock or other safety device that is properly engaged so as to render the firearm inoperable by a person other

162 than the owner or other lawfully authorized user.

163     § 1466. Manufacture, sale, transport, transfer, purchase, receipt, and possession of assault weapons; class E or F

164 felony.

165     (a) Prohibitions. - Except as provided in subsection (b) or (c) of this section, it is unlawful for a person to do any of

166 the following:

167     (1) Transport an assault weapon into this State.

168       (2) Manufacture, sell, offer to sell, transfer, purchase, receive, or possess an assault weapon.

169       (b) Applicability - This section does not apply to any of the following:

170       (1) The following individuals, if acting within the scope of official business:

171       a. Personnel of the United States government or a unit of that government.

172       b. Members of the armed forces of the United States or of the National Guard.

173       c. A law-enforcement officer.

174       (2) An assault weapon modified to render it permanently inoperative.

175       (3) Possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage,

176  purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who does any of the following:

177       a. Provides or services an assault weapon for a law-enforcement agency of this State or for personnel

178  exempted under paragraph (b)(1) of this section.

179       b. Acts to sell or transfer an assault weapon to a licensed firearm dealer in another state or to an individual

180  purchaser in another state through a licensed firearms dealer.

181       c. Acts to return to a customer in another state an assault weapon transferred to the licensed firearms dealer

182  or manufacturer under the terms of a warranty or for repair.

183       (4) Organizations that are required or authorized by federal law governing their specific business or activity to

184  maintain assault weapons.

185       (5) The receipt of an assault weapon by inheritance, and possession of the inherited assault weapon, if the

186  decedent lawfully possessed the assault weapon and the person inheriting the assault weapon is not otherwise a person

187  prohibited under § 1448 of this title.

188       (6) The receipt of an assault weapon by a personal representative of an estate for purposes of exercising the

189  powers and duties of a personal representative of an estate, including transferring the assault weapon according to will

190  or probate proceedings.

191       (7) Possession by a qualified retired law-enforcement officer who is not otherwise prohibited from receiving an

192  assault weapon if either of the following applies:

193       a. The assault weapon is sold or transferred to the qualified retired law-enforcement officer by the law-

194  enforcement agency on retirement.

195       b. The assault weapon was purchased or obtained by the qualified retired law-enforcement officer for

196  official use with the law-enforcement agency before retirement.

HD : KL : MAW : 2141510711
LC : HVW : : 5081510253

Draft: 06/13/2022 03:36 PM

197     (8) Possession or transport by an armored car guard, as defined in § 1302 of Title 24, if the armored car guard

198     is acting within the scope of employment with an armored car agency, as defined under § 1302 of Title 24, and is licensed

199     under Chapter 13 of Title 24.

200     (9) Possession, receipt, and testing by, or shipping to or from any of the following:

201         a. An ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory.

202         b. A facility or entity that manufactures or provides research and development testing, analysis, or

203     engineering for personal protective equipment or vehicle protection systems.

204     (c) Exceptions. -

205     (1) A licensed firearms dealer may continue to do all of the following with an assault weapon that the licensed

206     firearms dealer lawfully possessed on or before [the effective date of this Act]:

207         a. Possess the assault weapon.

208         b. Sell the assault weapon or offer the assault weapon for sale. But, the licensed firearms dealer may only

209     sell the assault weapon or offer the assault weapon for sale as permitted under paragraph (b)(3)b. of this section.

210         c. Transfer the assault weapon. But, the licensed firearms dealer may only transfer the assault weapon as

211     permitted by paragraph (b)(3)b. or (b)(3)c. of this section.

212     (2)a. A licensed firearms dealer may take possession of an assault weapon from a person who lawfully possessed

213     the assault weapon before [the effective date of this Act] for the purposes of servicing or repairing the assault weapon.

214         b. A licensed firearms dealer may transfer possession of an assault weapon received under paragraph

215     (c)(2)a. of this section for purposes of accomplishing service or repair of the assault weapon.

216     (3) A person who lawfully possessed, or completed a purchase of an assault weapon prior to [the effective date

217     of this Act], may possess and transport the assault weapon on or after [the effective date of this Act] only under the

218     following circumstances:

219         a. At that person's residence, place of business, or other property owned by that person, or on property

220     owned by another person with the owner's express permission.

221         b. While on the premises of a shooting range.

222         c. While attending any exhibition, display, or educational project that is about firearms and that is sponsored

223     by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized

224     entity that fosters proficiency in, or promotes education about, firearms.

HD : KL : MAW : 2141510711
LC : HVW :  : 5081510253

Draft: 06/13/2022  03:36 PM

225    d. While transporting the assault weapon between any of the places set forth in this this paragraph (c)(3) of

226    this section, or to any licensed firearms dealer for servicing or repair under paragraph (c)(2) of this section, if the

227    person places the assault weapon in secure storage.

228    (4) A person may transport an assault weapon to or from any of the following if the person places the assault

229    weapon in secure storage:

230    a. An ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory.

231    b. A facility or entity that manufactures or provides research and development testing, analysis, or

232    engineering for personal protective equipment or vehicle protection systems.

233    (5) Ownership of an assault weapon may be transferred from the person owning the assault weapon to a member

234    of that person's family, and it is lawful for the family member to possess the transferred assault weapon under paragraph

235    (c)(3) of this section, if the transferor lawfully possessed the assault weapon and the family member to whom the assault

236    weapon is transferred is otherwise lawfully permitted to possess it.

237    (d) Penalty. – A violation of this section is a class D felony.

238    (e) Disposal. - A law-enforcement agency in possession of a person's assault weapon as a result of an arrest under

239    this section shall dispose of the assault weapon under the process established for deadly weapons and ammunition under §

240    2311 of this title following the person's adjudication of delinquency or conviction under this section or by the person's

241    agreement to forfeit the assault weapon under an agreement to plead delinquent or guilty to another offense.

242    § 1467. Voluntary certificate of possession.

243    (a) A person who is exempt from § 1466(a) of this title under § 1466(c)(3) of this title may, no later than 1 year from

244    the [effective date of this Act], apply to the Secretary of the Department of Safety and Homeland Security for a certificate of

245    possession.

246    (b) In a prosecution under § 1466 of this title, it is an affirmative defense that the defendant was lawfully in

247    possession or had completed a purchase of the assault weapon prior to [the effective date of this Act]. A certificate of

248    possession is conclusive evidence that a person lawfully possessed or had completed a purchase of an assault weapon before

249    [the effective date of this Act] and is entitled to continue to possess and transport the assault weapon on or after [the effective

250    date of this Act] under § 1466(c)(3) of this title.

251    (c) The Secretary of the Department of Safety and Homeland Security shall establish procedures with respect to the

252    application for and issuance of certificates of possession for assault weapons that are lawfully owned and possessed before

253    [the effective date of this Act]. Rules and procedures under this subsection must include all of the following:

254      (1) That the application contain proof that the person lawfully possessed or had completed a purchase of an

255   assault weapon before [the effective date of this Act].

256      (2) That the certificate of possession must contain a description of the assault weapon, including the make,

257   model, and serial number. For an assault weapon manufactured before 1968, identifying marks may be substituted for

258   the serial number.

259      (3) That the certificate of possession must contain the full name, address, date of birth, and thumbprint of the

260   person who owns the assault weapon, and any other information the Secretary deems appropriate.

261      (4) That the Department will not retain copies of the certificate or other identifying information relating to any

262   individual who applies for a voluntary certificate of possession.

263      (d) A person who inherits or receives a weapon from a family member that is lawfully possessed under §

264   1466(c)(3) of this title and lawfully transferred may apply for a certificate of possession within 60 days of taking

265   possession of the weapon. To receive a certificate, the person must show that the transferor was lawfully in possession

266   and that he/she is the lawful recipient of the transfer.

267      §§ 1468 – 1469. [Reserved.]

268      Section 2. Amend § 1457, Title 11 of the Delaware Code by making deletions as shown by strike through and

269   insertions as shown by underline as follows:

270      § 1457. Possession of a weapon in a Safe School and Recreation Zone; class D, E, or F felony; class A or B

271   misdemeanor.

272      (a) Any person who commits any of the offenses described in subsection (b) of this section, or any juvenile who

273   possesses a firearm or other deadly weapon, and does so while in or on a "Safe School and Recreation Zone" shall be guilty

274   of the crime of possession of a weapon in a Safe School and Recreation Zone.

275      (b) The underlying offenses in Title 11 shall be:

276      (1) Section 1442. — Carrying a concealed deadly weapon; class G felony; class D felony.

277      (2) Section 1444. — Possessing a destructive weapon; class E felony.

278      (3) Section 1446. — Unlawfully dealing with a switchblade knife; unclassified misdemeanor.

279      (4) Section 1448. — Possession and purchase of deadly weapons by persons prohibited; class F felony.

280      (5) Section 1452. — Unlawfully dealing with knuckles-combination knife; class B misdemeanor.

281      (6) Section 1453. — Unlawfully dealing with martial arts throwing star; class B misdemeanor.

282      (7) Section 14XX. – Manufacture, sale, transport, transfer, purchase, receipt, or possession of assault weapons;

283   class E or F felony.

HD : KL : MAW : 2141510711
LC : HVW : : 5081510253

284            Section 3. If any provision of this Act or the application of this Act to any person or circumstance is held invalid,

285   the provisions of this Act are severable if the invalidity does not affect the other provisions or applications of the Act which

286   can be given effect without the invalid provision or application.

287            Section 4. This Act is to be known as the "Delaware Lethal Firearms Safety Act of 2022."

HD : KL : MAW : 2141510711
LC : HVW : : 5081510253

Draft: 06/13/2022  03:36 PM

# EXHIBIT B



SPONSOR: Sen. Sokola & Sen. Sturgeon & Sen. Townsend &
Rep. Mitchell
Sens. Gay, Hansen, S. McBride, Pinkney, Poore; Reps.
Baumbach, Bentz, Chukwuocha, Griffith, Heffernan,
Kowalko, Lynn, Minor-Brown, Morrison

DELAWARE STATE SENATE
151st GENERAL ASSEMBLY

SENATE SUBSTITUTE NO. 1
FOR
SENATE BILL NO. 6
AS AMENDED BY
SENATE AMENDMENT NO. 1, HOUSE AMENDMENT NO. 1,
AND HOUSE AMENDMENT NO. 2
AS AMENDED BY HOUSE AMENDMENT NO. 3.

AN ACT TO AMEND TITLE 11 OF THE DELAWARE CODE RELATING TO DEADLY WEAPONS.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend Subchapter VII, Chapter 5, Title 11 of the Delaware Code by making deletions as shown by strike

through and insertions as shown by underline as follows:

§§ 1464-1469. [Reserved.]

§ 1465. Definitions related to large-capacity magazines.

For purposes of this section and §§ 1466 and 1467 of this title:

(1) "Ammunition feeding device" means any magazine, belt, drum, feed strip, or similar device that holds

ammunition for a firearm.

(2)a. "Large-capacity magazine" means any ammunition feeding device capable of accepting, or that can readily

be converted to hold, more than 17 rounds of ammunition.

b. "Large-capacity magazine" does not include an attached tubular device designed to accept, and only

capable of operating with, .22 caliber rimfire ammunition.

c. For purposes of this subsection, the presence of a removable floor plate in an ammunition feeding device

that is not capable of accepting more than 17 rounds of ammunition shall not, without more, be sufficient evidence

that the ammunition feeding device can readily be converted to hold more than 17 rounds of ammunition.

(3) "Licensed firearms dealer" means a person licensed under Chapter 9 of Title 24 or 18 U.S.C. § 921 et seq.

(4) "Qualified retired law-enforcement officer" means as defined under § 1441B(c) of this title.

§ 1466. Large-capacity magazines prohibited; class E felony; class B misdemeanor; or civil violation.

(a) Except as otherwise provided in subsections (c) and (d) of this section, it is unlawful for a person to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine.

(b)(1) A violation of this section which is a first offense which only involves possession of a large capacity magazine is a civil penalty of $100.

(2) A second violation of this section which only involves possession of a large capacity magazine is a class B misdemeanor.

(3) All other violations of this section, including a subsequent offense involving only possession of a large capacity magazine are a class E felony.

(4) A large-capacity magazine is subject to forfeiture for a violation of this section.

(5) The Superior Court has exclusive jurisdiction over violations under subsections (b)(2) and (b)(3) of this section.

