## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GAVIN J. BIRNEY; DELAWARE :
STATE SPORTSMEN'S :
ASSOCIATION, INC.; and :
BRIDGEVILLE RIFLE & PISTOL :
CLUB, LTD., :
 :
  Plaintiffs, :
 :
 v. : C.A. No. 22-1624-RGA
 :
DELAWARE DEPARTMENT OF :
SAFETY AND HOMELAND :
SECURITY; NATHANIEL :
MCQUEEN JR. in his official :
capacity as Cabinet Secretary, :
Delaware Department of Safety and :
Homeland Security; and COL. :
MELISSA ZEBLEY in her official :
capacity as superintendent of the :
Delaware State Police, :
 :
  Defendants. :

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF</u>

  Plaintiffs Gavin J. Birney; Delaware State Sportsmen's Association ("DSSA"); and Bridgeville Rifle and Pistol Club, Ltd. ("BRPC") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this amended[1] complaint against Defendants, Delaware Department of Safety and Homeland Security;

---

[1] A redlined version highlighting changes from the original complaint is attached as Exhibits "X," along with a Stipulation to Amend of the parties.

Secretary Nathanial McQueen Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley as the top law enforcement officer at the Delaware State Police, all of whom are Delaware state officials responsible for enforcing and implementing Delaware's laws and regulations infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family, and for other lawful purposes, and allege as follows:

## **INTRODUCTION**

1.     The United States Supreme Court and a unanimous Delaware Supreme Court have recognized that the fundamental right to self-defense includes the right to keep and bear firearms both inside and outside the home. In defiance of this established and unassailable authority, the Delaware General Assembly recently enacted into law House Bill 451 ("HB 451"[2]) which flouts the fundamental civil rights of Delawareans, particularly those 18 years-old through 20 years-old, by making them criminals–felons–for exercising one of their most exalted rights enshrined in both the Delaware Constitution and the United States Constitution.[3]

---

[2] "HB 451" refers to 11 *Del. C*. §§ 1445, 1448 as well as provisions in HB 451. HB 451 is attached hereto as Exhibit "A."

[3] "The constitutional right to keep and bear arms is enshrined in the Bill of Rights as among the most important "civil rights" of citizens." *McDonald v. City of Chicago*, 561 U.S. 742, 774-75 (2010).

130233262.2

2

2.   The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const., amend. II. Under the Second Amendment, Plaintiffs Birney; DSSA (and its members); and BRPC (and its members) are all similarly situated individuals who are legally eligible to possess and acquire firearms, and have a fundamental constitutionally guaranteed right to keep common firearms for defense of self and family, and for other lawful pursuits.

### Delaware Criminalizes Lawful Behavior by Law-Abiding Citizens

3.   When HB 451 was signed into law on June 30, 2022, the State of Delaware criminalized the purchase and ownership of common firearms used by law abiding citizens, 18 years-old through 20 years-old, for lawful purposes—and making it a felony for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C.* § 1448 (a)(5) (2022).

4.   The State's limited exceptions to these broad criminal statutes do not allow typical law-abiding citizens 18 years-old through 20 years-old to keep and bear common firearms for lawful purposes. *See* 11 *Del. C.* §§ 1448 (5)(a)(1)-(3), 1448 (5)(b)(1)-(3).

5.   The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny thousands of individuals who reside in Delaware, including Plaintiffs and their members, and others like them, their fundamental, individual right to keep and bear common arms due to HB 451.

130233262.2

6.    Plaintiffs seek declaratory relief on the basis that HB 451 violates their rights under the Second and Fourteenth Amendments of the U.S. Constitution and their right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution.

### Key Authorities

7.    HB 451 relies upon laws and court precedent formulated before the U.S. Supreme Court's recent landmark decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. _, 142 S.Ct. 2111 (2022).

8.    In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

9.    In so doing, the *Bruen* court repudiated the "means-end" scrutiny to restrictions upon fundamental Second Amendment rights that had developed in Circuit Courts following *Heller*. HB 451 draws its inspiration from exactly those types of flawed, now repudiated restrictions.

10.    The Supreme Court, thus, reinforced the approach to assessing a Second Amendment challenge it had established in *District of Columbia v. Heller*, 554 U.S.

570 (2008). That approach requires only: (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Second Amendment to demark the limits on the exercise of that right. *Id*.

11.     But *Bruen*, like *Heller* before it, also made clear that a firearms ban, like HB 451, that bans arms in common use by law-abiding citizens, for lawful purposes, cannot be consistent with the Nation's historical tradition of firearms regulation and cannot stand. *Bruen*, 142 S. Ct. at 2128 (holding it is "'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"); *see also Heller*, 554 U.S. at 625 (holding a law, by definition, cannot fit into the Nation's historical tradition of restricting "dangerous and unusual" weapons if it bans "possession and use of weapons that are 'in common use.'")

12.     Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has begun to crumble in the decision's wake. HB 451 should be no different.  *See, e.g., Firearms Pol'y Coal., Inc. v. McGraw*, 2022 WL 3656996 at *4 (N.D. Tex. Aug. 25, 2022) (invalidating federal law prohibiting sale of handguns to those under age 21); George A. Mocsary,

*Treating Young Adults as Citizens* (forthcoming law review article in TEXAS REVIEW OF LAW & POLITICS), attached hereto as Exhibit B.