(c) This section does not apply to any of the following:

(1) Personnel of the United States government or a unit of that government who are acting within the scope of official business.

(2) Members of the armed forces of the United States or of the National Guard who are acting within the scope of official business.

(3) A law-enforcement officer.

(4) A qualified retired law-enforcement officer.

(5) An individual who holds a valid concealed carry permit issued by the Superior Court under § 1441 of this title.

(6) A licensed firearms dealer that sells a large-capacity magazine to another licensed firearms dealer or to an individual exempt under paragraphs (c)(1) through (5) of this section.

(7) A large-capacity magazine that a person has rendered permanently inoperable or has permanently modified to accept 17 rounds of ammunition or less.

(d)(1) The Secretary of the Department of Safety and Homeland Security ("Secretary") shall establish and administer a compensation program for residents of this State to allow a resident in possession of a large-capacity magazine on [the effective date of this Act] to relinquish the large-capacity magazine to the Department of Safety and Homeland Security ("Department") or a participating local law-enforcement agency in exchange for a monetary payment established under this subsection.

LC : MJC : CM : 4801510194
LC : HVW : CM : 5081510266

Released: 06/16/2022  09:46 PM

(2) The Secretary shall adopt rules to implement the compensation program, including the following:

a. That the compensation program be implemented between [the effective date of this Act] and June 30, 2023, at locations throughout this State. The Department shall coordinate with local law-enforcement agencies in implementing the program.

b. That the compensation program allows a resident to relinquish a large-capacity magazine to the Department, or a local law-enforcement agency participating in the program, in exchange for a compensation in the amount of the market rate for each large-capacity magazine.

c. That establishes the method for providing the monetary payment and reimbursing a participating law-enforcement agency for payments made to residents under the compensation program.

d. That the compensation program is subject to the availability of funds appropriated for this specific purpose by the General Assembly. This subsection does not create a right or entitlement in a resident to receive a monetary payment under the compensation program.

(3) The Secretary shall submit a report to the General Assembly by December 29, 2023, providing the results of the compensation program, including the number of large-capacity magazines relinquished to law-enforcement agencies, by county, and the total amount expended under the program.

§ 1467. Possession of a large-capacity magazine during the commission of a felony; class B felony.

(a) It is unlawful for a person to possess a large-capacity magazine during the commission of a felony.

(b) Possession of a large-capacity magazine during the commission of a felony is a class B felony.

(c) A person may be found guilty of violating this section notwithstanding that the felony for which the person is convicted and during which the person possessed the large-capacity magazine is a lesser included felony of the one originally charged.

§§ 1468-1469. [RESERVED].

Section 2. The sum of $45,000 is appropriated from the General Fund in Fiscal Year 2023 for the purpose of providing compensation for the purchase of large-capacity magazines by the Department of Safety and Homeland Security under Section 1 of this Act.

Section 3. If any provision of this Act or the application of this Act to any person or circumstance is held invalid, the provisions of this Act are severable if the invalidity does not affect the other provisions or applications of the Act which can be given effect without the invalid provision or application.

Section 4. This Act is to be known as the "Delaware Large-Capacity Magazine Prohibition Act of 2022."

Section 5. This Act takes effect 60 days after its enactment into law.

LC : MJC : CM : 4801510194
LC : HVW : CM : 5081510266

Released: 06/16/2022 09:46 PM

Section 6. Section § 1466(d) of Title 11, as contained in Section 1 of this Act, expires on January 1, 2024.

# EXHIBIT C



SPONSOR: Sen. Townsend & Sen. McDowell & Rep. Chukwuocha
Sens. Sokola, Sturgeon; Reps. Baumbach, Bentz, Bolden,
Heffernan, K. Johnson, Kowalko

## DELAWARE STATE SENATE
## 150th GENERAL ASSEMBLY

### SENATE BILL NO. 68

### AN ACT TO AMEND THE DELAWARE CODE RELATING TO DEADLY WEAPONS.

**BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:**

1     Section 1. Amend Subchapter VII, Chapter 5, Title 11 of the Delaware Code by making deletions as shown by

2 strike through and insertions as shown by underline as follows:

3     §§ 1462–1469. [Reserved.]

4     § 1463. Definitions related to assault weapons.

5     For purposes of this section and §§ 1464 and 1465 of this title:

6     (1) "Ammunition feeding device" means any magazine, belt, drum, feed strip, or similar device that holds

7 ammunition for a firearm.

8     (2) "Assault long gun" means any of the following or a copy, regardless of the producer or manufacturer:

9         a. American Arms Spectre da Semiautomatic carbine.

10         b. Avtomat Kalashnikov semiautomatic rifle in any format, including the AK-47 in all forms.

11         c. Algimec AGM-1 type semi-auto.

12         d. AR 100 type semi-auto.

13         e. AR 180 type semi-auto.

14         f. Argentine L.S.R. semi-auto.

15         g. Australian Automatic Arms SAR type semi-auto.

16         h. Auto-Ordnance Thompson M1 and 1927 semi-automatics.

17         i. Barrett light .50 cal. semi-auto.

18         j. Beretta AR70 type semi-auto.

19         k. Bushmaster semi-auto rifle.

20         *l.* Calico models M-100 and M-900.

21         m. CIS SR 88 type semi-auto.

22         n. Claridge HI TEC C-9 carbines.

LC : MJC : NMX
1241500024

Released: 04/10/2019 11:23 AM

23    o. Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle.

24    p. Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2.

25    q. Dragunov Chinese made semi-auto.

26    r. Famas semi-auto (.223 caliber).

27    s. Feather AT-9 semi-auto.

28    t. FN LAR and FN FAL assault rifle.

29    u. FNC semi-auto type carbine.

30    v. F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun.

31    w. Steyr-AUG-SA semi-auto.

32    x. Galil models AR and ARM semi-auto.

33    y. Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3.

34    z. Holmes model 88 shotgun.

35    aa. Manchester Arms "Commando" MK-45, MK-9.

36    bb. Mandell TAC-1 semi-auto carbine.

37    cc. Mossberg model 500 Bullpup assault shotgun.

38    dd. Sterling Mark 6.

39    ee. P.A.W.S. carbine.

40    ff. Ruger mini-14 tactical rifle.

41    gg. SIG 550/551 assault rifle (.223 caliber).

42    hh. SKS with detachable magazine.

43    ii. AP-74 Commando type semi-auto.

44    jj. Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, and M1A, excluding the M1

45    Garand.

46    kk. Street sweeper assault type shotgun.

47    *ll.* Striker 12 assault shotgun in all formats.

48    mm. Unique F11 semi-auto type.

49    nn. Daewoo USAS 12 semi-auto shotgun.

50    oo. UZI 9mm carbine or rifle.

51    pp. Valmet M-76 and M-78 semi-auto.

52    qq. Weaver Arms "Nighthawk" semi-auto carbine.

| 53 | rr. Wilkinson Arms 9mm semi-auto "Terry". |
| 54 | (2) "Assault pistol" means any of the following or a copy, regardless of the producer or manufacturer: |
| 55 | a. AA Arms AP-9 pistol. |
| 56 | b. Beretta 93R pistol. |
| 57 | c. Bushmaster pistol. |
| 58 | d. Claridge HI-TEC pistol. |
| 59 | e. D Max Industries pistol. |
| 60 | f. EKO Cobra pistol. |
| 61 | g. Encom MK-IV, MP-9, or MP-45 pistol. |
| 62 | h. Heckler and Koch MP5K, MP7, SP-89, or VP70 pistol. |
| 63 | i. Holmes MP-83 pistol. |
| 64 | j. Ingram MAC 10/11 pistol and variations, including the Partisan Avenger and the SWD Cobray. |
| 65 | k. Intratec TEC-9/DC-9 pistol in any centerfire variation. |
| 66 | l. P.A.W.S. type pistol. |
| 67 | m. Skorpion pistol. |
| 68 | n. Spectre double action pistol (Sile, F.I.E., Mitchell). |
| 69 | o. Stechkin automatic pistol. |
| 70 | p. Steyer tactical pistol. |
| 71 | q. UZI pistol. |
| 72 | r. Weaver Arms Nighthawk pistol. |
| 73 | s. Wilkinson "Linda" pistol. |
| 74 | (3) "Assault weapon" means any of the following: |
| 75 | a. An assault long gun. |
| 76 | b. An assault pistol. |
| 77 | c. A copycat weapon. |
| 78 | (4) "Copycat weapon" means any of the following: |
| 79 | a. A semiautomatic centerfire rifle that can accept a detachable magazine and has any 2 of the following: |
| 80 | 1. A folding stock. |
| 81 | 2. A grenade launcher or flare launcher. |
| 82 | 3. A flash suppressor. |

83          4. A pistol grip that protrudes conspicuously beneath the action of the weapon.

84          b. A semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10

85  rounds.

86          c. A semiautomatic centerfire rifle that has an overall length of less than 29 inches.

87          d. A semiautomatic pistol with a fixed magazine that can accept more than 10 rounds.

88          e. A semiautomatic shotgun that has a folding stock.

89          f. A shotgun with a revolving cylinder.

90          (5) "Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm

91  without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

92          (6) "Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or

93  redirect muzzle flash from the shooter's field of vision.

94          (7) "Qualified retired law-enforcement officer" means as defined in § 1441B(c) of this title.

95          (8) "Shooting range" means any land or structure used and operated in accordance with all applicable laws

96  and ordinances for the shooting of targets for training, education, practice, recreation, or competition.

97          (9) "Grenade launcher" means a device designed to fire, launch, or propel a grenade.

98          (10) "Secure storage" means a firearm that is stored in a locked container or equipped with a tamper resistant

99  mechanical lock or other safety device that is properly engaged so as to render the firearm inoperable by a person other

100  than the owner or other lawfully authorized user.

101          § 1464. Manufacture, sale, transport, transfer, purchase, receipt, and possession of assault weapons; class E or F

102  felony.

103          (a) Prohibitions. - Except as provided in subsection (b) or (c) of this section, it is unlawful for a person to do any of

104  the following:

105          (1) Transport an assault weapon into this State.

106          (2) Manufacture, sell, offer to sell, transfer, purchase, receive, or possess an assault weapon.

107          (b) Applicability - This section does not apply to any of the following:

108          (1) The following individuals, if acting within the scope of official business:

109          a. Personnel of the United States government or a unit of that government.

110          b. Members of the armed forces of the United States or of the National Guard.

111          c. A law-enforcement officer.

112          (2) An assault weapon modified to render it permanently inoperative.

113     (3) Possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage,

114 purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who does any of the following:

115     a. Provides or services an assault weapon for a law-enforcement agency of this State or for personnel

116 exempted under paragraph (b)(1) of this section.

117     b. Acts to sell or transfer an assault weapon to a licensed firearm dealer in another state or to an

118 individual purchaser in another state through a licensed firearms dealer.

119     c. Acts to return to a customer in another state an assault weapon transferred to the licensed firearms

120 dealer or manufacturer under the terms of a warranty or for repair.

121     (4) Organizations that are required or authorized by federal law governing their specific business or activity to

122 maintain assault weapons.

123     (5) The receipt of an assault weapon by inheritance, and possession of the inherited assault weapon, if the

124 decedent lawfully possessed the assault weapon and the person inheriting the assault weapon is not otherwise a person

125 prohibited under § 1448 of this title.

126     (6) The receipt of an assault weapon by a personal representative of an estate for purposes of exercising the

127 powers and duties of a personal representative of an estate.

128     (7) Possession by a qualified retired law-enforcement officer who is not otherwise prohibited from receiving

129 an assault weapon if either of the following applies:

130     a. The assault weapon is sold or transferred to the qualified retired law-enforcement officer by the law-

131 enforcement agency on retirement.

132     b. The assault weapon was purchased or obtained by the qualified retired law-enforcement officer for

133 official use with the law-enforcement agency before retirement.

134     (8) Possession or transport by an armored car guard, as defined in § 1302 of Title 24, if the armored car guard

135 is acting within the scope of employment with an armored car agency, as defined under § 1302 of Title 24, and is

136 licensed under Chapter 13 of Title 24.

137     (9) Possession, receipt, and testing by, or shipping to or from any of the following:

138     a. An ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory.

139     b. A facility or entity that manufactures or provides research and development testing, analysis, or

140 engineering for personal protective equipment or vehicle protection systems.