13.    In *Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432 (E.D. Va. May 10, 2023), adult Plaintiffs over the age of 18 years-old but under the age of 21 years-old successfully challenged the constitutionality of an interlocking collection of federal law and regulations that prevent 18 to 20 year-olds from purchasing handguns from federal firearms licensed dealers.

14.    In light of *Bruen* and *Heller*, the District Court for the Eastern District of Virginia granted Plaintiffs' motion for summary judgment and struck down the restriction against sale to 18 year-olds to 20 year-olds, finding that "the statutes and regulations in question are not consistent with our Nation's history and tradition" and therefore cannot stand. *Id*. at *56.

15.    On August 30, 2023, a nationwide injunction, to prevent enforcement of a ban on purchases of firearms by person between 18 and 21, was issued in the *Fraser* case and which states in part: "people between the ages of 18 and 21 in the Eastern District of Virginia suffer an equal burden as people of the same age in the Southern District of New York, the Central District of California, or any other

district." *Fraser v. BATFE*,  2023 U.S. Dist. LEXIS 154088, at *23 (E.D. Va. Aug. 30, 2023).[4]

16.    The District of Minnesota also granted the motion for summary judgment of three 18 year-old to 20 year-old plaintiffs who brought suit to challenge the age requirement in Minn. Stat. § 624.714, subd. 2, prohibiting the issuance of a license to carry a pistol in public to any adult under the age of 21 years-old. *Worth v. Harrington*, 2023 U.S. Dist. LEXIS 56638 (D. Minn. Mar. 31, 2023).

17.    The District Court held that plaintiffs' right to carry was protected by the Second Amendment, and that a statute to prohibit 18 to 20 year-olds from publicly carrying handguns for self-defense was not consistent with the Nation's historical tradition. *Id.* at *25.

18.    Even before *Bruen*, courts struck down statutes, similar to HB 451, restricting fundamental Second Amendment rights based upon age restrictions.

19.     In *Jones v. Bonta*, 2022 WL 1485187 (9th Cir. 2022), the Ninth Circuit Court of Appeals reversed the district court and granted a preliminary injunction in favor of plaintiffs between the ages of 18 through 20 who were restricted, by California statute, from purchasing semi-automatic weapons.[5]

---

[4] This case is currently stayed pending appeal to the United States Court of Appeals for the Fourth Circuit.

[5] This decision has since been vacated for further review by the District Court, in light of *Bruen*.

20.   The Ninth Circuit reached this decision applying intermediate scrutiny, prior to *Bruen*, and therefore ruled in favor of plaintiffs under a more oppressive standard than the instant Plaintiffs face in the instant challenge.

21.   Now post-*Bruen*, the government undoubtedly has the burden of proof to establish that it has not infringed on the constitutional right to keep and bear arms. *Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375, at *16 n.13 (D. Del. Sep. 23, 2022)

## JURISDICTION

22.   This Court has jurisdiction to decide issues arising under the U.S. Constitution.

23.   This Court has personal jurisdiction over Defendants because Cabinet Secretary McQueen and Col. Zebley are officials working for the State of Delaware, and the Delaware Department of Safety and Homeland Security is a state agency.

## PARTIES

24.  Plaintiff Gavin J. Birney is a natural person, a resident of Sussex County, Delaware, an adult between 18 and 21 years of age, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Birney is a member of DSSA and BRPC.

25.  Plaintiff DSSA is a Delaware corporation with a principal place of business in Sussex County, Delaware. DSSA was founded in 1968 as the official

130233262.2

State-level affiliate of the National Rifle Association of America, and its membership currently consists of approximately 4,500 individual members, including members between the ages of 18 years-old and 20 years-old, and constituent clubs. DSSA's prime purpose is to preserve, protect and defend the constitutional rights of its members and to support the rights of the people of the State of Delaware to keep and bear arms for lawful purposes. DSSA brings this action on behalf of itself and its members, including Birney, in order to protect and defend the constitutional rights of its members and of itself.

26. Plaintiff BRPC is a Delaware corporation with a principal place of business in Sussex County, Delaware. BRPC was formed in the early 1950s by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual members and their families, including members 18 years-old through 20 years-old, residing in Delaware, Maryland, Pennsylvania, Virginia, New Jersey, and other states. BRPC serves as a competitive shooting club that conducts education, training and competitive shooting events drawing competitors and participants from throughout the United States. BRPC brings this action on behalf of itself and its members, including Birney, in order to protect the rights of its members and to protect

BRPC's ability to continue to engage in competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

27. Defendant Delaware Department of Safety and Homeland Security is a department within the State of Delaware that oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including HB 451. Defendant Delaware Department of Safety and Homeland Security's enforcement of HB 451's ban on "deadly weapons" against Delaware residents, 18 years-old through 20 years-old, places Plaintiff, Birney, under imminent threat of arrest and/or prosecution should he violate HB 451, which leaves him unable to buy common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

28. Defendant Nathanial McQueen Jr. is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security for the State of Delaware. This suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security. In this capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including HB 451. Defendant McQueen's ongoing enforcement of HB 451's ban on "deadly weapons" against Delaware residents ages 18 years-old through 20 years-old places Plaintiffs under imminent threat of arrest and/or prosecution should they violate HB 451,

130233262.2

which leaves them unable to keep common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

29. Defendant Col. Melissa Zebley is the Superintendent of the Delaware State Police. This suit is brought against Defendant Zebley in her official capacity as Superintendent of the Delaware State Police. In this capacity Defendant Zebley executes and administers the State's laws, including HB 451. Defendant Zebley's ongoing enforcement of HB 451's ban on "deadly weapons" against Delaware residents ages of 18 years-old through 20 years-old places Plaintiffs under imminent threat of arrest and/or prosecution should they violate HB 451, which leaves them unable to keep common firearms. Members and supporters of DSSA and BRPC in Delaware face the same clear threat of enforcement.