141 (c) Exceptions. -

142     (1) A licensed firearms dealer may continue to do all of the following with an assault weapon that the licensed

143     firearms dealer lawfully possessed on or before [the effective date of this Act]:

144          a. Possess the assault weapon.

145          b. Sell the assault weapon or offer the assault weapon for sale. But, the licensed firearms dealer may only

146     sell the assault weapon or offer the assault weapon for sale as permitted under paragraph (b)(3)b. of this section.

147          c. Transfer the assault weapon. But, the licensed firearms dealer may only transfer the assault weapon as

148     permitted by paragraph (b)(3)b. or (b)(3)c. of this section or by paragraph (d)(2)b. of this section.

149     (2)a. A licensed firearms dealer may take possession of an assault weapon from a person who lawfully

150     possessed the assault weapon before [the effective date of this Act] for the purposes of servicing or repairing the

151     assault weapon.

152          b. A licensed firearms dealer may transfer possession of an assault weapon received under paragraph

153     (c)(2)a. of this section for purposes of accomplishing service or repair of the assault weapon.

154     (3) A person who lawfully possessed, had a purchase order for, or completed an application to purchase an

155     assault weapon before [the effective date of this Act], may possess and transport the assault weapon on or after [the

156     effective date of this Act] only under the following circumstances:

157          a. At that person's residence, place of business, or other property owned by that person, or on property

158     owned by another person with the owner's express permission.

159          b. While on the premises of a shooting range.

160          c. While attending any exhibition, display, or educational project that is about firearms and that is

161     sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state

162     recognized entity that fosters proficiency in, or promotes education about, firearms.

163          d. While transporting the assault weapon between any of the places set forth in this this paragraph (c)(3)

164     of this section, or to any licensed firearms dealer for servicing or repair under paragraph (c)(2) of this section, if

165     the person places the assault weapon in secure storage.

166     (4) A person may transport an assault weapon to or from any of the following if the person places the assault

167     weapon in secure storage:

168          a. An ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory.

169          b. A facility or entity that manufactures or provides research and development testing, analysis, or

170     engineering for personal protective equipment or vehicle protection systems.

Released: 04/10/2019  11:23 AM

171       (5) The transfer of an assault weapon from the person owning the assault weapon to a family member, and

172    possession of the transferred assault weapon, if the person lawfully possessed the assault weapon and the family

173    member to whom the assault weapon is transferred is not otherwise a person prohibited under § 1448 of this title. For

174    purposes of this paragraph, "family member" means a spouse or an individual related by consanguinity within the third

175    degree as determined by the common law.

176       (d) Penalty. - A violation of this section is a class F felony for a first offense and a class E felony for any

177    subsequent offense within 10 years of a prior offense.

178       (e) Disposal. - A law-enforcement agency in possession of a person's assault weapon as a result of an arrest under

179    this section shall dispose of the assault weapon under the process established for deadly weapons and ammunition under §

180    2311 of this title following the person's adjudication of delinquency or conviction under this section or by the person's

181    agreement to forfeit the assault weapon under an agreement to plead delinquent or guilty to another offense.

182       § 1465. Voluntary certificate of possession.

183       (a) A person who is exempt from § 1464(a) of this title under § 1464(c) of this title may, no later than 1 year from

184    the [effective date of this Act], apply to the Secretary of the Department of Safety and Homeland Security for a certificate

185    of possession.

186       (b) A certificate of possession is conclusive evidence that person lawfully possessed, had a purchase order for, or

187    completed an application to purchase an assault weapon before [the effective date of this Act] and is entitled to continue to

188    possess and transport the assault weapon on or after [the effective date of this Act] under § 1464(c)(3) of this title.

189       (c) The Secretary of the Department of Safety and Homeland Security shall promulgate regulations to establish

190    procedures with respect to the application for and issuance of certificates of possession for assault weapons that are

191    lawfully owned and possessed by person [the effective date of this Act]. Regulations under this subsection must include all

192    of the following:

193       (1) That the application contain proof that the person lawfully possessed, had a purchase order for, or

194    completed an application to purchase an assault weapon before [the effective date of this Act].

195       (2) That the certificate of possession must contain a description of the assault weapon, including the make,

196    model, and serial number. For an assault weapon manufactured before 1968, identifying marks may be substituted for

197    the serial number required by paragraph (c)(1) of this section.

198       (3) That the certificate of possession must contain the full name, address, date of birth, and thumbprint of the

199    person who owns the assault weapon, and any other information the Secretary deems appropriate.

LC : MJC : NMX
1241500024

Released: 04/10/2019  11:23 AM

200           (4) That the name and address of the person issued a certificate of possession is confidential and may not be

201   disclosed, except to a law-enforcement agency and its employees acting in the performance of official duties.

202           (5) That the Secretary shall make certificates of possession available in a searchable, centralized database, to

203   any state or federal law enforcement agency to be used only for valid law enforcement purposes.

204           (d) A certificate of possession only authorizes the possession of an assault weapon specified in the certificate by

205   the resident to whom the Secretary issued the certificate.

206           (e) A person in possession of multiple assault weapons on [the effective date of this Act] must apply for a separate

207   certificate for each assault weapon the person wants to certify lawfully possessed, had a purchase order for, or completed an

208   application to purchase an assault weapon before [the effective date of this Act].

209           §§ 1466 – 1469. [Reserved.]

210           Section 2. Amend § 1457, Title 11 of the Delaware Code by making deletions as shown by strike through and

211   insertions as shown by underline as follows:

212           § 1457. Possession of a weapon in a Safe School and Recreation Zone; class D, E, or F felony; class A or B

213   misdemeanor.

214           (a) Any person who commits any of the offenses described in subsection (b) of this section, or any juvenile who

215   possesses a firearm or other deadly weapon, and does so while in or on a "Safe School and Recreation Zone" shall be guilty

216   of the crime of possession of a weapon in a Safe School and Recreation Zone.

217           (b) The underlying offenses in Title 11 shall be:

218           (1) Section 1442. — Carrying a concealed deadly weapon; class G felony; class D felony.

219           (2) Section 1444. — Possessing a destructive weapon; class E felony.

220           (3) Section 1446. — Unlawfully dealing with a switchblade knife; unclassified misdemeanor.

221           (4) Section 1448. — Possession and purchase of deadly weapons by persons prohibited; class F felony.

222           (5) Section 1452. — Unlawfully dealing with knuckles-combination knife; class B misdemeanor.

223           (6) Section 1453. — Unlawfully dealing with martial arts throwing star; class B misdemeanor.

224           (7) Section 1464. – Manufacture, sale, transport, transfer, purchase, receipt, or possession of assault weapons;

225   class E or F felony.

226           Section 3. If any provision of this Act or the application of this Act to any person or circumstance is held invalid,

227   the provisions of this Act are severable if the invalidity does not affect the other provisions or applications of the Act which

228   can be given effect without the invalid provision or application.

229           Section 4. This Act is to be known as the "Delaware Assault Weapons Prohibition Act of 2019."

LC : MJC : NMX
1241500024

230          Section 5. This Act takes effect 60 days after its enactment into law.

<u>SYNOPSIS</u>

This Act prohibits the manufacture, sale, offer to sell, transfer, purchase, receipt, possession, or transport of assault weapons in Delaware, subject to certain exceptions. One exception relevant to individuals is that the Act does not prohibit the possession and transport of firearms that were lawfully possessed or fully applied for before the effective date of this Act; although for these firearms there are certain restrictions relating to their possession and transport after the effective date of this Act. This Act creates a voluntary certificate of possession, to enable persons who lawfully possess an assault weapon before the effective date of this Act to be able to prove ownership after the effective date of this Act.

This Act is based on the Firearm Safety Act of 2013 ("FSA") passed in Maryland in the wake of the tragic slaughtering of children on December 14, 2012, at Sandy Hook Elementary School in Newtown, Connecticut. The FSA's assault weapons ban was upheld as constitutional on February 21, 2017, by the full membership of the United States Court of Appeals for the Fourth Circuit, in the case of Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017).

The names Newtown, Aurora, San Bernardino, Orlando, Las Vegas, and Parkland, among others, have become synonymous with tragic killing of innocent, unsuspecting Americans of all ages and backgrounds, amidst a framework of federal and state laws that have permitted the purchase of weapons designed for the battlefield — not for our schools, our theaters, our places of worship, or our homes.

Safety — both for the general public, as well as members of Delaware's law-enforcement community — is the objective of this Act, as it was for the FSA. And, as with the FSA, a primary goal of this Act is to reduce the availability of assault weapons so that when a criminal acts, he or she does so with a less dangerous weapon and less severe consequences.

Relying on United States Supreme Court precedent from District of Columbia v. Heller, 554 U.S. 570 (2008), as well as the holdings of its sister circuits, the full Fourth Circuit concluded that the assault weapons banned by the FSA are not protected by the Second Amendment. The Fourth Circuit was convinced that the banned assault weapons are among those arms that are "like" "M-16 rifles" — "weapons that are most useful in military service" — which the Heller Court singled out as being beyond the Second Amendment's reach.

The Fourth Circuit concluded that Maryland had presented extensive uncontroverted evidence demonstrating that the assault weapons outlawed by the FSA are exceptionally lethal weapons of war. The Fourth Circuit also concluded that the evidence showed the difference between the fully automatic and semiautomatic versions of military-style weapons is slight. Further evidence considered by the Fourth Circuit that motivates this Act is as follows:

(1) Like their fully automatic counterparts, the banned assault weapons are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed, and that their design results in a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns.

(2) The banned assault weapons have been used disproportionately to their ownership in mass shootings and the murders of law-enforcement officers.

(3) The banned assault weapons further pose a heightened risk to civilians in that rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials, and that criminals armed with the banned assault weapons possess a "military-style advantage" in firefights with law-enforcement officers, as such weapons allow criminals to effectively engage law-enforcement officers from great distances and their rounds easily pass through the soft body armor worn by most law-enforcement officers.

(4) Although self-defense is a conceivable use of the banned assault weapons, most individuals choose to keep other firearms for that purpose.

(5) Prohibitions against assault weapons will promote public safety by reducing the availability of those armaments to mass shooters and other criminals, by diminishing their especial threat to law-enforcement officers, and by hindering their unintentional misuse by civilians.

(6) In many situations, the semiautomatic fire of an assault weapon is more accurate and lethal than the automatic fire.

Finding this evidence and these conclusions by the Fourth Circuit to be strongly persuasive of the applicable framework of constitutional rights, and firmly believing that promoting the safety of the Delaware public and Delaware law-enforcement is a paramount function of the Delaware General Assembly, Delaware legislators file this Act in the name of public safety and with adherence to core constitutional principles.

Author: Senator Townsend

Page 9 of 9

LC : MJC : NMX                                                    Released: 04/10/2019  11:23 AM
1241500024

# EXHIBIT D



**User Name:** Alexander MacMullan
**Date and Time:** Thursday, September 8, 2022 12:09:00 PM EDT
**Job Number:** 179026397

## Document (1)

1. _Bianchi v. Frosh, 858 Fed. Appx. 645_
   **Client/Matter:** 999999.999999
   **Search Terms:** Bianchi v. Frosh, 858 Fed. Appx. 645
   **Search Type:** Natural Language
   **Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| Cases | Court: State Courts > Maryland,Federal > U.S. Sup. Ct.,Federal > 4th Circuit4th Cir. - Ct. of App.,Federal > 4th Circuit4th Cir. - U.S. Dist. Cts. > U.S. Dist. Md.,Federal > 4th Circuit4th Cir. - U.S. Bankr. Cts. > U.S. Bankr. Md.,Federal > U.S. Cir. Cts. (1789-1911)Maryland (1789-1911) |

LexisNexis | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2022 LexisNexis
Alexander MacMullan

 Warning
As of: September 8, 2022 4:09 PM Z

## *Bianchi v. Frosh*

United States Court of Appeals for the Fourth Circuit

September 14, 2021, Submitted; September 17, 2021, Decided

No. 21-1255

**Reporter**
858 Fed. Appx. 645 *; 2021 U.S. App. LEXIS 28163 **; 2021 WL 4240385

DOMINIC BIANCHI, an individual and resident of Baltimore County; DAVID SNOPE, an individual and resident of Baltimore County; MICAH SCHAEFER, an individual and resident of Anne Arundel County; FIELD TRADERS LLC, A resident of Anne Arundel County; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, Plaintiffs - Appellants; v. BRIAN E. FROSH, in his official capacity as Attorney General of Maryland; COL. WOODROW W. JONES, III, in his official capacity as Secretary of State Police of Maryland; R. JAY FISHER, in his official capacity as Sheriff of Baltimore County, Maryland; JIM FREDERICKS, in his official capacity as Sheriff of Anne Arundel County, Maryland, Defendants - Appellees.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** Vacated by, Remanded by *Bianchi, Dominic v. Frosh, Att'y Gen of Md., 2022 U.S. LEXIS 3258 (U.S., June 30, 2022)*

**Prior History: [**1]** Appeal from the United States District Court for the District of Maryland, at Baltimore. (1:20-cv-03495-JKB). James K. Bredar, Chief District Judge.