## FACTUAL ALLEGATIONS

### I.    DELAWARE'S UNCONSTITUTIONAL HB 451

30. The State of Delaware bans Delawareans, 18 years-old through 20 years-old, from purchasing and owning common firearms labeled "deadly weapons" pursuant to HB 451.

31. This broad ban on purchasing and owning any firearm so labeled applies to every Delawarean 18 years-old through 20 years-old who does not fall into one of a few narrow categories: primarily on-duty military personnel, law enforcement

130233262.2

11

officers, and certain persons licensed to carry a concealed deadly weapon. 11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).

32.   If an ordinary, law-abiding citizen 18 years-old through 20 years-old bears a "deadly weapon" as defined by HB 451 they commit either an unclassified misdemeanor, a Class E felony offense or a Class G felony offense and are subject to severe criminal sanctions, including imprisonment for up to five years for the first offense. 11 *Del. C.* §§ 4205, 1445 (c). Further, under both state and federal law, conviction under these provisions would result in a lifetime ban on possession of firearms. 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[6]

## II.   FIREARMS IN COMMON USE

33.   Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), HB 451 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home. *Id.* at 628-629.

34. HB 451 bans Delawareans 18 years-old through 20 years-old from purchasing or owning firearms labeled "deadly weapons."

---

[6] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10, § 4509(b)(6) (jury).

35. Specifically, HB 451 provides that "[e]xcept as otherwise provided, "[a]ny person under the age of 21" is "prohibited from purchasing, owning, possessing, or controlling a deadly weapon or ammunition for a firearm within the State." 11 *Del. C.* § 1448(a)(5).

36. While not specifically incorporated into HB 451, "deadly weapon," is defined in the Delaware Criminal Code as:

> "…a "firearm", as defined in paragraph (12) of this section, a bomb, a knife of any sort (other than an ordinary pocketknife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chain or ice pick or any "dangerous instrument", as defined in paragraph (4) of this section, which is used, or attempted to be used, to cause death or serious physical injury. For the purpose of this definition, an ordinary pocketknife shall be a folding knife having a blade not more than 3 inches in length."

11 *Del. C.* § 222(a)(6)

37. In turn, a "firearm" is defined as including "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded. It does not include a BB gun." 11 *Del. C.* § 222(a)(13).

38. HB 451 further identifies a limited subset of firearms that do not qualify as "deadly weapons," exempting the following from its ban:

  a. A shotgun as defined in § 1444(c) of this title or ammunition for

   a shotgun;

  b. A muzzle-loading rifle as defined in § 704(f) of Title 7;

c. Deadly weapons other than firearms if the person is 18 years of age or older. 11 *Del. C.* § 1448 (a)(5)(a)(1)-(3).

39. HB 451 also identifies a limited subset of individuals to which HB 451 does not apply, as follows:

a. An active member of the Armed Forces of the United States or the National Guard;

b. A qualified law-enforcement officer as defined in § 1441A of this title;

c. A person who has license to carry a concealed deadly weapon pursuant to § 1441 of this title. 11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).

40. HB 451 further provides "[p]aragraph (a)(5) of this section [§ 1448] does not apply to the possession or control of a firearm by a person 18 years of age or older." 11 *Del. C.* § 1448 (a)(5)(e).

41. Therefore, HB 451 bans any law-abiding Delawarean, 18 years-old through 20 years-old, who does not possess a concealed carry license, from purchasing or owning a firearm deemed a "deadly weapon."[7]

---

[7] HB 451 is not a model of clarity, requiring reference to and application of often inapposite statutes to derive the final set of individuals who are subject to this new outright ban from purchasing or owning commonly owned and used firearms. *See* Explanation of the HB 451 Ban, attached hereto as Exhibit "C."

130233262.2

42.  Handguns and/or pistols banned from purchase and/or ownership by HB 451 are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)); *see also*, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1269 (D.C. Cir. 2011)(Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semi-automatic—….have not traditionally been banned and are in common use  by law-abiding citizens.").

43.  Because HB 451 presumably also bans purchase and/or ownership of certain rifles and/or long guns, it is noted that "[n]ationally, modern rifles are ubiquitous ... In 2018 it was reported that 909, 330 Ford F-150s were sold. Twice as many modern rifles were sold the same year." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal, 2021). A 2022 study by the National Shooting Sports Foundation, the firearm industry trade association, estimated 24,446,000 Modern Sporting Rifles to be in circulation in the United States since 1990. That is an increase of over 4.5 million rifles since the last estimate was released in 2020 and far exceeds the 16,100,000 F-150 trucks estimated to be on the road.  *Commonly Owned: NSSF Announces Over 24 Million MRS in Circulation*, July 20, 2022, NATIONAL FIREARM INDUSTRY TRADE ASSOCIATION,  https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.