*Andrews v. United States, 2005 U.S. Dist. LEXIS 53075 (E.D.N.C., July 19, 2005)*

**Disposition:** AFFIRMED.

## Core Terms

en banc

**Counsel:** Raymond M. DiGuiseppe, THE DIGUISEPPE

LAW FIRM, P.C., Southport, North Carolina; Adam Kraut, FIREARMS POLICY COALTION, Sacramento, California; David H. Thompson, Peter A. Patterson, Tiernan B. Kane, COOPER & KIRK, PLLC, Washington, D.C., for Appellants.

Brian E. Frosh, Attorney General of Maryland, Robert A. Scott, Assistant Attorney General, Ryan R. Dietrich, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

**Judges:** Before THACKER and RICHARDSON, Circuit Judges, and TRAXLER, Senior Circuit Judge.

## Opinion

**[*646]** PER CURIAM:

Plaintiffs appeal the district court's order dismissing their *42 U.S.C. § 1983* complaint for failure to state a claim upon which relief may be granted. In this action, Plaintiffs sought to challenge Maryland's Firearm Safety Act's ban on assault weapons as violative of the *Second Amendment*. As Plaintiffs concede, however, their argument is squarely foreclosed by this court's decision in *Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017)* (en banc). "As a panel, we are not authorized to reconsider an en banc holding." *Joseph v. Angelone, 184 F.3d 320, 325 (4th Cir. 1999)*. Accordingly, we affirm the district court's **[**2]** order. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*

---

**End of Document**

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 22-cv-01685-RM

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS, and
CHARLES BRADLEY WALKER,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR, a Colorado municipality, and
JOE PELLE, in his capacity as Sheriff of Boulder County, Colorado

      Defendants.

## TEMPORARY RESTRAINING ORDER

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order and for

Preliminary Injunction (ECF No. 11). While the Motion seeks a temporary restraining order

("TRO") and a preliminary injunction, at this time, the Court rules only on the request for a

TRO. The request for a preliminary injunction will be deferred until the hearing set forth below.

The Court grants in part, denies in part, and defers in part the Motion for the reasons below. The

Court also sets this matter for a status hearing and a hearing on the Motion for a Preliminary

Injunction.

## I.    BACKGROUND

The Town of Superior, Colorado, one of the defendants in this case[1], adopted an ordinance that went into effect on July 1, 2022, which amended the Superior Municipal Code, Article 9, Section 10, (the "Amended Code") and which regulates the possession, use, transfer, and sale of certain weapons within the Town limits.  Town of Superior Ordinance 0-9 Series 2022.  Plaintiffs, two nonprofit organizations that represent gun owners, as well as one current resident of Superior, Colorado, filed a Complaint raising one claim for relief.  (ECF No. 1.) Plaintiffs assert that the Amended Code violates their rights to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution.  They seek declaratory judgment holding the provisions unconstitutional on their face or as applied to law-abiding adults.  Plaintiffs also filed the Motion at issue, requesting that this Court enter a TRO immediately and that it set this matter for consideration of their motion for a preliminary injunction.  (ECF No. 11.)

In its effort to rule on the Motion, the Court has faced two significant challenges.  It is not entirely clear to the Court, based on Plaintiffs' Motion, which precise provisions of the Amended Code they wish to challenge.  The Court also notes, however, that the Amended Code is not, itself, a model of clarity.  Nevertheless, based on the Motion, it appears to the Court that Plaintiffs primarily challenge three of the Amended Code's provisions—section 10-9-40, section 10-9-240, and section 10-9-260.

---

[1] Defendant Joe Pelle is named in his official capacity as the Sheriff of Boulder County, Colorado.  The Town of Superior contracts with the Boulder County Sheriff's Office for public safety purposes and Plaintiffs assert that it is Defendant Pelle who will be responsible for implementing the provisions of the amended Municipal Code.

## II.    LEGAL STANDARDS AND ANALYSIS

The Court begins its analysis with a discussion of the standard for the granting of a

TRO and then proceeds to briefly review the Supreme Court's recent pronouncements on the

right to bear arms.   The Court then turns to each of the challenged provisions and will discuss

them in turn.

### A. TRO Standard

To obtain a TRO or injunctive relief in any other form a plaintiff must establish: "(1) a

substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is

issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may

cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the

public interest." *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276,

1281 (10th Cir. 2016) (quotation omitted).   The final two requirements merge when the

government is the opposing party.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).   " It is the

movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. South

Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).   In cases like this one, in which a TRO

would provide the movant all of the relief that could be sought at trial on the merits, an injunction

is considered disfavored. *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).   The Court must,

therefore, scrutinize such motions more closely and the movant must make a strong showing of

both the likelihood of success on the merits and that the balance of harms favors the relief. *Id.* at

1125-26.  If the movant, however, demonstrates that "the three 'harm' factors tip *decidedly* in its

favor, the 'probability of success requirement' is somewhat relaxed." *Heideman*, 348 F.3d at 1189

(emphasis original).

3

A TRO is an extraordinary remedy, and therefore the plaintiff must demonstrate a right to relief that is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). A TRO may issue without notice to the opposing party, but its duration is limited to fourteen days unless the Court extends it for an additional fourteen days for good cause or the adverse parties agree to a longer extension. Fed. R. Civ. P. 65(b)(2).

### B. The Right to Bear Arms

Beginning with its 2008 decision in the case of *District Columbia v. Heller*, 554 U.S. 570 (2008), through its recent decision in *New York State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court has issued several opinions clarifying the scope of the right to bear arms as protected by the Second and Fourteenth Amendments to the Constitution. In *Heller*, the Court concluded that the Second Amendment secures the right to bear arms and that an absolute prohibition on the possession of handguns violated that right. 554 U.S. at 573, 636. The Court acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. . . .[T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court concluded that the type of weapons protected are "those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Governments can, the Court noted, restrict certain dangerous and unusual weapons, "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625-627.

In *McDonald v. City of Chicago, Il.*, 561 U.S. 742, 749, 791 (2010), the Court concluded that the Second Amendment "is fully applicable to the States" as incorporated by the Fourteenth Amendment.

4

Finally, in *Bruen*, the Court concluded that the Second and Fourteenth Amendments protect the right of "ordinary, law-abiding citizens" to "carry handguns publicly for self-defense." 142 S.Ct. at 2122. The Court also concluded that the New York licensing regime at issue in that case, which permitted only licensed individuals to carry guns in public, and which required a showing of a "special need for self-defense" in order to obtain such a license, violated the Constitution. *Id.* The Court ultimately concluded that the Second Amendment specifically "guaranteed 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156. The Court directed that a governmental entity seeking to limit or restrict the right to bear arms must meet its "burden to identify an American tradition justifying" the limitation at issue. *Id.* The Court pointed out some such historic restrictions, such as limitations on the intent for which one could carry arms, the manner in which one could carry arms, or certain "exceptional circumstances" under which one could not carry arms at all. *Id.* But it noted that "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* In its simplest terms, the Second and Fourteenth Amendments prohibit governments from preventing "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.*

In none of these cases has the Supreme Court expressly adopted one of the traditional levels of scrutiny to be applied when reviewing legislative enactments that impact the right to bear arms. However, in *Bruen*, the Court stated,

> We reiterate that the standard for applying the Second Amendment is as follows:
> When the Second Amendment's plain text covers an individual's conduct, the
> Constitution presumptively protects that conduct. The government must then
> justify its regulation by demonstrating that it is consistent with the Nation's
> historical tradition of firearm regulation. Only then may a court conclude that the

individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, n.10 (1961)).

It is in front of this backdrop that the Court must consider the provisions of Superior's Amended Code.

### C. Section 10-9-40, "Possession and sale of illegal weapons"

Section 10-9-40, entitled "Possession and sale of illegal weapons" prohibits any person from knowingly possessing, selling, or otherwise transferring an "illegal weapon." An "illegal weapon" is defined in the Amended Code as "an assault weapon, large-capacity magazine, rapid-fire trigger activator, blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife." § 10-9-20. The Amended Code also defines an "assault weapon" to include a semi-automatic center-fire rifle which has the capacity to accept a detachable magazine and also has one of a list of enumerated characteristics, a semi-automatic center-fire pistol with any one of certain listed characteristics, a semi-automatic center-fire pistol with a fixed magazine that has the capacity to accept more than ten (10) rounds, all semi-automatic shotguns with any one of a list of characteristics, any firearm that has been modified to be operable as an assault weapon, and any part designed to convert a firearm into an assault weapon. *Id.*

Section 10-9-40 also contains a list of exemptions to which, it states, the prohibition shall not apply. Of particular significance to the Court, though not entirely clear, are the first two listed exemptions. "This Section shall not apply to: (1) Any person holding a valid federal firearms license from possession of any firearm authorized pursuant to such license; [and] (2) A firearm for which the U.S. Government has issued a stamp or permit pursuant to the National Firearms Act." § 10-9-40(b). The Amended Code does not, however, specify the provisions to which it refers in the first exception, related to a "federal firearms license."

6

The Amended Code further includes a section on "Defenses." § 10-9-190. Among

those listed, it states that,

> (e) It is a specific defense to a charge of violating Section 10-9-40 that: (1) The person had a valid permit for such weapon pursuant to federal law at the time of the offense; or (2) That the illegal weapon was an assault weapon accompanied by a valid certificate of ownership."

As in the provision itself, the Defenses section of the Amended Code does not identify what

federal permits are available that would provide such a defense to prosecution.

Plaintiffs also submitted a supplement to their Motion which included an e-mail, sent by

the Town of Superior, regarding this provision as well as the provision addressing assault

weapons. In the email, the Town informed residents that

> [a]s of July 30, 2022, in the Town of Superior, a person may not possess an illegal weapon as defined under Sec. 10-9-20. Per the ordinance, an illegal weapon means an assault weapon, large-capacity magazine, rapid-fire trigger activator, blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife.
> . . .
> The items listed above should be removed from the Town by July 30, 2022, unless an exemption applies to you in the ordinance. You may dispose of them at the Boulder County Sherriff's Office.

(ECF No. 13-1.)

### 1. Substantial Likelihood of Success on the Merits

Because this Motion would award Plaintiffs the same relief they would seek after a trial

on the merits—i.e. an injunction preventing Defendants from enforcing these provisions—a TRO

or preliminary injunction is disfavored and Plaintiffs must make a strong showing on this factor.

*Awad*, 670 F.3d at 1126. Even applying such a standard, however, the Court concludes that

Plaintiffs have a strong likelihood of success on the merits as to this provision.

As noted above, the Court must first consider whether the Second Amendment's plain

language encompasses the conduct at issue in this section. *Bruen*, 142 S.Ct. at 2129–30. In this

case, the provision provides that no person may knowingly possess, sell, or otherwise transfer a so-called "illegal weapon." § 10-9-40(a). As discussed, the Amended Code defines "illegal weapon" to include assault weapons, which in turn are defined to include a number of different semi-automatic weapons. § 10-9-20. Plaintiffs have stated that semi-automatic weapons, as well as magazines that hold more than ten rounds, are commonly used by law-abiding citizens for lawful purposes. Plaintiffs have submitted the Declaration of James Curcuruto (ECF No. 11-3) in support of their assertion. Plaintiffs also cite to a dissent in a Fourth Circuit case in which the Judge sets out a number of statistics that support that proposition. *Kolbe v. Hogan*, 849 F.3d 114, 153-55 (4th Cir. 2017) (Traxler, J., dissenting). For example, Judge Traxler cites a statistic that between 1990 and 2012, "the number of AR- and AK- style weapons manufactured and imported into the United States was 'more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.'" *Id.* at 153 (quoting the appellate record). A decision of this Court, furthermore, noted that, as the parties in that case had stipulated, "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions, although the exact number subject to regulation in Colorado is unknown," and "semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense." *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014), *vacated in part on other grounds and remanded*, 823 F.3d 537 (10th Cir. 2016). The Court concludes, therefore, that the conduct regulated by this provision of the Amended Code, the right to possess, sell, or transfer illegal weapons, (which, as defined, include weapons commonly used by law-abiding citizens for lawful purposes), is covered, at least in part, by the Second Amendment, and therefore that conduct is presumptively protected.