44.  Handguns and long guns banned from purchase and/or ownership by HB 451 aid home defense.

45.  Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property.

46.  HB 451 harms law-abiding citizens, not criminals.

47.  HB 451's prohibition against Delawareans 18 years-old through 20 years-old purchasing and/or owning firearms labeled as "deadly weapons" effectively bans the acquisition of firearms that are commonly used for lawful purposes, including self-defense in the home.

### III.    THE UNCONSTITUTIONAL LICENSING PROCESS

48.  The State of Delaware, through HB 451, further imposes exceptions for Delawareans 18 years-old through 20 years-old that further serves to impose unconstitutional licensing requirements upon ordinary, law-abiding citizens, including Plaintiffs.

130233262.2

49.  The State of Delaware purports to create an "exception" to HB 451's ban to the extent that HB 451 does not apply to "[a] person who has a license to carry a concealed deadly weapon pursuant to § 1441 of this title." 11 *Del. C.* § 1448 (a)(5)(b)(3).

50.  However, this "exception" requires prospective permit holders to comply with a vague, arbitrary, discretionary, and burdensome registration and licensing process.

51.  The permit that provides a purported "exception" to HB 451 is open to "[a] person of full age[8] and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the protection of the person's property," and requires prospective permit holders to strictly comply with the following conditions:

(1) The person shall make application therefor in writing and file the same with the Prothonotary of the proper county, at least 15 days before the then next term of the Superior Court, clearly stating that the person is of full age and that the person is desirous of being licensed to carry a concealed deadly weapon for personal protection or protection of the person's property, or both, and also stating the person's residence and occupation. The person shall submit together with such application all

---

[8] Pursuant to 1 *Del. C.* § 701, "[a] person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." This statutory right should apply with greater force to constitutional rights in Article I, Section 20 of the Delaware Constitution, which post-dated the statutory recognition of adult-rights for 18-year-olds.

130233262.2

information necessary to conduct a criminal history background check. The Superior Court may conduct a criminal history background check pursuant to the procedures set forth in Chapter 85 of Title 11 for the purposes of licensing any person pursuant to this section.

(2) At the same time the person shall file, with the Prothonotary, a certificate of 5 respectable citizens of the county in which the applicant resides at the time of filing the application. The certificate shall clearly state that the applicant is a person of full age, sobriety and good moral character, that the applicant bears a good reputation for peace and good order in the community in which the applicant resides, and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property, or both. The certificate shall be signed with the proper signatures and in the proper handwriting of each such respectable citizen.

(3) Every such applicant shall file in the office of the Prothonotary of the proper county the application verified by oath or affirmation in writing taken before an officer authorized by the laws of this State to administer the same, and shall under such verification state that the applicant's certificate and recommendation were read to or by the signers thereof and that the signatures thereto are in the proper and genuine handwriting of each. Prior to the issuance of an initial license the person shall also file with the Prothonotary a notarized certificate signed by an instructor or authorized representative of a sponsoring agency, school, organization or institution certifying that the applicant: (i) has completed a firearms training course which contains at least the below-described minimum elements; and (ii) is sponsored by a federal, state, county or municipal law enforcement agency, a college, a nationally recognized organization that customarily offers firearms training, or a firearms training school with instructors certified by a nationally recognized organization that customarily offers firearms training. The firearms training course shall include the following elements:

   a. Instruction regarding knowledge and safe handling of firearms;

   b. Instruction regarding safe storage of firearms and child safety;

c. Instruction regarding knowledge and safe handling of ammunition;

d. Instruction regarding safe storage of ammunition and child safety;

e. Instruction regarding safe firearms shooting fundamentals;

f. Live fire shooting exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition;

g. Identification of ways to develop and maintain firearm shooting skills;

h. Instruction regarding federal and state laws pertaining to the lawful purchase, ownership, transportation, use and possession of firearms;

i. Instruction regarding the laws of this State pertaining to the use of deadly force for self-defense; and

j. Instruction regarding techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution.

(4) At the time the application is filed, the applicant shall pay a fee of $65 to the Prothonotary issuing the same…

(b) The Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county. In making such publication it shall be sufficient for the Prothonotary to do the same as a list in alphabetical form stating therein simply the name and residence of each applicant respectively.

(c) The Prothonotary of the county in which the application for license is made shall lay before the Superior Court, at its then next term, all applications for licenses, together with the certificate and

recommendation accompanying the same, filed in the Prothonotary's office, on the first day of such application.

(d) The Court may or may not, in its discretion, approve any application, and in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose…

11 *Del. C.* § 1441.

52.   HB 451 thus overextends an already vague, arbitrary, discretionary, and burdensome licensing process, originally designed for public carry, to the right to mere purchase and/or ownership of firearms.

53.   HB 451's unconstitutional licensing process reduces fundamental rights to mere privileges to be granted or denied at the whim of public officials and private individuals, accountable to no one, to whom the State of Delaware has impermissibly delegated the authority to review and pass judgment on applicants.

54.   HB 451's unconstitutional licensing process conditions the grant of what is a fundamental right of all citizens upon vague, arbitrary, and discretionary requirements such as proof of "good moral character." *Bruen*, 142 S. Ct. 2111 at 2135 n.1 (noting with disapproval states with licensing schemes that give officials discretion to deny licenses based on a perceived lack of suitability).