8

The Court turns, then, to the government's justification for its regulation, and whether it is consistent with the Nation's historical tradition of firearm regulation. At this stage, what the Court has available to it is only the Ordinance itself. The Town of Superior set out at length its justifications for enacting the Amended Code in its preamble. Among the reasons it lists are (1) gun violence's grave threat to public safety, in particular given the Town's population density; (2) the elevated levels of mass shootings in 2020 and 2021, including a shooting in the neighboring city of Boulder, at a King Soopers, where ten people were killed with an assault weapon and large capacity magazine; (3) the fact that such weapons are commonly used in mass shooting events; (4) the particular military and criminal applications of semi-automatic weapons and the fact that the pertinent features of those weapons "are unnecessary in shooting sports or self-defense"; (5) the fact that such weapons are also commonly used in other types of violent crimes, beyond mass shootings; (6) the fact that some such weapons, specifically the AK- and AR-style pistols possess many of the same features, and pose the same threats to public safety, as short-barreled rifles, which are highly restricted; (7) the ease with which users can modify semi-automatic weapons with bump stocks and other accessories to convert them to something resembling fully automatic machine guns; (8) the fact that mass shootings involving large-capacity magazines result in nearly five times as many people shot as those that do not involve such magazines; (9) the fact that federal and state-level prohibitions like the ones the Town was enacting have been shown to have a statistically significant protective effect in lowering the number of high-fatality mass shootings; and (10) that gaps in current law permit people with dangerous histories to purchase such firearms without a background check. Town of Superior Ordinance 0-9 Series 2022.

The Court is sympathetic to the Town's stated reasoning. However, the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes, whether in an individual's home or in public.

The Court also notes that the Town's justifications are somewhat undermined by the other subsections of this very provision. Specifically, subsection (b)(1) provides that "[a]ny person holding a valid federal firearms license from possession of any firearm authorized pursuant to such license" will not be subject to the prohibition of 10-9-40. The following subsection, (b)(2) likewise exempts any "firearm for which the U.S. Government has issued a stamp or permit pursuant to the National Firearms Act." The National Firearms Act, referenced in the latter subsection, provides for permitting such firearms as short-barreled shotguns and rifles, machineguns, and silencers. Each of those weapons is arguably even more deadly than the semi-automatic weapons that the Town of Superior seeks to ban, yet these provisions would permit individuals to possess, sell, or otherwise transfer them.

The Court acknowledges that the nature of this TRO has required it to issue an Order without hearing from Defendants, who may be aware of pertinent historical precedent. Based on the information before it, however, the Court concludes that there is a strong likelihood that Plaintiffs will be successful on the merits as to this provision.

### 2. *Irreparable Harm*

The most important of the TRO factors is the risk that a plaintiff will suffer an irreparable harm if the TRO is not granted. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017). Most courts, however, "consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v.*

10

*City of Fort Collins, Colo.*, 916 F.3d 792, 805 (10th Cir. 2019). Thus, in the context of a

constitutional challenge like this one, that "principle collapses the first and second preliminary-

injunction factors, equating likelihood of success on the merits with a demonstration of

irreparable injury." *Id.* at 806. Because this challenge involves a constitutional right, and

because the Court already concluded that Plaintiffs are likely to succeed on the merits, the Court

also concludes that Plaintiffs have established that they will be irreparably harmed if a TRO is

not issued.

### 3. *Balance of Harms/Public Interest*

Because the government is the opposing party in this case, as previously noted, the final

two factors collapse into one. *Nken*, 556 U.S. at 435. When "a constitutional right hangs in the

balance, . . . 'even a temporary loss' usually trumps any harm to the defendant." *Free the*

*Nipple-Fort Collins*, 916 F.3d at 806. This is true, in part, because the government "has no

interest in keeping an unconstitutional law on the books." *Id.* It is also always in the public

interest to prevent the violation of an individual's constitutional rights. *Id.* at 807. Thus, the

Court concludes that these factors, too, weigh in favor of Plaintiffs in this case.

Under the circumstances presented here, the Court concludes that it must maintain the

status quo until such time as the parties can more fully brief this matter. Therefore, the Court

GRANTS the Motion for Temporary Restraining Order as to section 10-9-40.

### D. Section 10-9-240, "Assault weapons"

The second section with which Plaintiffs take exception is section 10-9-240, which

addresses assault weapons and, specifically, those weapons already possessed by someone in

Superior prior to the effective date of the Amended Code, July 1, 2022. The provision provides

that a person who legally possessed an assault weapon before July 1, 2022 can obtain a

certificate in order to legally continue to possess the assault weapon. It states that any such certificates must be obtained by December 31, 2022. To qualify for such a certificate, the person must submit to a background check.

The provision goes on to state that even a person with a proper certificate may "[p]ossess the assault weapon only on property owned or immediately controlled by the person, or while on the premises of a licensed gunsmith for the purpose of lawful repair," or while using the weapon on a licensed firing range, or traveling to or from one of those locations. § 10-9-240(d)(2). It goes on to state that, while traveling, the weapon must be stored unloaded and in a locked container. *Id.*

The section also prohibits the purchase, sale, or transfer of even properly certified assault weapons unless they are being transferred to a licensed gunsmith for repair or to law enforcement for destruction. § 10-9-240(e). Finally, it provides that any person who acquires an assault weapon by inheritance must either (1) modify the weapon to render it permanently inoperable; (2) surrender the assault weapon for destruction; (3) transfer the assault weapon to a properly licensed firearms dealer; or (4) permanently remove the weapon from the Town of Superior. § 10-9-240(f).

Finally, the provision prohibits the owner of a certified assault weapon from possessing in the town any additional assault weapons purchased after the effective date of the Amended Code, July 1, 2022. § 10-9-240(g).

As noted with regard to Section 10-9-40, the Town of Superior sent information to its residents informing them of this new provision of the Amended Code. Specifically, the Town informed residents that they have until December 31, 2022, in which to obtain a certificate for any assault weapon they legally possessed prior to July 1, 2022.

12

*1. Substantial Likelihood of Success on the Merits*

For all of the reasons the Court discusses in its analysis of section 10-9-40, the Court concludes that Plaintiffs are very likely to succeed on the merits of their claim as to this section. While the provision does provide protection for those individuals who already owned assault weapons on July 1, 2022, and provides only a licensing scheme for those individuals, any residents who wish to possess such a weapon but did not obtain one before that date are not permitted to do so now or in the future. Furthermore, the provision makes no allowance for individuals who may have owned such a weapon prior to July 1, 2022, but who do not move to the Town of Superior until after December 31, 2022, the deadline on which to register them. There is no similar legacy provision for such owners. The Court also notes that the provision prohibits any individual who receives such a weapon through inheritance, bequest, or succession, from maintaining it as a working assault weapon. § 10-9-240(f). Such a recipient can only choose between modifying the weapon to render it inoperable, surrendering it for destruction, transferring it to a licensed firearms dealer, or permanently removing the weapon from the Town of Superior. Thus, eventually every weapon that currently qualifies for legacy protection will, upon the death of its owner, lose such protection.

As previously discussed, the Court concludes that the Second Amendment encompasses the conduct addressed by this provision. And, also as previously discussed, the Court is unaware of a historical precedent that would permit the Town of Superior to impose such a regulation that would, in reality, eventually ban all assault weapons. Therefore, despite the Town of Superior's substantial and legitimate concerns, the Court concludes that Plaintiffs are likely to prevail on the merits of their claim as to this provision.

13

### 2. *Irreparable Harm and the Balance of Harms/Public Interest*

For the reasons discussed above in Subpart D, the Court concludes that Plaintiffs have met their burdens with regard to these factors as well. This provision, too, infringes on a constitutional right and therefore no further showing of irreparable harm is required. Similarly, because the public has an interest in ensuring that constitutional rights are protected, and the Town has no interest in maintaining an unconstitutional provision, the balance of Plaintiffs' harms and the public interest weigh in favor of granting the TRO. The Court therefore GRANTS the Motion for a TRO with regard to section 10-9-240.

### E. Section 10-9-260, "Open carry of firearms"

The third provision at issue states that "No person shall knowingly openly carry a firearm on or about their person in a public place." § 10-9-260(a). It then carves out a number of exceptions, stating that this provision will not apply to, among others, individuals who are "carrying a concealed handgun . . . with a valid permit to carry issued or recognized pursuant to C.R.S. § 1812-201, et. seq., or the otherwise lawful use of a handgun by a person with a valid permit to carry." § 10-9-260(b)(7). The section does not discuss what, precisely, is required to obtain a permit to open carry a handgun, and Plaintiffs have not addressed any such regulations or statutes in their motion. Individuals are also permitted to openly carry firearms on their own property, business or dwelling or on the property of another with permission of the property owner, and to carry firearms in motor vehicles or other private means of transit. § 10-9-260(b)(4), (5).

### 1. *Substantial Likelihood of Success on the Merits*

On this final provision, the Court reaches a different conclusion regarding whether Plaintiffs have met their burden to demonstrate that they are highly likely to succeed on the

merits of their claim. The conduct at issue clearly comes within the coverage of the language of

the Second Amendment, as the Supreme Court has held that the right to "bear arms" includes the

right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the

purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with

another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125,

143 (1998) (Ginsburg, J., dissenting; alterations original). The Supreme Court has also

concluded that "[t]he definition of 'bear' naturally encompasses public carry." *Bruen*, 142 S.Ct.

at 2135. As the Court noted, "confining the right to 'bear' arms to the home would make little

sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'"

*Id.* (quoting *Heller*, 554 U.S. at 599; alterations original). And, as previously explained, the

Court concludes that this prohibition applies to weapons that are commonly used by law-abiding

citizens for lawful purposes.

Unlike the prior provisions discussed in this Order, however, section 10-9-260 appears to

include a pair of, in the Court's view, important exemptions. This provision does not apply to

(1) "[t]he carrying of a concealed handgun by a person with a valid permit to carry issued or

recognized pursuant to C.R.S. § 18-12-201, et seq." and (2) "the otherwise lawful use of a

handgun by a person with a valid permit to carry." § 10-9-260(b)(7). The Supreme Court

explained in *Heller* that,

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the 19th-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose. . . . Although
> we do not undertake an exhaustive historical analysis today of the full scope of
> the Second Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and qualifications
> on the commercial sale of arms.

15

554 U.S. at 626-27 (citations omitted).

In *Bruen*, furthermore, the Supreme Court considered the licensing scheme enacted by the State of New York. 142 S.Ct. at 2122. Far from concluding that *any* licensing scheme fails under the Second Amendment, the Court's majority alone spent over thirty pages explaining that *one particular requirement* of the scheme failed to pass constitutional muster. *Id.* at 2122-56. Specifically, the Court concluded that the scheme violated the Constitution because it permitted citizens to bear arms "only after demonstrating to government officers some special need" to do so. *Id.* at 2156. Thus, while the Supreme Court has concluded that the Constitution prohibits certain, unreasonable licensing requirements, it has not held that all such requirements are unconstitutional.

In this case, as noted, the Amended Code provides an exemption for those who carry a gun either pursuant to a concealed carry permit *or* pursuant to an otherwise lawful "permit to carry." 10-9-206(b)(7). Plaintiffs have not provided the Court with any argument or information as to why those permit requirements are unreasonable or whether the exemption fails to adequately protect their rights to openly carry weapons. Thus, the Court concludes that Plaintiffs have failed to carry their burden of demonstrating that they are highly likely to prevail on the merits as to this provision.