55.   HB 451's unconstitutional licensing process is arbitrary, discretionary, lengthy, expensive, invasive, and unnecessary. Every firearm purchaser must already pass a background check under federal law which the federal government

130233262.2

has streamlined via computer to take place in mere minutes. *See Bruen*, 142 S. Ct. 2111 at 2138 n.9 (declining to rule out constitutional challenges to licensing regimes where, for example, lengthy wait times in processing license applications or high fees deny ordinary citizens their right to public carry.)

56.  Ordinary, law-abiding Delawareans ages 18 years-old through 20 years-old are completely barred from purchase and/or ownership of common firearms—mislabeled as "deadly weapons" prior to applying and participating in HB 451's exception via an unconstitutional registration and licensing process.

57.  The licensing process incorporated through HB 451 heavily discriminates against and acts as a barrier to the acquisition of commonly used firearms by the poor or disadvantaged citizens of State of Delaware, who often live in urban areas where access to a public shooting range is effectively non-existent and where the licensing process is prohibitive. The underlying intent and practical effect of these requirements is the disenfranchisement of Second Amendment rights for the poor and disadvantaged. These and the other requirements imposed by the registration and licensing process of the Regulatory Scheme form undue and effective practical barriers to the exercise of fundamental constitutional rights preserved by the Second Amendment.[9]

---

[9] An overtly racist history of gun licensing and registration laws has been evident since around the time of America's founding. The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro,

## IV.    THE NATION'S LONG HISTORY OF ENSURING THE RIGHTS OF 18 THROUGH 20 YEAR-OLD CITIZENS TO BEAR ARMS

58.    The tradition of young adults owning, keeping, and bearing arms is deep-rooted in our law and custom. As far back as medieval times, able-bodied men aged fifteen and older were compelled to own and possess personal arms and had a duty, when asked, to use those personal arms to maintain the king's peace and protect their communities and property. *See* David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 788 (2014).

59.    "[T]he militia from its obscure origin in Saxon times has been composed of all subjects and citizens capable of bearing arms, regardless of age or parental

---

mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823). An exception was provided, however, for "negroes, mullattos, or Indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.* Delaware, in its early history, like many states, used laws to restrict the use of firearms as a means of racial discrimination. *Laws of the State of Delaware*, Chapter 94, Vol. 12, March 6, 1861, at Section 7 (prohibiting free blacks from possessing guns); Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? at 233 (2021); Stephen B. Tahmassebi, *Gun Control and Racism*, 2 Civil Rights Law Journal 67 (1991) (describing history of gun control coinciding with oppression of blacks); *First Conviction under Weapon Law; Judge Foster Gives Marino Rossi One Year for Arming Himself…*" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting Italian immigrants to restrict their Second Amendment rights.)

130233262.2

22

authority." S.T. Ansell, *Legal and Historical Aspects of the Militia*, 26 YALE L.J. 471, 473 (1917).

60.   And the militia was not the only institution imposing an obligation to acquire and possess arms: "[u]nder English law originating long before the Norman Conquest of 1066, all able-bodied men were obliged to join in the hutesium et clamor (hue and cry) to pursue fleeing criminals." Kopel, *supra* n.8, at 771–72.

61.   More generally, sheriffs, coroners, and magistrates could "summon all able-bodied males to assist in keeping the peace," *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L. J. 495, 535 (2019), and the traditional minimum age for these law-enforcement duties was typically 15 or 16 years old. Kopel, *supra* n.6, at 788, 790.

62.   For example, at common law, the sheriff could command citizens—already armed—to help suppress riots, arrest criminals, and otherwise enforce civil processes. *Id*. at 792.

63.   This deep-rooted tradition was brought across the Atlantic by the American colonists. The U.S. Supreme Court in *Heller* confirmed that the "militia" in colonial America consisted of "a subset of 'the people'—those who were male, able bodied, and within a certain age range." 128 S. Ct. at 2783.

64.   Before ratification, when militias were solely defined by state law, most colonies and states set the age for militia enlistment at 16.

65.   Every colony passed, at some point, laws identifying 18 year-olds as persons required to own and possess arms.

66.   Delaware did not enact a militia statute until 1740. It required "all the inhabitants and freemen" aged fifteen to sixty-three to "provide and keep . . . a well-fixed firelock or musket," plus ammunition supplies and cleaning tools. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, at 556.

67.   Delaware's pre-Revolutionary militia acts recognized owning, keeping and bearing arms as a right and a duty, requiring each male to "provide himself" with a firearm and "to keep such Arms and Ammunition by him." *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* 171 (Philadelphia: B. Franklin, 1741).[10]

68.   After the Revolution began, Delaware enacted several militia statutes in 1778. The foundational act "establishing a Militia within this State" included "each and every able-bodied, effective, Male white Person between the Ages of Eighteen and Fifty." *Id*.

69.   Like most states, Delaware enacted a new militia law after the federal Uniform Militia Act passed in 1792. Delaware's 1793 act included "each and every

---

[10] As an example, for security against pirates, "all the Inhabitants and Freemen" of the seaport of Lewes were obliged to meet armed on the sound of the alarm. *Id*. at 152.

free able bodied white male citizen of this state, who is or shall be of the age of eighteen years, and under the age of forty-five years." *Id*. at 558.