### 2. *Irreparable Harm*

Because Plaintiffs have not demonstrated to date that this section likely violates their constitutional rights, they can also not rely on that fact to prove that they will suffer irreparable harm if the Court declines to issue a TRO as to this provision. Plaintiffs, however, offer no other arguments as to why they will suffer irreparable harm absent a TRO. They do not explain why they cannot obtain the necessary permits in order to continue to openly carry

16

their weapons without fear that an enforcement action will be taken against them. Accordingly, Plaintiffs have not established that they will be irreparably harmed if a TRO is not issued.

### 3. *Balance of Harms/Public Interest*

Finally, the Court concludes that the balance of harm and the public interest as to this section also weigh in favor of denying the TRO. The government has a substantial interest in protecting the public in general, and in this case it has apparently sought to do so by ensuring that anyone who openly carries a weapon in the Town of Superior does so only having received an appropriate license. Pursuant to the provisions cited in the Amended Code, for example, an individual can obtain a license to carry a concealed weapon after demonstrating, and submitting proof of, "competence with a handgun" and after meeting other eligibility-related requirements, such as not being ineligible to possess a firearm on account of a status as a previous criminal offender. §§ 18-12-203, 18-12-108, C.R.S. (2021). Plaintiffs have not provided any information to the Court regarding the other permitting mentioned in the Amended Code, nor have they made any argument regarding any alleged inadequacies of these exceptions to the prohibition on the open carrying of firearms.

For all these reasons, the Court DENIES the TRO with regard to section 10-9-260.

### III. CONCLUSION

Based on the foregoing, it is

**ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 11) is **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART** as follows:

(1) The Motion for Temporary Restraining Order is GRANTED as to section 10-9-40 of the Municipal Code of the Town of Superior and Defendants are hereby **RESTRAINED** from enforcing the provisions of that section;

(2) The Motion for Temporary Restraining Order is GRANTED as to section 10-9-240 of the Municipal Code of the Town of Superior and Defendants are hereby **RESTRAINED** from enforcing the provisions of that section;

(3) That security as provided for by Fed. R. Civ. P. 65(c) is not required in this matter;

(4) The Motion for Temporary Restraining Order is **DENIED** as to section 10-9-260 of the Municipal Code of the Town of Superior. Defendants will not be restrained from enforcing that section;

(5) The Motion for Preliminary Injunction is **DEFFERRED** and will be heard as set forth below; and it is

**FURTHER ORDERED** that pursuant to Fed. R. Civ. P. 65(b)(4), any Defendant restrained may apply to this Court to dissolve or modify this Order on two (2) days' notice, or such shorter notice as this Court may allow, but no such application shall serve to suspend this Temporary Restraining Order once effective or stay its terms unless otherwise ordered by this Court; and it is

**FURTHER ORDERED** that this Temporary Restraining Order shall remain in effect for fourteen (14) days from its effective date, unless it is otherwise modified by the Court;[2] and it is

**FURTHER ORDERED** that on **July 29, 2022 at 10:30 a.m.** counsel for the Parties shall appear for a status conference on this matter in Courtroom A601 at the Alfred A. Arraj Courthouse, 901 19th Street, Denver, Colorado; and it is

---

[2] If Plaintiffs seek to extend this Temporary Restraining Order or if Defendants consent to an extension of this Temporary Restraining Order, they shall notify the Court as soon as possible. *See* Fed. R. Civ. P. 65(b)(2).

**FURTHER ORDERED** that this case is set for a preliminary injunction hearing on

**Thursday, August 4, 2022, at 9:00 a.m.** in Courtroom A601 at the Alfred A. Arraj Courthouse,

901 19th Street, Denver, Colorado. The parties shall comply with any requirements for

evidentiary hearings in Judge Raymond P. Moore's Civil Practice Standards found at

http://www.cod.uscourts.gov/Portals/0/Documents/Judges/RM/Civil%20Practice%20Standards

%20-%20March%202015.pdf.

DATED this 22nd day of July, 2022 at 3:00 p.m.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02113-CNS-MEH

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS, and
MARTIN CARTER KEHOE,

     Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

     Defendant.

---

## ORDER

---

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order (TRO) and for Preliminary Injunction. (ECF No. 14). Defendant opposes the motion for preliminary injunction but does not contest the motion for a TRO. (*Id.*, p. 1). This Order only addresses the motion for a TRO; the motion for a preliminary injunction will be deferred until the Court conducts a hearing. As such, the Court GRANTS the motion for the TRO for the following reasons.

### I. FACTS

On August 2, 2022, the Board of County Commissioners of Boulder County adopted Ordinance No. 2022-5, which prohibits the sale and purchase of assault weapons, large capacity

1

magazines, and trigger activators.[1] (ECF No. 1-1). The Ordinance prohibits a person, corporation, or other entity in unincorporated Boulder County from manufacturing, importing, purchasing, selling, or transferring any assault weapon, large-capacity magazine, or rapid-fire trigger activator. (*Id.*, p. 6). The Ordinance does not prohibit a person, corporation, or other entity from possessing an assault weapon, large-capacity magazine, or rapid-fire trigger activator.

On August 18, 2022, Plaintiffs (consisting of two nonprofit groups and Martin Kehoe) filed an Amended Complaint alleging that the Ordinance violates the Second and Fourteenth Amendments of the United States Constitution and seeking declaratory judgment and any other remedies available under 42 U.S.C. §§ 1983 and 1988. (ECF No. 2, pp. 7-8). Specifically, Plaintiffs challenge only the Ordinance's regulation of assault weapons and large-capacity magazines. (ECF No. 14, pp. 2-3).

## II. LEGAL STANDARD

To obtain a temporary restraining order, a plaintiff must establish "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). The final two requirements (harm to the opposing party and the public interest) merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because injunctive relief is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal. *Schrier v. Univ.*

---

[1] Plaintiffs refuse to use the terms "assault weapon" and "large-capacity magazine" arguing that it is "politically charged rhetoric." (ECF No. 14, p. 2). Regardless, it is the law that is at issue and the Court will use the language and terminology that was used in the Ordinance.

2

*Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted). The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford the movant all the relief that he could recover at the conclusion of a full trial on the merits. *Id*. at 1259. The Tenth Circuit's definition of "probability of success" is liberal, especially where "the moving party has established that the three 'harm' factors tip decidedly in its favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The duration of a TRO issued without notice to the opposing party is limited to fourteen days unless extended for good cause or the adverse party agrees to an extension. Fed. R. Civ. P. 65(b)(2). Plaintiffs' motion falls into the third category of disfavored injunctions, however, this Court notes that Defendant does not oppose the motion for a TRO.

### III. ANALYSIS

The Court will first examine the "harm" factors before examining whether Plaintiffs have established a probability of success. *See Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981).

1. Irreparable Harm

This factor requires the Court to ask whether irreparable injury will befall the movants without an injunction. The Tenth Circuit has noted that the infringement of a constitutional right is enough to satisfy this factor and requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). Here, Plaintiffs allege that their Second and Fourteenth Amendment rights will be violated by the Ordinance and therefore satisfy this factor.

3

2. Balance of Harms and Public Interest

The next two factors collapse into one because the Government is the opposing party. This analysis requires the Court to balance the irreparable harms identified above against the harm that the preliminary injunction causes to Defendant. "When a constitutional right hangs in the balance, though, even a temporary loss usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (citation omitted). Moreover, it is "always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 807. Because Plaintiffs challenge parts of an allegedly unconstitutional ordinance, the Court finds that the analysis tips in favor of granting Plaintiffs' motion.

3. Substantial Likelihood of Prevailing on the Merits

Because Plaintiffs have established that the harm factors tip decidedly in their favor, the Court's analysis of this fact is "somewhat relaxed." *Heideman*, 348 F.3d at 1189. "The movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992) (internal quotations and citation omitted). Plaintiffs are challenging the constitutionality of Defendant's regulation of assault weapons and large-capacity magazines. The Supreme Court has recently ruled that individuals have a constitutional right to carry a handgun for self-defense outside the home and New York's licensing regime for public-carry licenses impermissibly interfered with that right. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022); *but see id*. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed

4

anything that we said in *Heller* or *McDonald v. Chicago* . . . about restrictions that may be imposed on the possession or carrying of guns."). On this admittedly limited record and with a liberal analysis of this factor, the Court finds that Plaintiffs establish a substantial likelihood of success on the merits.

## IV. CONCLUSION

Accordingly, it is ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 14, is GRANTED IN PART and DEFERRED IN PART.

It is FURTHER ORDERED that the Motion for Temporary Restraining Order is GRANTED as to Ordinance No. 2022-5 regarding assault weapons and large-capacity magazines and Defendant is hereby RESTRAINED from enforcing it as to these categories. Defendant is not restrained from enforcing Ordinance No. 2022-5 as to rapid-fire trigger activators. The security under Rule 65(c) is not required in this case.

The Motion for Preliminary Injunction is DEFERRED, and a hearing will be set after the Court conducts a status conference.

It is FURTHER ORDERED that the parties shall appear for a **status conference** on this matter on **September 8, 2022, at 9:00 a.m.** in Courtroom C204 before Judge Charlotte N. Sweeney at the Byron G. Rogers United States Courthouse.

It is FURTHER ORDERED that under Rule 65(b)(4), the restrained Defendant may apply to this Court to dissolve or modify this Order on two (2) days' notice, or such shorter notice as this Court may allow, but no such application shall serve to suspend this Temporary Restraining Order once effective or stay its terms unless otherwise ordered by this Court.

Finally, it is FURTHER ORDERED that this Temporary Restraining Order shall remain in effect for fourteen (14) days from its effective date unless it is otherwise modified by the Court. If Plaintiffs seek to extend the Temporary Restraining Order or if Defendant consents to an extension of this Temporary Restraining Order, they shall notify the Court as soon as possible. *See* Fed. R. Civ. P. 65(b)(2).

DATED this day 30th of August 2022.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

6

# EXHIBIT F

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 21-1830

EUGENE MICHAEL FREIN; DEBORAH FREIN,
Appellants

v.

PENNSYLVANIA STATE POLICE; PIKE COUNTY
DISTRICT ATTORNEY'S OFFICE; RAYMOND TONKIN;
JOHN/JANE DOE I–V

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:20-cv-00939)
District Judge: Honorable Malachy E. Mannion

Argued: March 23, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*

(Filed: August 30, 2022)

Curt M. Parkins          [ARGUED]
COMERFORD LAW
538 Spruce Street, Suite 430

Scranton, PA 18503

*Counsel for Appellants*

Sean A. Kirkpatrick            [ARGUED]
PENNSYLVANIA ATTORNEY GENERAL'S OFFICE
Strawberry Square, 15th Floor
Harrisburg, PA 17120

*Counsel for Pennsylvania State Police*

David J. MacMain            [ARGUED]
MACMAIN CONNELL & LEINHAUSER
433 West Market Street, Suite 200
West Chester, PA 19382

*Counsel for District Attorney Pike County & Raymond J.
Tonkin*

_____

OPINION OF THE COURT

_____

BIBAS, *Circuit Judge*.

Although police may seize potential evidence using a warrant, they may not keep it forever. Yet they did that here. After a man assassinated a Pennsylvania State Trooper and injured another, troopers seized his *parents'* guns. The government never used the guns as evidence. And eight years after the crime, once the son lost his last direct appeal, the officers still refused to return them—even though the officers do not claim that the parents or the guns were involved in the crime.

Because the parents were never compensated, they have a takings claim. And because they lawfully owned the guns, they have a Second Amendment claim too. But since they had a real chance to challenge the government's keeping the guns, they got procedural due process. So we will affirm in part, reverse in part, vacate in part, and remand.

## I. BACKGROUND

Eric Matthew Frein is on death row for cold-blooded murder. In 2014, he ambushed two Pennsylvania State Troopers, killing one and injuring the other. For a while, he evaded capture. Police knew he had used a .308-caliber rifle. So they got a warrant to search the home that he shared with his parents and seize that type of rifle and ammunition.

When they executed the warrant, state police did not find a .308-caliber rifle. Instead, they found forty-six guns belonging to the parents: twenty-five rifles, nineteen pistols, and two shotguns. None was a .308. Even so, the officers got a second warrant and seized them all.

Eventually, the long arm of the law caught Frein. He was arrested, tried, convicted, and sentenced to death. His conviction was affirmed on direct appeal and certiorari was denied. But throughout that long process, the government never used the guns it had seized from the parents—not at trial, at sentencing, or on appeal. Plus, it never arrested or charged the parents and never alleged that any of their guns was involved in the crime. So the parents went to Pennsylvania state court and asked to get their guns back, raising Second Amendment,

takings, due-process, excessive-fines, and state-law objections. In a one-sentence order, their motion was denied.