70.   That federal legislation, The Militia Act of 1792 (Uniform Militia Act) was signed into law by President Washington on May 8, 1792. 1 Stat. 271 (1792) (Uniform Militia Act) (UMA). The Act provided:

> That each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia, by the Captain or Commanding Officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this Act. And it shall at all time hereafter be the duty of every such Captain or Commanding Officer of a company, to enroll every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of 18 years, or being at the age of 18 years, and under the age of 45 years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrollment, by the proper noncommissioned Officer of the company, by whom such notice may be proved. That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powderhorn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned Officers shall severally be armed with a sword or hanger, and espontoon; and that from and after five years from the passing of this Act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound; and every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold

130233262.2

the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.
*Id*.

71.   Congress made no changes to the 1792 Militia Act until the Civil War, when an 1862 revision removed the word "white" from the definition of the militia. Militia Act of 1862, 12 Stat. 597 (July 17, 1862).

72.   The 1792 Act was not repealed and replaced until 1903, whereupon the Dick Act took its place, defining the modern militia as consisting of all-able-bodied male citizens between 18 and 45 years of age, and aliens who have declared intent to naturalize. Dick Act, ch. 196, 32 Stat. 775 (1903).

73.   Further, in 1972, Delaware passed legislation confirming that 18 year-olds are adults under the law of Delaware, stating, "[a] person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." 1 *Del. C.* § 701.

74.   In *Heller*, the Supreme Court made clear that "the people" protected by the Second Amendment was not restricted to only those in "the militia," however the Court also explicitly confirmed that "the militia" consisted of a subset of "the people" with Second Amendment rights. *Id*. at 651.

75.    Further, the Delaware Supreme Court, in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 642 (Del. 2017), specifically endorsed the above *Heller* interpretation.

### V.    DEFENDANTS' LAWS DO NOT SERVE THEIR STATED PURPOSE TO PROVIDE FOR THE SAFETY OF 18 YEAR-OLDS THROUGH 20 YEAR-OLDS WHOSE SECOND AMENDMENT AND DELAWARE CONSTITUTIONAL RIGHTS THEY HAVE RESTRICTED

76.    While the precedent of *Heller* and now *Bruen* have made perfectly clear that "means-end scrutiny" has no place in assessing the constitutionality of legislation restricting Second Amendment rights, it is still notable that HB 451 undoubtedly does not serve, but rather detracts, from its stated purpose.

77.    In its preamble, HB 451 states that it endeavors to place restriction on "young people" purchasing firearms "for their safety and the safety of our communities."

78.    However, violent crime rates among young adults 18 years-old through 20 years-old are very low. Based on the most recent data, covering 2016-2018, at most, just 6/100th of 1% will commit a homicide during the age span from 18 to 20, and 1.04% will commit a robbery, 1.02% will commit an aggravated assault, and 2.12 % will commit any of these three offenses. *Resident population by age in 2016*: U.S.        Census        Bureau        website        at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=

130233262.2

27

bkmk#; *Arrests by age and by offense type*: *U.S. Federal Bureau of Investigation, Uniform Crime Reports, annual issues, covering 2016-2018*, Federal Bureau of Investigation website at https://ucr.fbi.gov/crime-in-the-u.s.

79.   Conversely, young adults have the highest rates of violent crime "victimization" and thus are especially likely to need effective means of self-protection. *Criminal Victimization, 2017.* U.S. Bureau of Justice Statistics (2018), https://www.bjs.gov/content/pub/pdf/cv17.pdf.

80.   Further, self-defense with a gun is highly effective. Crime victims who use this self-protection strategy are less likely to be injured or lose property than victims who use other strategies, including nonresistance. Jongyeon Tark & Gary Kleck, *Resisting Crime: The Effects of Victim Action on the Outcomes of Crime,* 42 CRIMINOLOGY,  Nov. 2004, 861, 861-909**,** Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes | Office of Justice Programs (ojp.gov).

81.   Experience with age-based restrictions on purchase and possession of firearms indicates that they have no detectable crime-reducing effect. Gary Kleck & E. Britt Patterson, *The Impact of Gun Control and Gun Ownership Levels on Violence Rates* 9 JOURNAL OF QUANTITATIVE CRIMINOLOGY 249, 249-287 (1993); Gary Kleck, Tomislav Kovandzic & Jon Bellows, *Does Gun Control Reduce Violent Crime*? 41 CRIMINAL JUSTICE REVIEW 488, 488-513 (2016); Gary Kleck, *Regulating*

*Guns Among Young Adults,* 44 AMERICAN JOURNAL OF CRIMINAL JUSTICE, at 689-704 (2019).

82.   More specifically applicable to HB 451's ban on gun purchases by young adults, Kleck found that the ban on handgun purchases by person ages 18 years-old to 20 years-old implemented in the Federal Gun Control Act of 1968, from which HB 451 took inspiration, had no impact on violent crime among persons in this age group, as indicated by age specific arrest data. This study also found no effect of state bans on gun carrying/possession by persons aged 18 years-old to 20 years-old. Kleck, *Regulating Guns Among Young Adults*, 44 American Journal of Criminal Justice 689, 689-704.