The parents now sue the state police, its officers, the Pike County District Attorney, and its prosecutors under 42 U.S.C. § 1983. The parents do not challenge the seizure under the Fourth Amendment. But they say that by keeping the guns after the criminal case ended, the government is violating two other parts of the Constitution: the Fifth Amendment's Takings Clause and the Second Amendment's right to "keep … Arms." Plus, they argue that the state's procedure for letting them reclaim their property violated procedural due process.

In response, the officials concede that they never used the guns at trial or on appeal. They claim that they might need the guns as evidence if Frein's state habeas (technically, PCRA) or federal habeas petition yields a new trial, but can only speculate about how they might use them. And they stress that they seized the guns under a valid search warrant. The District Court agreed and dismissed their suit for failure to state a claim.

Now the parents appeal. We review de novo. *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018).

## II. BY KEEPING THE PARENTS' GUNS AFTER THE CRIMINAL CASE ENDED, THE OFFICIALS TOOK THEIR PROPERTY FOR PUBLIC USE WITHOUT COMPENSATING THEM

Start with the Fifth Amendment claim. The parents correctly charge the government with taking their "private property … for public use, without just compensation." U.S. Const. amend. V. They challenge *not* the searching officers'

initial seizure under a warrant, but the state police's continued retention of the guns once the criminal case ended.

## A. The parents have stated a takings claim

The Fifth Amendment's text supports the parents. After all, their guns are "private property." And they were "taken" by the officials. Plus, the parents have never gotten a dime, let alone "just compensation." *Id.*

Finally, the officials pressed the property into "public use." *Id.* The parents' property was seized by public officials (police) to help public prosecutors enforce state law at a public trial. So their claim checks all the Fifth Amendment boxes.

The officials counter that because the parents have tried to get their guns back in state court, they are collaterally estopped from using a takings claim to try again. Not so. The state court's order would preclude this takings claim only if the state court had decided an "identical" issue. *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 351 (3d Cir. 2014). But that one-sentence order said nothing about takings or the government's need to keep the evidence for a possible retrial; it gave no reasoning at all. Nor could claim preclusion have barred this claim, even if the officials had raised it, because Rule 588 motions are the wrong vehicle for seeking just compensation for a taking. *Compare* Pa. R. Crim. P. 588 (authorizing only "the return of the property"), *with Dep't of Transp. v. A & R Dev. Co.*, 2020 WL 1130855, at *6 (Pa. Commw. Ct. Mar. 9, 2020) (explaining that Pennsylvania's "Eminent Domain Code … is the exclusive remedy for a de facto taking").

Next, the government says *Bennis v. Michigan* forecloses this claim. *Bennis* held that the government need not compensate the owner when it has "lawfully acquired" property in reliance on its police powers, rather than "eminent domain." 516 U.S. 442, 452 (1996). No one doubts that the government seized the guns under its literal police powers. And because it had a valid warrant, it says it lawfully acquired the guns too.

But *Bennis* applies only when the government gains title to the property. There, formal ownership of the property had been "transferred by virtue of [a forfeiture] proceeding from [the owner] to the State." *Id.* Here, by contrast, the government has never "lawfully acquired" title to the guns; they still belong to the parents. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (confirming that a taking happens "when[ever] the government physically takes possession of property without acquiring title to it"). Plus, the guns are not forfeitable as contraband, instrumentalities, or proceeds of a crime. They are, at most, potential evidence, and police do not gain title to "mere evidence." *Warden v. Hayden*, 387 U.S. 294, 306 n.11 (1967). So *Bennis* is no obstacle to the parents' takings claim.

**B. The warrant does not immunize officials who keep property this long**

The officials have one last card to play: they seized the parents' property under a judicial warrant. *See Warden*, 387 U.S. at 301–02 (letting police seize evidence under search warrants). The seizure, the parents agree, was valid. And warrants can shield officials from liability.

But not for this long. Though valid warrants immunize officers who stay within their scope, they are not blank checks. *See Bruce v. Rawlins*, 95 Eng. Rep. 934 (KB 1770) (letting officers be sued for trespass when a search under a writ of assistance turned up nothing); *see also* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 586–89 (1999) (noting that trespass liability for valid yet unsuccessful search warrants was "an aspect of common law … well known at the time of the framing"). *But cf.* Fabio Arcila, Jr., *The Death of Suspicion*, 51 Wm. & Mary L. Rev. 1275, 1284 & nn.15–16 (2010) (noting a debate over how much immunity warrants and writs of assistance conferred). They are a limited exception to the rule against taking private property.

And that exception applies narrowly. At the Founding, warrants authorized taking property tied to a particular crime or wrong—hence the Fourth Amendment's requirement of probable cause. So warrants had to "particularly" identify the "things to be seized," and those "things" had to be tied to the crime for which there was probable cause. U.S. Const. amend. IV; *see* Davies at 601, 651–52. And though officers could also take evidence not listed in the warrant, it still needed to be "material as evidence *on the charge made against the prisoner*." *Rex v. Barnett*, 172 Eng. Rep. 563, 564 (CP 1829) (emphasis added); *see also Crozier v. Cundey*, 108 Eng. Rep. 439, 439 (KB 1827) (letting officers seize items not mentioned in the warrant only if those items were "likely to furnish evidence of the identity of the articles stolen and mentioned in the warrant"). If officers exceeded these limits, they would be liable. Thus, at the Founding, warrants immunized officers from trespass suits only for seizing evidence tied to a particular charge.

Because the point of seizing evidence is to use it in a criminal proceeding, the government may hang onto it through that proceeding. *See, e.g.*, Kensington Dist. N. Liberties, Pa., Act of Mar. 28, 1787, 2 Smith 401, §XII (letting the government keep seized gunpowder until a court decided whether it was lawfully possessed). And at the Founding, that proceeding would have ended by the time the conviction was final, not after the prisoner had exhausted collateral review. Indeed, collateral review was historically a civil remedy treated as a matter of legislative grace, not an integral part of the criminal process. *See, e.g.*, *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202, 209 (1830) (Marshall, C.J.) (holding that the writ of habeas corpus "excepts from those who are entitled to its benefit … persons convicted" by "a court of competent jurisdiction"); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1520–21 (2022) (tracing the history of "permissive," not "mandatory," grants of habeas power to courts).

Thus, the warrant immunizes the officers who first seized the guns. But after the conviction became final, the warrant's justification ran out. "It is well settled that the government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture." *United States v. Chambers*, 192 F.3d 374, 376 (3d Cir. 1999); *accord United States v. Francis*, 646 F.2d 251, 262 (6th Cir. 1981).

If the government wants to keep the property after the conviction becomes final, it needs some justification. That is why it may keep contraband, property that is illegal to own. It may

8

also keep the proceeds of the crime or the instrumentalities used to commit it. *See* 21 U.S.C. § 853; *Kaley v. United States*, 571 U.S. 320, 323 (2014). But it may do that only after going through one of two processes. First, it may use criminal forfeiture to get the proceeds or instrumentalities as "an element of the sentence imposed *following conviction*." *Libretti v. United States*, 516 U.S. 29, 38–39 (1995) (second word of emphasis added). In other words, it must first prove the owner's guilt at trial. *United States v. Sandini*, 816 F.2d 869, 873 (3d Cir. 1987).

Or the government may use civil forfeiture to take the property even without convicting the owner. *See United States v. U.S. Currency in the Amount of $145,139.00*, 18 F.3d 73, 75 (2d Cir. 1994). But even then, the government must have at least probable cause to link the property to the crime. *See, e.g.*, *United States v. $10,700.00*, 258 F.3d 215, 222 (3d Cir. 2001) (analyzing 19 U.S.C. § 1615).

The parents' guns fall into none of these categories. The police have never said the guns are contraband. Nor have they tried to forfeit them. A new warrant or other proof of continued compliance with the Fourth Amendment could justify retention for collateral review, say, or a new investigation or prosecution. But the government offers no such justification. When we asked the district attorney's lawyer if there would be probable cause to seize the guns today, he conceded, "I would think not." Oral Arg. Tr. 41:18–42:11. Because the government has not compensated the parents for the guns either, their takings claim may proceed.

9

We need not decide when, after the criminal case, this liability accrues and whether the plaintiff must first demand return of the property and be refused.

### III. BY HOLDING ON TO THE PARENTS' GUNS AFTER THE CRIMINAL CASE ENDED, THE OFFICIALS INFRINGED THEIR RIGHT TO KEEP ARMS

The Second Amendment guarantees "the right of the people to keep and bear Arms." According to the parents, the officials validly *seized* their guns under a warrant, but violated that right by *refusing to return* them. To decide that claim, we ask whether the constitutional text and "this Nation's historical tradition" permit holding on to the guns. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (abrogating *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), which set forth our previous framework for evaluating Second Amendment challenges). They do not. We hold that unless an exception applies, the Second Amendment protects a person's right to keep his lawfully owned guns.

### A. The Second Amendment's text protects a person's right to keep his own guns for self-defense

Start with the constitutional text: "keep … Arms." The Second Amendment secures an individual right to "have weapons" on hand. *District of Columbia v. Heller*, 554 U.S. 570, 582, 592 (2008) (defining "keep"). So aside from a few exceptions, the government may not prevent citizens from buying and owning guns. *Id.* at 628–29.

Nor may it barge into a home, seize guns, and keep them beyond the scope of a warrant or other authorized seizure. By

protecting the "keep[ing of] … Arms," the Second Amendment ensures that the People may "retain" their firearms "in [their] custody." *Keep* (defs. 1 & 2), Samuel Johnson, *A Dictionary of the English Language* (1755); *see also Keep* (defs. 1 & 2), Noah Webster, *American Dictionary of the English Language* (1828) ("[t]o hold; to retain in one's power or possession").

The government may not "infringe[]"on this right. U.S. Const. amend. II. That guarantee, of course, forbids "destroy[ing]" the right by banning gun ownership. *Infringe* (def. 2), Samuel Johnson, *A Dictionary of the English Language* (1755). But it also forbids lesser "violat[ions]" that "hinder" a person's ability to hold on to his guns. *Id.* (defs. 1 & 2); *accord Infringe* (defs. 2 & 3), Noah Webster, *American Dictionary of the English Language* (1828). Indeed, the Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification. *Bruen*, 142 S. Ct. at 2131–33.

That approach makes sense. With other constitutional rights, we scrutinize not only total bans but also lesser restrictions and burdens. Thus, we may be skeptical of public-health rules that cap how many people may physically attend church, even if the rules do not ban them from worshipping. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Or an execution protocol that lets a chaplain into the execution chamber but stops him from praying out loud. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1274 (2022). Or a law that criminalizes flag burning without regulating spoken or written words. *See Texas v. Johnson*, 491 U.S. 397, 402–03, 419–20 (1989). Even if the government has not entirely

prevented citizens from speaking or worshipping, its burdens on speech and worship may violate the First Amendment.

Likewise, the Second Amendment prevents the government from hindering citizens' ability to "keep" their guns. Here, retaining the parents' "entire collection of guns" hinders their ability to hold on to it. Oral Arg. Tr. 27:18–19. So the government "infringed" on the parents' right to "keep" their arms when it began holding on to the guns indefinitely. The seizure under a valid warrant immunized the government for the duration of the criminal case. But now that the case is over, the government must either get another warrant or return the property.

## B. History confirms the parents' Second Amendment right to get their guns back

The history bears this out. The ratifiers of both the Second Amendment and the Fourteenth Amendment (which secures the right in the states) understood that arbitrary seizures prevent citizens from keeping arms for their self-defense. *Cf. McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating the right to keep arms against the states).

The seeds of the Second Amendment were planted centuries ago in England, when King Charles II authorized his officers "to search for and seize all Armes in the custody or possession of any person" whom they considered dangerous. An Act for ordering the Forces in the several Counties of this Kingdom, 13 & 14 Car. II, c.3, § XIII (1662); *see also* Stephen P. Halbrook, *That Every Man Be Armed* 43, 210 n.40 (1984) (noting that a 1670 ban on commoners' owning guns and bows was

used "to justify breaking and entering houses to search for arms"); Joyce Lee Malcolm, *To Keep and Bear Arms* 23–53 (1994) (discussing various seventeenth-century seizures).