83.   HB 451, oddly, also appears to allow possession and use but not purchase or ownership of a deadly weapon. Apparently, Delaware believes 18 through 20 year-old Delawareans are mature enough to use firearms, but not to purchase or own them.

## VI.   DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AMENDMENT AND THE BROADER RIGHTS AFFORDED BY THE DELAWARE CONSTITUTION

84.   The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

85.   "[I]t 'has always been widely understood that the Second Amendment codified a pre-existing right.' The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (citing *Heller*, 554 U.S. at 599.)

86.   The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

87.   The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

88.   The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634 (2008).

89.   "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-635.

90.   In *Heller*, the Supreme Court refuted the argument that "the people" protected by the Second Amendment was restricted to only those in "the militia,"

however the Court also explicitly confirmed that "the militia" consisted of a subset of "the people" with Second Amendment rights—those who were male, able-bodied and of a certain age range. *Id*. at 651.

91.    In the wake of the Supreme Court's decisions in *Heller* and *McDonald*, Courts of Appeals developed a two-step test to assess Second Amendment claims. But in *Bruen*, the Supreme Court rejected that two-step test as inconsistent with *Heller* and *McDonald* and as containing one step too many. The Court determined that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

92.    In so doing, the Supreme Court held that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (citing *Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

93. *Bruen*, thus, reinforced the *Heller* approach to assessing a Second Amendment challenge by (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Second Amendment to demark the limits on the exercise of that right. *Id*. at 2127-28.

94. *Bruen* further reinforced reasoning by analogy, maintaining that "[m]uch like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present- day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. at 2132.

95. In so doing, *Bruen* also reinforced *Heller's* determination that there is no tradition, in this Nation, of banning merely dangerous arms—just a tradition of banning "dangerous *and* unusual" arms. *See Bruen*, 142 S. Ct. at 2128 (emphasis added)

96. Therefore, no matter what ill-fitting analogue the State of Delaware attempts to put forward to justify HB 451, it will fail because HB 451 is a ban on an "entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," and the purported analogues the State suggests cannot justify the Regulatory Scheme.

130233262.2

32

97. *Heller* and *Bruen* did the requisite historical review on the issue of bans of arms in common use for lawful purposes by law-abiding citizens and made clear there are no historical analogues for bans like HB 451.

98. The firearms at issue in this case, labeled as "deadly weapons" and/or "dangerous weapons" and banned as to Delawareans ages 18 years-old through 20 years-old under HB 451 are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. And they are, moreover, exactly what they would bring to service, e.g., militia duty and repelling violent mobs, should that be necessary.

99. Plaintiffs and their members, age 18 years-old through 20 years-old, have a constitutional right to make use of common firearms, banned by HB 451, for effective self-defense and not to be disarmed by HB 451 and its enforcement by Defendants.

100. The State must permit ordinary, law-abiding citizens, aged 18 years-old through 20 years-old, to keep and bear common firearms, deemed "deadly weapons" under HB 451, for lawful purposes.

101. The right of Delawareans ages 18 years-old through 20 years-old, to keep and bear common firearms, deemed "deadly weapons" and/or "dangerous weapons" under HB 451, guaranteed under the Bill of Rights, cannot be subjected to laws and regulations such as HB 451's licensing and registration process, that act

130233262.2

33

as an unconstitutional burden preventing law-abiding citizens from keeping and bearing common firearms.

102.   The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller* 554 U.S. at 636.

103.   Yet, this is precisely how HB 451 operates, completely shutting out ordinary, law-abiding citizens, ages 18 years-old through 20 years-old, from exercising their rights in the State—and making a "policy choice" that the Federal and State Constitutions have "taken off the table."

## VII.   THE EFFECT ON PLAINTIFFS

104.   Plaintiff Gavin J. Birney is a resident of Milton, Delaware, and a member of DSSA and BRPC, who owns firearms deemed "deadly weapons" and/or dangerous weapons" under HB 451. Birney is an honor roll student and is the president of his school's chapter of the National Honor Society. Birney has taken marksmanship classes at his high school and has attended firearm training courses from Triangle Self-Defense and the United States Concealed Carry Association.

105.   Birney intends and desires to exercise his right to keep and bear arms by continuing to possess and purchase firearms deemed "deadly weapons" and/or "dangerous weapons" by HB 451. Birney would continue to purchase and possess these firearms were it not for Defendants' enforcement of Delaware's outright ban

130233262.2

on these common arms for Delawareans ages 18 years-old through 20 years-old. Particularly, Birney would acquire and possess handguns for purposes of self-defense and for purposes of participating in International Defensive Pistol Association competitions with his father. Further, Birney currently possesses firearms deemed "deadly weapons" and/or "dangerous weapons" by HB 451 that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of HB 451. Birney also does not currently have a license to carry concealed weapons pursuant to 11 *Del. C.* § 1441, which would purportedly be "exempt" from the ban of HB 451.

106.    Members of Plaintiff DSSA, 18 years-old through 20 years-old, intend and desire to acquire, possess, and transport pistols, rifles, and shotguns banned by HB 451 as "deadly weapons" and/or "dangerous weapons" and are subject to and adversely affected by each and every restriction on "deadly weapons" and/or "dangerous weapons" (including the definitions thereof) articulated in this complaint.

107.    But for HB 451, some DSSA members 18 years-old through 20 years-old would possess handguns designated as "deadly weapons" and/or "dangerous weapons" under HB 451. Such handguns are commonly used for self-defense and target-shooting.

108.   Further, some DSSA members are in the business of selling firearms in the State of Delaware. DSSA members' businesses are subject to and adversely affected by the restrictions on "deadly weapons" and/or "dangerous weapons" as defined and articulated in this complaint.

109.   Plaintiff BRPC is a competitive shooting club that has members 18 years-old through 20 years-old, that also conducts education, training, and competitive shooting events. BRPC and its members are subject to and adversely affected by the restrictions on "deadly weapons" and/or "dangerous weapons" as defined and articulated in this complaint.

110.   BRPC conducts competitive shooting events that involve the use of handguns. Further, BRPC membership permits the immediate family living in the same household as a named member to participate in the same club activities and competitive shooting programs as the named member. As a direct result of the bans of HB 451, BRPC and its members 18 years-old through 20 years-old are  prohibited from exercising their right to keep and bear arms by acquiring, "deadly weapons" and/or "dangerous weapons" for use in club activities. The restrictions on "deadly weapons" and/or "dangerous weapons" as defined, and articulated in this complaint, adversely affect the continued operation of BRPC and the rights of its individual members.

## COUNT I

**42 U.S.C. § 1983 Claim for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution**

111.   There is an actual and present controversy between the parties.

112.   The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states, including those 18 years-old through 20 years-old, their fundamental right to keep and bear arms, both in the home and in public.

113.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

114.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, own, receive or possess common firearms for all lawful purposes, including self-defense.

115.   Under HB 451, the State bans Delawareans 18 years-old through 20 years-old from purchasing and owning, "deadly weapons" that are common firearms. 11 *Del. C.* § 1448(a)(5).

116.   HB 451's licensing process further violates the Second Amendment of the United States Constitution because:

(a)   it denies a constitutional right until a license to exercise that right is issued;

(b)     the licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome, vague and arbitrary;

(c)     the licensing process, both on the face of the statute and as applied, was designed to deny constitutional rights and make it more burdensome to exercise them…

117.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

118.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of their fundamental constitutional rights in the State of Delaware, including Plaintiffs, Birney, DSSA and its members and BRPC and its members, through Defendants' enforcement and implementation of HB 451.

119.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## COUNT II

### Deprivation of Plaintiffs' Rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution

120.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

121.   There is an actual and present controversy between the parties.

122.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

123.   All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

124.    HB 451 also identifies a limited subset of individuals to which HB 451 does not apply, as follows:

(a)    An active member of the Armed Forces of the United States or the National Guard;

(b)    A qualified law-enforcement officer as defined in § 1441A of this title;

(c)    A person who has license to carry a concealed deadly weapon pursuant to § 1441 of this title. 11 *Del. C.* § 1448 (a)(5)(b)(1)-(3).

125.   HB 451's exception, or condition to exercise a right on a license to carry a concealed deadly weapon application, is based on a process that further premises the grant of what is a fundamental right of all citizens upon vague, arbitrary, and discriminatory requirements such as proof of "good moral character."

126.   The law thus discriminates in favor of selected Delawareans 18 years-old through 20 years-old and against other law-abiding Delawareans 18 years-old through 20 years-old, such as Plaintiffs Birney, similarly situated DSSA members, and similarly situated BRPC members.

127.   HB 451's exceptions arbitrarily and unreasonably afford a privilege—ownership of weapons—to one group of individuals that is denied to others and is unconnected to any legitimate state interest.

128.   Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived persons of the fundamental right to Equal Protection in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of HB 451's enumerated exceptions, which is causing Plaintiffs irreparable harm for which they seek declaratory relief.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

(a)   A declaratory judgment that HB 451 and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Birney, DSSA and its similarly situated members, and BRPC and its similarly situated members, from exercising their fundamental right to keep and bear arms, including offering for sale, acquiring, purchasing,  owning and lawfully using common firearms banned under HB 451, for all lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

(b)   A declaratory judgment that HB 451 and all related regulations, policies, and/or customs designed to enforce or implement the same violates

Plaintiffs Birney, DSSA and its similarly situated members, and BRPC and its similarly situated members, rights to Equal Protection under the Fourteenth Amendment to the U.S. Constitution. Declaratory judgment is proper in this matter, pursuant to 10 *Del. C.* § 6501 as there is a real controversy between the parties, an interest is adversely affected, and the issue is ripe for resolution;

(c)     Attorney's fees pursuant to 42 U.S.C. § 1988.

(d)     Any and all other and further relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully submitted,

LEWIS BRISBOIS
  BISGAARD & SMITH LLP

By:  */s/ Francis G.X. Pileggi*
  Francis G.X. Pileggi (DE Bar No. 2624)
  Sean M. Brennecke (DE Bar No. 4686)
  500 Delaware Ave., Suite 700
  Wilmington, Delaware 19801
  302-985-6000
  Francis.Pileggi@LewisBrisbois.com
  Sean.Brennecke@LewisBrisbois.com

    and
  Alexander MacMullan, Esquire
  (*Pro Hac Vice Motion Forthcoming*)
  552 E. Swedesford Road, Suite 270
  Wayne, Pennsylvania 19087
  Alexander.MacMullan@LewisBrisbois.com

Dated:  October 18, 2023          *Attorneys for Plaintiffs*

130233262.2