After Charles II was deposed, the English Bill of Rights guaranteed the right of Protestants to "have arms for their defence suitable to their conditions, and as allowed by law." Bill of Rights, 1 W. & M., ch. 2, § 7, *in* 3 Eng. Stat. at Large 441 (1689); *see* Malcolm, *To Keep and Bear Arms* 115–21 (summarizing parliamentary debates).

Like Englishmen, colonial Americans feared arbitrary gun seizures. In 1774, with tensions rising, the Crown "instituted a general policy of searching places [in the Boston area] for arms and seizing them." Stephen P. Halbrook, *Encroachments of the Crown on the Liberty of the Subject: Pre-Revolutionary Origins of the Second Amendment*, 15 U. Dayton L. Rev. 91, 105 (1989). The Crown's efforts to search and disarm colonists continued over the next two years. Indeed, "[t]he British attempt to seize or destroy the arms and ammunition at Lexington triggered the" Revolutionary War. Halbrook, *That Every Man Be Armed* 62.

Plus, the Fourteenth Amendment's ratifiers understood that it would stop gun seizures. Before the Civil War, black people had been denied citizenship and, with it, the right "to keep and carry arms." *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857). Though *Dred Scott* fell with the Confederacy, Southerners kept seizing the freedmen's guns. *Heller*, 554 U.S. at 615. In Mississippi, white militias "seized every gun and pistol found in the hands of the (so called) freedmen," insisting that state law did not recognize their right to arms. Halbrook, *That Every*

13

*Man Be Armed* 117 (quoting a *Harper's Weekly* column); *accord McDonald*, 561 U.S. at 772. So too in South Carolina, where a former federal official reported similar seizures to Congress. H.R. Rep. No. 39-30, pt. 2, at 229 (1866), *quoted in* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. Rev. 1359, 1447–48. As one senator put it, "the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description." Cong. Globe, 39th Cong., 1st Sess. 915 (1866), *quoted in McDonald*, 561 U.S. at 772.

In response, the federal government took pains to explain to freedmen that "no military or civil officer ha[d] the right or authority to disarm" them. Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876*, at 19 (1998) (quoting a Freedmen's Bureau circular). Against this backdrop, Congress passed the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1871 to protect all citizens' constitutional rights, including the right to arms. *Id.* The Fourteenth Amendment was designed to secure that right as well. *McDonald*, 561 U.S. at 772–76.

## C. The narrow historical exceptions do not justify holding on to the guns

As this history shows, the government may not ordinarily seize and hold on to weapons. There are few exceptions to that rule, and none applies here.

For instance, the government may confiscate guns from those who have been convicted of serious crimes or committed

14

dangerous acts. *Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) (plurality opinion), *abrogated on other grounds by Bruen*; *see Heller*, 554 U.S. at 626–27 (dictum). But the parents have neither been convicted of any crime nor committed any dangerous act.

The government may also seize and forfeit guns used to commit a crime. But that does not help the government here either. It first seized the parents' guns under a warrant. But that warrant was tied to the son's trial; as explained, its immunity ran out by the time the parents sued. And the government has not gotten and cannot get another warrant because it admits that there is no probable cause. So the parents had the right to keep the guns that they had lawfully bought and still lawfully owned. When the government took the parents' guns and re-fused to return them, it burdened that right.

Pushing back, the government cites other authority suggest-ing that seizures do not burden Second Amendment rights as long as citizens can "retain[ ] or acquir[e] other firearms." *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011); *see also Houston v. City of New Orleans*, 675 F.3d 441, 445 (5th Cir.), *vacated*, 682 F.3d 361 (5th Cir. 2012); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571–72 (7th Cir. 2014); John L. Schwab & Thomas G. Sprankling, Houston, *We Have a Prob-lem: Does the Second Amendment Create a Property Right to a Specific Firearm?*, 112 Colum. L. Rev. Sidebar 158 (2012).

The government notes that the Takings and Due Process Clauses more clearly protect private property. *Walters*, 660 F.3d at 317; Schwab & Sprankling at 167–68. So, it suggests, the Second Amendment provides "not a property-like right to

a specific firearm," but just a general right to buy guns. *Houston*, 675 F.3d at 445.

We disagree. We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere. Just as those seizures and retentions can violate the First Amendment, seizing and holding on to guns can violate the Second. The Second Amendment may let the government outlaw specific types of weapons—perhaps "dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (dicta); *accord Bruen*, 142 S. Ct. at 2143; Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1548 (2009). But as we have explained, it does forbid unjustifiable burdens on the right to "keep" one's own arms.

And that protection is not redundant of more property-focused protections. For instance, the Takings Clause allows seizures so long as the government pays "just compensation." But the Second Amendment appears to forbid "disarm[ing] private citizens" even if the government compensates those citizens for their property. *Cf. Heller*, 554 U.S. at 591–92. The other guarantees do not prevent this one from applying too.

## IV. PENNSYLVANIA GAVE THE PARENTS DUE PROCESS

Finally, the parents claim that the government violated their due process rights by holding on to their guns. They insist that they were entitled to process before the deprivation. And they say the deprivation happened when the government held on to

their guns after the criminal case, not when it first seized them. Thus, they claim that process was due after seizure but before retention.

We disagree. True, we usually require that the government give process before it deprives people of their property. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). But if that is not "feasibl[e]," it may give process after the deprivation. *Id.*

The core of due process is an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). The parents got that opportunity here: They sought the return of their property under Pennsylvania Rule of Criminal Procedure 588, the state analogue to Federal Rule of Criminal Procedure 41(g). Doing so entitled them to a hearing at which they could introduce evidence. Pa. R. Crim. P. 588(B). The hearing was conducted by a judge, and the parents had the assistance of a lawyer. They could have appealed that judge's decision, but did not. *See, e.g.*, *Commonwealth v. Durham*, 9 A.3d 641, 642 (Pa. Super. Ct. 2010).

This process was all that was due under *Mathews*. *See* 424 U.S. at 335. The parents' Second Amendment right makes their private interest substantial. But the extensive process minimized the risk of erroneous deprivation. So Pennsylvania's scheme is "constitutionally adequate." *Zinermon*, 494 U.S. at 126.

The parents parry with two out-of-circuit cases, yet neither saves their claim. One case rejected a post-deprivation replevin suit as inadequate. But it did so because Missouri made the gun

owner sue in four counties. *Lathon v. City of St. Louis*, 242 F.3d 841, 844 (8th Cir. 2001). Pennsylvania, by contrast, lets owners simply file a motion. Pa. R. Crim. P. 588. The other case did hold that post-deprivation tort suits are generally inadequate. *Walters*, 660 F.3d at 313. But the Eighth Circuit has since walked that case back. *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 928–29 (8th Cir. 2016).

Because it was infeasible to give process before deprivation, and because the process the parents got was robust, we will affirm the District Court on this point.

## V. THE PARENTS MAY NOT SEEK DAMAGES AGAINST THE STATE POLICE

The Pennsylvania State Police is an arm of the Commonwealth of Pennsylvania. So the parents may not sue the police for money damages. *Ex parte Young*, 209 U.S. 123, 151 (1908). All they may seek is an injunction. *See id.* at 159; Oral Arg. Tr. 3:25–4:12 (conceding the point).

In reaching this conclusion, we hold that states must specifically authorize takings claims *for compensation*. True, Congress has authorized takings suits against states. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168, 2176–77 (2019). But that does not mean that plaintiffs may seek compensation. That is because the Takings Clause, as incorporated against the states, did not alter the states' traditional immunity from federal suits, at least if state courts remain open to hear these claims. *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734–35 (6th Cir. 2022); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (collecting cases). Pennsylvania's Eminent Domain

Code opens its state courts to takings claims. *Knick,* 139 S. Ct. at 2168. Unless Pennsylvania decides that it prefers to pay damages to compensate owners for takings, federal plaintiffs like the parents may get only a declaration and injunction requiring the state to return their property.

\* \* \* \* \*

The police understandably seized the parents' guns in 2014 while a killer was still at large. But he has long since been captured and convicted, and his conviction has been affirmed. The judicial warrant does not authorize keeping the guns past this point. The Constitution requires the officials who are holding on to the guns to pay the parents just compensation and bars them from keeping the guns indefinitely. So we will reverse the District Court's dismissal of the Takings and Second Amendment claims. But because the parents got enough process, we will affirm the dismissal of their procedural-due-process claim.

# EXHIBIT C

## <u>EXHIBIT "C" TO COMPLAINT</u>

### <u>The Ban—11 *Del. C.* § 1448(a)(5)</u>

Bans any person under age 21 from purchasing, owning, possessing, or controlling a deadly weapon or ammunition for a firearm within the State:

"[e]xcept as otherwise provided in this section, the following persons are prohibited from purchasing, owning, possessing, or controlling a deadly weapon or ammunition for a firearm within the State:
Any person under the age of 21."

### <u>Deadly Weapons—11 *Del. C.* § 222(a)(6)</u>

"deadly weapon," is defined in the Delaware Criminal Code as:

"…a "firearm", as defined in paragraph (12) of this section, a bomb, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick or any "dangerous instrument", as defined in paragraph (4) of this section, which is used, or attempted to be used, to cause death or serious physical injury. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length."

### <u>Exemptions</u>

- **11 *Del. C.* § 1448 (a)(5)(a)(1)-(3)**

  Exempts the following from 11 *Del. C.* § 1448(a)(5):

  a. A shotgun as defined in § 1444(c) of this title or ammunition for a shotgun;
  b. A muzzle-loading rifle as defined in § 704(f) of Title 7;
  c. Deadly weapons other than firearms if the person is 18 years of age or older.

- **11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).**

  States that 11 *Del. C.* § 1448(a)(5 does not apply to:
  (1) law enforcement;

1

(2) military and national guard; and
(3) concealed carry permit holders

- **11 *Del. C.* § 1448 (a)(5)(e).**

    States that 11 *Del. C.* § 1448(a)(5) does not apply to **possession or control** of a deadly weapon by a person 18 years of age or older

## Conclusion

- HB 451 does not apply to 18-20 year old Delawareans as follows:

1. shotguns, muzzle-loading rifles and deadly weapons other than firearms if the person is over 18;
2. military members, law-enforcement officers, and people with carry licenses;
3. possessing or controlling a firearm while hunting or recreational firearms activity or transporting to those events;
4. possessing or using during justifiable self-defense; or
5. possessing or controlling a firearm by a person over 18.

- HB 451 does apply to 18-20 year old Delawareans as follows:

    Owning and/or purchasing a firearm without a carry license other than those exempted firearms listed immediately above

EFiled: Nov 23 2022 01:22PM EST
Transaction ID 68430616
Case No. K22C-11-031 RLG

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

COUNTY:     N   **K**   S          CIVIL ACTION NUMBER:_____

| | |
|---|---|
| Caption:<br><br>Gavin J. Birney; Delaware State Sportsmen's<br><br>Association, Inc. and Bridgeville Rifle<br><br>& Pistol Club, Ltd.,  Plaintiffs<br><br>v.<br><br>Delaware Department of Safety and Homeland Security; Nathaniel McQueen Jr., in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley in her official capacity as superintendent of the Delaware State Police, Defendants | Civil Case Code:  _CCHA_____<br><br>Civil Case Type:  _Transfer from Chancery Court_<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION  (MNA) _____<br><br>Name and Status of Party filing document:<br>Gavin J. Birney; Delaware State Sportsmen's Association, Inc. and Bridgeville Rifle & Pistol Club, Plaintiffs<br><br>Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>_Complaint for Declaratory Judgment_<br><br>JURY DEMAND:   YES_____ NO  x_____ |
| ATTORNEY NAME(S):<br><br>Francis G.X. Pileggi, Esquire<br>ATTORNEY ID(S):<br>2624<br><br>FIRM NAME:<br>Lewis Brisbois Bisgaard & Smith LLP<br><br>ADDRESS:<br>500 Delaware Avenue, Suite 700<br>Wilmington, DE  19801<br>TELEPHONE NUMBER:<br>(302) 985-6000<br><br>FAX NUMBER:<br>(302) 985-6001<br><br>E-MAIL ADDRESS:<br>Francis.Pileggi@LewisBrisbois.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>_____<br><br>_____<br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br><br>_____<br><br>_____<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_Dispositive Motions Expected to be Filed Soon_<br><br>_____<br><br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |